Filed 5/30/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GERAWAN FARMING, INC., <br><br> Petitioner, <br><br> v. <br><br> AGRICULTURAL LABOR RELATIONS BOARD, <br><br> Respondent; <br><br> UNITED FARM WORKERS OF AMERICA, <br><br> Real Party in Interest. | F073720 <br><br> (42 ALRB No. 1) <br><br> **OPINION** |

ORIGINAL PROCEEDING; petition for writ of review.

Irell & Manella, David A. Schwarz, S. Adina Stohl; Barsamian & Moody, Ronald H. Barsamian; Michael P. Mallery; and Michael W. McConnell for Petitioner.

Laura F. Heyck and Todd M. Ratshin for Respondent.

Martinez Aguilasocho & Lynch, Mario Martinez and Edgar Iván Aguilasocho for Real Party in Interest.

-ooOoo-

This case involves the intersection of two of the fundamental purposes of the Agricultural Labor Relations Act (Labor Code,[1] § 1140 et seq.; the ALRA): one is the policy to provide agricultural workers with the right to choose in questions of labor representation through a secret ballot election process (§§ 1140.2, 1152, 1156-1156.7; see *J.R. Norton Co. v. Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 8, 34); the other is the policy to prevent and remedy unfair labor practices committed by employers.[2] (§§ 1160-1160.9.) Both of these important statutory goals were directly at stake—and to some extent at odds—in the proceedings below before the Agricultural Labor Relations Board (the Board). An election to decide whether to decertify an incumbent union (the United Farm Workers of America or the UFW) had been ordered by the Board based on an employee petition, and a vote was actually taken, but from the Board's perspective there were lingering issues of whether alleged misconduct by the employer, Gerawan Farming, Inc. (Gerawan), may have tainted the employees' decertification effort. The ballots were impounded and administrative proceedings conducted. In the end, as reported in its decision in *Gerawan Farming, Inc.* (2016) 42 ALRB No. 1, the Board nullified the employees' election as a remedy for Gerawan's purported unfair labor practices. By petition for review under section 1160.8, Gerawan challenges not only the Board's findings of unfair labor practices, but also the remedy imposed of setting aside the election. As more fully explained herein, we conclude the Board erred in several of its findings of unfair labor practices as well as in the legal standard applied in reaching its remedial conclusions. Accordingly, we set aside 42 ALRB No. 1, in part, and remand the

---

[1]    Unless otherwise indicated, all statutory references are to the Labor Code.

[2]    Of course, the ALRA also seeks to prevent and remedy unfair labor practices committed by unions, but here only the employer's conduct is at issue.

matter to the Board to reconsider its election decision in a manner consistent with the views set forth in this opinion.[3]

## SYNOPSIS OF CASE

Our factual introduction to this case is presented in two parts. In this initial part, we focus attention on key procedural events that culminated in Gerawan's writ of review, including the election itself. We also provide an introductory outline of our legal analysis of certain of the material issues. By framing these core events and issues up front, we hope to minimize the risk to the reader of losing the forest for the trees in this lengthy and complicated opinion. After this focused synopsis is given, a more comprehensive overview of the factual and procedural background will follow.

On October 25, 2013, farmworker Silvia Lopez (also referred to as the petitioner) filed a petition for decertification to the Board, signed by herself and a considerable number[4] of her coworkers at Gerawan, seeking an election to allow the agricultural workers at Gerawan to decide for themselves whether or not the incumbent union, the

---

[3]     We note that two related writ proceedings have been filed. Silvia Lopez (the decertification petitioner) and Gerawan have each filed petitions for writ of mandate to this court (filed as case No. F073730, *Lopez v. Agricultural Labor Relations Board*, and case No. F073769, *Gerawan Farming, Inc. v. Agricultural Labor Relations Board*), separately asserting (among other things) that the Board's decision and order in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1 violated their statutory and other rights by setting aside the election without adequate legal grounds and by failing to count the ballots. We have deferred any decision on whether to entertain the merits of the petitions for writ of mandate until after the issuance of our opinion on the present petition for review.

[4]     Although the Board never disclosed the number of signatures received, an attorney for Gerawan estimated that the petition for decertification likely included more than 2,500 farmworker signatures. We mention this only to glean an approximate number or a ballpark estimate; we are not making findings. The minimum quantity of signatures normally required is a "majority of the currently employed employees in the bargaining unit" (§ 1156.3, subd. (a)), assuming that the number of those currently employed is not less than 50 percent of "peak" employment for that calendar year. (*Id.*, subd. (a)(1).)

3.

UFW, would continue to be their certified bargaining representative.[5] Under the relevant provisions of the ALRA, an election will be ordered if an adequate threshold showing has been made such that the Board has reasonable cause to believe that a bona fide question of representation exists. (See §§ 1156.3 & 1156.7.)[6] Here, in response to the petition for decertification, and based upon its Regional Director's determination that the petition met the statutory requirements for holding an election,[7] the Board ordered an election "be held on Tuesday, November 5, 2013." On that date, the farmworkers at Gerawan cast their votes in a secret ballot election conducted by Board staff. It was arguably the largest election in ALRA history. However, rather than promptly tallying the ballots[8] preliminary to a consideration of any election objections, the Board had ordered the

---

[5] The last and only time that a representation election was held among Gerawan's agricultural workers was in 1990, which led to the UFW's certification by the Board in 1992. Afterwards, the UFW was apparently absent for nearly two decades, only to return in late 2012. Workers at the hearing below consistently testified that the first time they heard of a union at Gerawan was in 2012 or 2013.

[6] The case law describes this as a "showing of interest." The term "showing of interest" generally refers to the threshold number of worker signatures needed to obtain a representation election under the relevant statutes (see § 1156.3 or 1156.7). It serves the administrative function of confirming that the time and expense of conducting an election are warranted. (See *Nishikawa Farms, Inc. v. Mahony* (1977) 66 Cal.App.3d 781, 790-792.)

[7] The Regional Director, Silas Shawver, determined that a showing of interest had been made, but for reasons extrinsic to the prima facie sufficiency of the petition (i.e., alleged *employer* misconduct), sought to block any election. That blocking move was promptly overruled by the Board.

[8] The tally (or count) of votes is distinct from certification of the results. (See, e.g., Cal. Code Regs., tit. 8, §§ 20360, 20365 & 20380; *Bayou Vista Dairy* (2006) 32 ALRB No. 6, pp. 7-8 [while the process for election objections proceeded in considering certification, Regional Director ordered to open and count the ballots and issue a tally]; *Mann Packing Company, Inc.* (1990) 16 ALRB No. 15, pp. 1-3; *T. Ito & Sons Farms* (1983) 9 ALRB No. 56, pp. 1-2 [tally provided, election objections considered, followed by certification of results]; see also § 1156.3 [distinguishing election results, objections, and certification].)

ballots impounded. To the present day, the ballots remain impounded (i.e., in storage under the Board's possession and control), and they have never been opened and counted.

In September of 2014, more than 10 months after the election, a consolidated evidentiary hearing was commenced before an administrative law judge (ALJ) assigned by the Board to hear the following issues together: (i) the UFW's election objections, and (ii) the General Counsel of the Board's (the General Counsel's)[9] related claims that Gerawan committed unfair labor practices (e.g., employer instigation of and improper assistance to the decertification movement) which allegedly impacted the validity of the decertification petition and required the election to be set aside.[10] Four distinct parties participated through their respective counsel in the lengthy ALJ hearings, including the General Counsel/the Board, Gerawan, the UFW, and Silvia Lopez (as the petitioner). After the conclusion of the evidentiary proceedings, the ALJ issued a written decision finding that Gerawan committed pre-election unfair labor practices that, in the ALJ's view, tainted the decertification petition. Although the ALJ rejected as unsupported the allegations of employer instigation, the ALJ found that unlawful employer assistance and other violations had occurred. Gerawan's offending conduct was found to include, among other things, assistance of the workers' decertification movement by means of discriminating in favor of the pro-decertification signature gatherers, allowing Silvia Lopez to work reduced hours (which she often used to gather more signatures), and

---

[9] The General Counsel of the Board (or the General Counsel) is an appointed position distinct from the members of the Board, and among other responsibilities conducts the prosecution of unfair labor practices. The General Counsel is appointed by the Governor. (§ 1149.)

[10] Election objection procedures are set forth in section 1156.3, and proceedings under that section are commonly referred to as certification proceedings; whereas, unfair labor practice proceedings are addressed in section 1160.3, and final orders in unfair labor practice proceedings are reviewable in the courts of appeal under section 1160.8. Here, as noted, the two types of proceedings were *consolidated*, which becomes one of the significant factors in our analysis of whether we may address the election remedies.

failing to take action in response to certain protests and work stoppages on the part of pro-decertification workers. As a remedy for Gerawan's misconduct, the ALJ concluded that the petition for decertification would have to be dismissed and the election set aside. Exceptions to the ALJ's decision were made to the Board, and the matter came before the Board for its review. With minor changes, the Board affirmed the ALJ's decision and rationale in its entirety, including the relief granted. Thus, the Board upheld the dismissal of the decertification petition and nullification of the election based upon the findings that Gerawan committed pre-election unfair labor practices that tainted the decertification effort. The Board's decision was reported as *Gerawan Farming, Inc., supra,* 42 ALRB No. 1.

By petition for review under section 1160.8, Gerawan challenges the decision of the Board in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1. As noted, Gerawan's petition for review not only attacks the findings that it committed unfair labor practices, but also the drastic remedy imposed by the Board of setting aside the employees' secret ballot election. The Board and the UFW object to any review by this court of the Board's election-related decision, insisting that Gerawan must first follow the technical refusal to bargain procedure before any judicial review of that particular determination may be obtained.

Under the unique procedural posture of this case, where (i) the technical refusal to bargain procedure was wholly inadequate under circumstances created by the Board's own doing,[11] *and* (ii) the relief granted by the Board of setting aside the election in the consolidated hearing was based upon and inextricably intertwined with the Board's unfair labor practice findings, we agree with Gerawan that our review may include *both* the unfair labor practice findings *and* the legal soundness of the conclusions and the election-

---

[11]    As will be discussed, *post*, where the Board fails to provide a tally of the vote (as was the case here), the technical refusal to bargain remedy is rendered inadequate as a matter of law.

related relief premised on those findings. To some extent, then, we will consider the remedy imposed by the Board of setting aside the election. At the same time, we take a guarded approach. Since the Board has been entrusted by the Legislature with discretion to make election certification decisions (§§ 1156.3, 1156.7), our intention is to correct legal error, not substitute our discretion for that of the Board.

Having reviewed the entire record, we conclude that several of the unfair labor practice findings relied on by the Board were unsupported by the record as a whole. This alone would warrant returning the case to the Board to reconsider its remedy. More than that, however, it appears that the Board applied an incomplete or inadequate legal standard in reaching its decision to set aside the election. Specifically, the Board applied a narrow "taint" (or taint on the petition) standard under which it failed to meaningfully consider whether a reasonable basis existed to conclude that Gerawan's misconduct interfered with the employees' ability to exercise free choice in the election. Without that issue being squarely addressed by the Board and such interference reasonably found to have occurred on the record before it, the drastic remedy of throwing out the election in a case such as this one[12] would appear to be either arbitrary or punitive (or both)—i.e., *unnecessarily* disenfranchising the employees as a punishment for the employer's wrongdoing. In essence, the Board so narrowly focused on punishing the employer that it effectively lost sight of the correlative statutory value of protecting the farmworkers' right to choose, which was and is a fundamental part of the Board's mission under the ALRA. We believe the Board's one-sided approach constituted legal error, as more fully explained in the discussion portion of this opinion. For these and other reasons, we vacate the portion of the Board's decision in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1 dismissing the petition and setting aside the election, and remand the matter back to

---

[12]    We note at the outset that neither instigation *nor* pervasive or egregious employer intervention in the decertification petitioning process occurred here.

the Board to reconsider its decision in light of the corrected findings and legal standard set forth in this opinion.[13] For purposes of remand, we also address certain recurring issues that bear upon the remanded proceedings, including the need to issue a tally of ballots.

## FACTUAL AND PROCEDURAL BACKGROUND

At this point, we present a more comprehensive factual and procedural background. We do so in an effort to provide the surrounding context within which the relevant events occurred as well as to summarize the historical flow of factual and procedural events. This is a complicated case, the particular events of which are difficult to appreciate apart from an understanding of the larger whole, and so we think it is best not to view matters in a vacuum. Although we summarize some of the testimony in this background section, we do so merely to set the stage for our later discussion. We are not competing here with the formal findings of the ALJ or the Board. Any disagreements we have with the Board's factual findings on particular issues are separately discussed, later herein, in the "Discussion" portion of this opinion.

Gerawan and the UFW

Gerawan is the largest grower of tree fruit in California, both in terms of the number of employees and the amount of fruit that it grows. A family-owned farming business, Gerawan's owners and officers include Ray Gerawan, Daniel (Dan) Gerawan and Mike Gerawan, among others. In addition to growing and harvesting tree fruit such as peaches, nectarines, plums and apricots, Gerawan also grows and harvests substantial quantities of table grapes and wine grapes. Gerawan's extensive farming operations are conducted on thousands of acres of farmland in two main locations: the west side ranches in the Kerman area, and the east side ranches in the Reedley/Sanger area.

---

[13] Generally speaking, when the Board applies the wrong standard, we return the case to the Board so that it can apply the correct standard. (*J.R. Norton Co. v. Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 38-39.)

8.

Although the number of agricultural workers employed by Gerawan during the time frame of the second decertification[14] petition in the fall of 2013 is not precisely stated in the record, it was estimated that, during the tree fruit harvest, there would be about 50 to 55 crews, with 20 to 50 workers per crew.[15]

The UFW is a labor organization (or union) as defined by section 1140.4. In 1992, following a 1990 election, the UFW was duly certified by the Board as the collective bargaining representative of Gerawan's agricultural employees. According to Gerawan, after some initial bargaining sessions at that time, the UFW disappeared from the scene and made no contact whatsoever for nearly two decades before it returned in late 2012. At the administrative hearing below, the scope of examination was generally limited to the four- or five-year period prior to the decertification election. The ALJ did not permit evidence to establish an abandonment "defense," but did allow workers to testify whether they felt abandoned by the UFW in a colloquial sense, rather than as a legal conclusion.[16]

---

[14] As will be seen, the successful petition was the second petition filed with the Board; the first one having been dismissed by the Regional Director.

[15] Gerawan's workforce included both direct hire employees and farm labor contractor (or FLC) crews. As in most farming operations of this size, the number of agricultural workers fluctuated significantly throughout the year based on need, with the highest number of workers employed at the peak of harvest season. The UFW National Vice President, Armando Elenes, who represented the UFW in the negotiations with Gerawan during 2012-2013, estimated that once a contract was implemented with Gerawan, the union would gain roughly 3,000 Gerawan agricultural employees as new members (measured as an annual average), the number being considerably higher during peak (i.e., approximately 5,000) but much lower post-harvest (i.e., approximately 1,000 to 1,500). Again, we only mention such numbers to offer something of a rough ballpark estimate; we are not purporting to make any specific findings on that issue.

[16] At that time, the issue of abandonment was before the California Supreme Court, with the Board taking the position that abandonment based on union absence could not be raised by an employer to challenge a union's status as bargaining representative. The California Supreme Court recently vindicated the Board's position on that issue. In *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, the Supreme Court reversed this court and held that an employer is not entitled to defend against a union's request to commence mandatory mediation and conciliation

9.

Gerawan asserted that during the intervening years after the UFW disappeared, Gerawan's agricultural operations and workforce grew substantially in size, its methods of production changed and evolved, while Gerawan allegedly "became and maintained its position as the highest paying tree fruit and table grape farming operation" in the region.

The UFW Returns in Late 2012

In October of 2012, the UFW sent a letter to Gerawan reasserting its status as the certified bargaining representative of Gerawan's agricultural employees and demanding that Gerawan bargain in good faith. The letter also insisted that Gerawan provide to the UFW the names and addresses of all of Gerawan's agricultural employees. Gerawan provided employee information to the UFW, and negotiations between Gerawan and the UFW commenced in early 2013.

Gerawan's Communications to its Employees

Gerawan communicated with its employees about these significant new developments. A series of written notices (or mailers) were distributed to Gerawan's employees, either by mail or as an enclosure in the envelopes that contained the employees' paychecks. The first of these mailers, dated November 13, 2012, was signed by "Ray, Mike, and Dan Gerawan" and told the field workers the following message: "22 years ago, the United Farm Workers won an election to represent the agricultural employees of Gerawan Farming. However, except for one meeting 20 years ago, they have not contacted us since then. A few weeks ago we received the attached letter from the UFW demanding that we turn over your personal information to them and that we begin negotiating with them. [¶] One of the reasons we have to turn over your personal

---

proceedings (or MMC, pursuant to section 1164 et seq.) on the ground that the union had abandoned its status as the employees' bargaining representative. (*Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.*, *supra*, 3 Cal.5th at p. 1160.) That same decision also rejected various arguments that the MMC statute was unconstitutional. (*Id.* at p. 1146; see also, *Tri-Fanucchi Farms v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1161 [abandonment may not be raised by employer as a defense to bargaining].)

information to the UFW, including your home address, is because the UFW normally uses such information to visit employees' homes. It is up to you whether you wish to talk to them if they visit your home. [¶] As your employer, we did not want this to happen but we have no control over this. The UFW says they represent you, even though you probably did not even work here 22 years ago and some of you were not even born yet."

Over the next several months, Gerawan sent follow-up mailers. The follow-up mailers were written in a question-and-answer format. They purported to respond to a few basic, recurring questions or misconceptions (e.g., will the union likely make the workers pay dues?), but otherwise referred the employees to the ALRB as the appropriate agency to which they may express concerns or ask any further questions, noting that "[e]mployers are prohibited from helping their employees in such matters."[17] A subsequent mailer in April of 2013 was more specific, informing employees that the UFW was seeking "3%" of their paychecks as dues (per the most recent negotiations), and that it (the UFW) would have Gerawan fire employees who refused to pay any money to the union. This last mailer also told the workers, "AS ALWAYS, OUR DOOR IS OPEN," and listed a phone number for Ray, Mike, or Dan Gerawan, and also for Jose Erevia, the human resources manager at Gerawan who had the title "Employee Outreach and Regulatory Compliance Manager."

---

[17] One of the questions posed in a follow-up mailer was "When do we vote?" to which the mailer answered there is "no vote planned" because the union says it already represents you. The same mailer explained further that employees could contact the ALRB to learn about how elections are scheduled and conducted. In this regard, we note that in *Peter D. Solomon and Joseph R. Solomon, dba Cattle Valley Farms/Transco Land and Cattle Co.* (1983) 9 ALRB No. 65, pp. 7-8, the Board recognized the following principle: "[A]n employer does not violate the Agricultural Labor Relations Act (ALRA or Act) by responding to employees' questions or inquiries concerning their rights, including the right to decertify, or by referring employees to someone they can consult about their rights. Employees are entitled to receive information about their rights from whatever source; any other result would be contrary to the purposes of the Act."

Additionally, hourly pay raises were announced by a series of flyers sent out by Gerawan in March of 2013 (e.g., from $9 to $10 per hour), indicating that the decisions to grant such pay raises were from "Ray, Mike and Dan," and claiming that Gerawan consistently pays higher wages than other companies in the industry. The flyers did not credit the UFW for these pay raises, but expressed that they were solely Gerawan's decision, while noting the union was properly informed of the raises and that "we assume they will not cause any unnecessary delay." Jose Erevia was typically listed as the contact person on such flyers.

Months later, after the filing of the first petition for decertification in September 2013, Dan and Norma Gerawan[18] visited each of the crews with Jose Erevia. The basic message communicated to the crews was the same: An election was likely going to be scheduled soon, and the workers were reminded that they were free and had a right to choose whatever they thought was in their best interest.[19] Other pre-election communications included a consultant who spoke to the crews and expressed anti-union sentiments (i.e., that in her personal experience, unions often do not keep promises), and a DVD that was distributed to employees in October 2013, containing statements which, according to the General Counsel, solicited grievances concerning the union and generally cast the union in a negative light.[20]

---

[18]     Norma Gerawan is Dan Gerawan's wife.

[19]     In speaking to the crews, Dan Gerawan also told the workers about the history of the company as a family-owned business. When the Board finally ordered the election to proceed on November 5, 2013, Dan Gerawan issued a press release congratulating the workers.

[20]     According to the ALJ, the DVD conveyed a message that it would be best to vote against the union. We note that when a union representation campaign is underway, employers remain free under the First Amendment to communicate with their employees on matters concerning the campaign "so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" (*NLRB v. Gissel Packing Co*. (1969) 395 U.S. 575, 618.) The communications may include an employer's general views about unionism or any of its specific views about a particular union. (*Id*. at p. 618; see

Gerawan Trains its Crew Bosses to Avoid Union-Related Activity or Discussion

Beginning in November 2012, Gerawan provided a series of training sessions to its crew bosses and supervisors.[21]  The training was primarily conducted by Jose Erevia, and its ostensible purpose was to ensure that the crew bosses and supervisors understood and respected proper boundaries concerning union issues.  The crew bosses and supervisors were told that they should not get involved in union-related discussions or activities (either pro or con) and should not attempt to answer workers' questions.[22]  If workers had questions, the crew bosses were instructed to have them contact Jose Erevia.  In separate meetings with each of the crews, Gerawan's agricultural workers were informed that their crew bosses and supervisors were not going to be responding to questions about the union.  The workers were told that if they had questions, they could contact Jose Erevia.

MMC is Commenced

During the first three months of 2013, approximately 10 or 12 bargaining sessions took place between Gerawan and the UFW.  In late March of 2013, the UFW filed a declaration with the Board seeking to have the bargaining parties (Gerawan and UFW) ordered to commence a statutory process referred to as "mandatory mediation and

---

also § 1155 ["The expressing of any views, arguments, or opinions, or the dissemination thereof … shall not constitute evidence of an unfair labor practice under the provisions of this part, if such expression contains no threat of reprisal or force, or promise of benefit."]

[21]  The term "foreman" is synonymous with crew boss.  At Gerawan, there were "supervisors" who had authority over one or more crew bosses in a particular area.  It is not disputed that crew bosses and supervisors were in supervisory roles for purposes of the ALRA.  Depending on context, the term supervisor is sometimes used herein in a generic sense that would include both crew bosses and supervisors.

[22]  Similar training of crew bosses and supervisors was given in April, August and September 2013.  The consistent message was to keep away from and not get involved in concerted activity or union-related discussions and activities engaged in by workers.

conciliation" (or MMC) (see § 1164 et seq.).[23]  The Board granted that request in April of 2013, and the MMC process was underway in approximately May of 2013.[24]

A Chance Meeting Outside of the Mediation in Modesto

In June of 2013, Angel Lopez, an agricultural worker at Gerawan, heard that a mediation was taking place between Gerawan and UFW in Modesto, California.  Angel was concerned that the union would begin taking 3 percent from the workers as soon as a contract was in place.  He wanted to learn what was going on at the mediation, so he asked his mother-in-law, Silvia Lopez, to drive him to Modesto to attend.  When they arrived at the mediation location in Modesto on June 11, 2013, neither of them were allowed to enter the mediation session.  While waiting in the hallway outside the

---

[23]    In the statutory MMC process, after an initial 30-day period of voluntary mediation is exhausted, a decision maker (the mediator) takes evidence and hears argument from the parties on all disputed issues and then submits a report to the Board stating the mediator's findings on what he or she believes the terms of a collective bargaining agreement should be.  Once the report becomes the final order of the Board (i.e., after any review by the Board is concluded), it establishes the terms of a state-imposed collective bargaining agreement.  (See §§ 1164, subds. (c) & (d); 1164.3, subds. (a)-(e).)

[24]    In separate proceedings, the UFW filed charges against Gerawan with respect to the nature of the bargaining that occurred during this general time frame (i.e., from shortly before MMC was ordered through August of 2013).  An administrative law judge agreed with the UFW's contentions, finding that Gerawan engaged in bad faith surface bargaining.  The UFW has requested that we take judicial notice of the administrative law judge's decision in that matter, referenced as *Gerawan Farming, Inc*., case numbers 2012-CE-041-VIS, 2013-CE-007-VIS, 2013-CE-010-VIS.  Although those charges are not part of the proceedings presently under our review, and although bargaining is not an issue in this matter, in the interest of providing a full and comprehensive background to the instant case, we will grant the request.  However, while we judicially notice what the administrative law judge's decision was (i.e., what findings were made), we do not take judicial notice of the *truth* of those findings.  (*Arce v. Kaiser Foundation Health Plan, Inc*. (2010) 181 Cal.App.4th 471, 482; *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564-1565.)  On January 22, 2018, the Board affirmed the findings of the administrative law judge in the above-referenced matter.  (See *Gerawan Farming, Inc.* (2018) 44 ALRB No. 1.)  The Board's affirmance does not affect what we have stated regarding judicial notice.

14.

mediation session, an attorney, Paul Bauer, who was there representing another worker against the union, introduced himself and explained the nature of what was going on. Angel and Silvia Lopez asked what, if anything, could be done, and attorney Bauer mentioned that under the ALRA workers had a right to file a petition to seek an election. Angel and Silvia Lopez asked attorney Bauer if he would help them. Attorney Bauer said that he might be able to help, he gave them his card, and an appointment was scheduled for a later date at attorney Bauer's office.

Silvia Lopez Restarts Employment at Gerawan

Approximately two weeks after the trip to Modesto but before the appointment with attorney Bauer, Silvia Lopez returned to work at Gerawan as an agricultural worker. She had been employed by Gerawan in the past, but that was prior to 2010. Beginning in 2010, she had tried selling Herbalife instead, but that did not work out for her financially, so she planned on returning to Gerawan. She did so on or about June 25, 2013. Silvia Lopez stated that her decision to resume employment at Gerawan was also motivated, in part, by a concern she had to protect Angel.[25] Sometime during the summer of 2013, Silvia Lopez's daughters Belen and Lucerita also began working at Gerawan.

Appointment With Attorney Bauer—Silvia Lopez Agrees to Be The Petitioner

A number of agricultural workers employed at Gerawan came to the appointment at attorney Bauer's office along with Silvia and Angel Lopez. Attorney Bauer explained to them more fully about the decertification process, the need to gather a sufficient number of signatures, and the rules that had to be followed in doing so. According to Silvia Lopez, attorney Bauer informed them that the signature gathering should be done

---

[25]    Another factor noted by Silvia Lopez in returning to work at Gerawan was the possibility of more flexible work hours there. She said she had a medical condition that caused pain, and she thought that she might have to work reduced hours, which Gerawan's flexibility regarding attendance would potentially allow. The ALJ found her testimony about having a medical condition unpersuasive, because the daily routine of agricultural labor is very physically demanding.

during the lunch break,[26] or before or after work hours, and that they should not ask for the help of anyone who was a foreman or supervisor. The workers decided that they would attempt to gather the requisite signatures for obtaining a decertification election. However, there was a need for one person to serve as the petitioner. Silvia Lopez agreed to take that lead role. She testified that she did so partly because she wanted to protect her son-in-law, Angel, from undertaking that task himself.[27]

Signature Gathering Begins

Silvia Lopez, Angel Lopez, and a core group of about seven other agricultural workers at Gerawan became the main participants in the signature-gathering effort, although there were estimated to be about 20 or more workers who helped in some capacity or turned in some signature sheets. A few of the signature gatherers were family members of Silvia Lopez.[28] The signature-gathering effort began within a week or two after Silvia returned to work, or approximately in late June or early July of 2013. Silvia Lopez testified that as signature sheets were completed and turned in to her by the other signature gatherers, she did not check the names, but she counted and kept track of the total number of signatures.

---

[26] The workers only had a 30-minute lunch break. As noted by the ALJ, going from one crew to the next would usually take at least five or 10 minutes, leaving only a short space of time for signature gathering during lunch.

[27] At this meeting, attorney Bauer agreed to represent Silvia Lopez in her role as the petitioner. Attorney Bauer did not ask her for payment of fees. Later, another attorney, Anthony Raimondo, would agree to represent Silvia Lopez as the petitioner and would assist her throughout the remainder of the decertification process. Attorney Raimondo testified he took the case knowing that he would not be paid for his legal services.

[28] As pointed out by the ALJ, there were numerous family relationships within the Gerawan workforce, and this was true of the decertification participants. Two of Silvia Lopez's daughters (Belen Solano Lopez and Lucerita Lopez), and her son-in-law (Angel Lopez) were involved in the signature gathering effort. Some decertification proponents were related to crew bosses or supervisors. Silvia's spouse or boyfriend was a supervisor at Gerawan. Other decertification participants, such as Rolando Padilla and Gisela Castro, were related to crew bosses.

Lobbying Trip to Sacramento Regarding Senate Bill No. 25 (SB No. 25)

In August 2013, Dan Gerawan planned to meet with legislators and others in Sacramento to oppose a pending bill known as SB No. 25. He believed SB No. 25 would unfairly expand the MMC process and effectively make it perpetual. The day before the trip, he asked Jose Erevia to identify for him five or six agricultural employees who might have an interest in opposing the bill. Jose Erevia called back with a list of names that included Silvia Lopez, Rolando Padilla, Carlos Uribe Estrada, Jose de la Rosa and Rosa Madrigal.[29] Dan Gerawan contacted these workers by telephone and made it known to them that they were welcome to join him the following day in Sacramento, if they wanted to attend and speak their minds concerning the bill. The lobbying trip took place on August 14, 2013, and the invited workers arrived in Sacramento at the designated location. They met up with Dan Gerawan and walked as a group to talk to various legislators and staff. Barry Bedwell, the President of the California Fresh Fruit Association, was also there. Dan Gerawan introduced him to the workers, and Bedwell came with them for some of the lobbying visits that day. It was the first time Bedwell had met Silvia Lopez.

Fruit Giveaway Program Upgraded

Gerawan had a practice of giving away fresh fruit to its employees at certain locations, on a particular day each week (e.g., Friday after work). The program helped to reduce theft of fruit from the fields. In years past, the fruit was in large bins for the workers to select the fruit in a self-serve fashion. By 2013, the setting for the fruit giveaways was improved. The fruit was situated in smaller trays or containers on tables, and fruit flavored beverages were often provided. The fruit giveaway events were under

---

[29]     These individuals were participants of the pro-decertification effort.

17.

a shaded canopy, and sometimes Dan Gerawan and his wife would attend and greet the workers.[30]

The Board Seeks Injunction in Superior Court and Conducts Remedial Training

On July 15, 2013, the UFW filed an unfair labor practice charge against Gerawan, alleging that certain of Gerawan's supervisors or foremen were involved in the circulation of a decertification petition and/or coerced or encouraged employees to sign a petition to decertify the UFW. This led to an investigation by the Regional Director of the Board, Silas Shawver. On August 19, 2013, the Board (by Silas Shawver on behalf of the General Counsel) filed an ex parte application for a temporary restraining order (TRO) in the Fresno County Superior Court. The Board alleged three separate incidents of direct supervisor involvement in the circulation of the decertification petition.[31] The Board's application sought injunctive relief under section 1160.4[32] to prevent such

---

[30] Allegations had been made that the fruit giveaway upgrades were improper, but neither the ALJ nor the Board found the fruit giveaway improvements were wrongful or had any particular significance to the case.

[31] Allegedly, the three separate incidents occurred in July 2013 and involved crew bosses Leonel Nuñez, Cirilo Gomez and Sonia Martinez. These incidents were alleged as single events, not a continuing course of conduct. Regarding the Superior Court proceedings, Gerawan points out that the Board has not provided a complete record of the moving and opposing papers or the transcripts of the hearings regarding the Board's application for a temporary restraining order and preliminary injunction. It appears that all such court records were presented to the ALJ and to the Board by Gerawan, but some of the records (e.g., the transcripts) were deemed irrelevant and not considered. We grant Gerawan's request to include all of the Superior Court materials in the record on appeal. We also grant judicial notice of such court records.

[32] Under section 1160.4, subdivision (b)(2), a TRO shall issue "on a showing that reasonable cause exists to believe that the unfair labor practice has occurred" that "by its nature … would interfere with the free choice of employees to choose or not choose an exclusive bargaining representative." The temporary restraining order "shall remain in effect until an election has been held or for 30 days, whichever occurs first." (*Ibid.*) The "until an election has been held" language reflects that injunctive relief was intended by the Legislature to (among other things) protect the integrity of future elections by stopping or minimizing employer interferences in the decertification process.

18.

conduct from continuing, and also sought an order granting the Board access to Gerawan's employees to train them in their rights under the ALRA. The purpose, as stated by Mr. Shawver at the TRO hearing, was to protect the employees' ability to exercise their free choice and to increase the likelihood that any future decertification election would not be fatally tainted. He acknowledged that notifying the workers of their rights under the ALRA would be a factor to be considered in a decision concerning an election because all of the workers would have been informed of their rights to involve themselves in union decertification activities (or not) without interference: "[T]hat is helpful in finding that there has been more of a democratic process, free from interference when we know that workers have been properly informed of their rights."

The Superior Court granted the TRO, but denied the Board's request for access. The following day, Dan Gerawan personally invited the Board to conduct company-wide noticing and training of all of its employees and supervisors. The Board accepted the proposal. Access was granted to the Board, and the Board conducted noticing or training of over 2,000 Gerawan employees on August 28, 2013 and August 29, 2013. Separate training of the supervisors occurred on Saturday, August 24, 2013. The Board's noticing or training meetings were conducted by Regional Director, Silas Shawver.

On August 22 and 23, 2013, Jose Erevia personally met with all Gerawan crew bosses and supervisors to explain the TRO and the need to comply fully with it.

At the September 11, 2013, preliminary injunction hearing in the Superior Court, Silas Shawver reported to the court on the Board's training of the employees: "We went and spoke with all of the crews to give them information about—about their rights under the Act and also about the process and the importance of not having interference in their ability to make a decision as to supporting the union or supporting an effort to decertify the union as a representative." He also reported that the training of Gerawan's supervisors was a positive experience, including "full" discussions of the law and the consequences of supervisor involvement. Finally, he informed the Superior Court that,

19.

since the time the temporary restraining order issued, he had not learned of any further incidents of direct supervisor involvement. In short, the remedial process appeared to have been a success regarding the alleged problem of supervisor involvement.

Gerawan Asserts That UFW Sought to Entrap Crew Bosses

Jose Erevia testified that on August 26, 2013, he received an anonymous telephone call, alerting him that the UFW was planning to have pro-UFW workers attempt to trap crew bosses into turning down requests to gather pro-union signatures during worktime. The next day, Jose Erevia directed all crew bosses to read a statement to their crews that included the following message: "To avoid false accusations of wrongdoing or being trapped into committing violations, do not ask me for … permission to gather signatures or distribute promotional material. If you choose that activity then do it during your rest periods, meal period, and off-the-clock periods when you are free to use your time that way." Later, as predicted by the anonymous tip, there were multiple incidents in several crews where the crew bosses were approached by individuals who asked for permission to circulate documents or obtain signatures for the union during work hours.[33] Consistent with their training, the crew bosses did not grant the requesting workers permission to gather signatures during their work hours, but only at lunchtime or on breaks.

The ALJ found that "there was credible evidence that pro-UFW workers requested permission from their crew bosses to circulate pro-UFW petitions during work time, and that the foremen rejected those requests."[34] As will be seen, the ALJ further concluded that the requests made by pro-UFW workers together with the crew bosses' qualified

---

[33] Gerawan's opening brief asserts that these pro-union requests were obviously staged because the union had no reason to be gathering signatures; the union was not petitioning for an election, it was trying to prevent one from happening.

[34] Both the ALJ and the Board stopped short of finding that the UFW orchestrated these requests or had hatched a plan to entrap crew bosses. They avoided the need to make such a finding by noting that *even if* that were the case, the evidence still showed disparate treatment.

20.

denials were sufficient to show that Gerawan treated pro-union workers differently in regards to petitioning activity.

First Petition Filed and Rejected by Regional Director

On September 18, 2013, Silvia Lopez filed the first petition for decertification with the Board. On September 25, 2013, Regional Director Silas Shawver dismissed the first petition. The reasons given for the dismissal included that the petition fell short of making a sufficient showing of interest (i.e., not enough signatures), and that several signatures appeared to have been forged.[35]

Worker Protests and Stoppages

In response to the dismissal of the first petition, the decertification proponents did not cease their efforts, but immediately began gathering signatures for a second petition. More than that, on September 30, 2013, only a few days after the rejection of the first petition, Silvia Lopez and others in the pro-decertification group reacted by carrying out a work stoppage, which involved blocking work entrances to the fields early in the morning and urging all the arriving workers to gather at a designated location where a massive protest took place. Silvia Lopez and other individuals spoke at the protest, many of the workers carried protest signs, and television news reporters arrived and interviewed participants. Silvia Lopez testified that the main reason for the September 30 work stoppage and protest was not to gather signatures, but to protest the dismissal of the first petition and send a message to the Board that the workers really wanted an election. The ALJ did not find credible Silvia Lopez's testimony that the work stoppage was not to gather signatures. Several other decertification proponents had used the stoppage as an

---

[35] A copy of Shawver's letter, as Regional Director, dismissing the first petition was submitted by the UFW for judicial notice. We grant judicial notice of that record of a public agency, with the understanding that we do not judicially notice the truth of any findings or assertions set forth in the letter. (*Sosinsky v. Grant, supra,* 6 Cal.App.4th at pp. 1564-1565.)

21.

opportunity to gather signatures, and Silvia Lopez acknowledged that about 800 to 1,000 new signatures (for the second petition) were collected during the work stoppage.

On October 2, 2013, after Silvia Lopez's plea for financial help while on a talk radio program resulted in the California Fresh Fruit Association (or CFFA)[36] agreeing to sponsor a bus trip to Sacramento, hundreds of workers traveled to Sacramento to protest and/or seek redress from the Board at its main office. The CFFA is comprised of numerous grower members, and Gerawan was a prominent member of that Association. Dan Gerawan knew the Association's President, Berry Bedwell, and communicated with him on a regular basis during that time period.

There were also other protests engaged in by the pro-decertification workers, including in front of the Visalia regional office of the Board, where Silas Shawver's office as Regional Director was located.

Second Petition Filed and the November 5, 2013 Election

Silvia Lopez filed the second petition for decertification on October 25, 2013.[37] On October 31, 2013, Regional Director Silas Shawver issued a letter finding that an adequate showing of interest had been made, but nevertheless blocking the prospective election on the ground that Gerawan had committed unfair labor practices that allegedly made it "impossible" to conduct an election "in an atmosphere where employees can exercise their choice in a free and uncoerced manner." The Board vacated Shawver's blocking decision and ordered that a secret ballot election be conducted on November 5, 2013. (*Gerawan Farming, Inc*., Admin. Order No. 2013-46 (Nov. 1, 2013) p. 4.) The Board's order criticized Shawver's failure to mention "the degree to which remedial

---

[36]    Formerly known as the California Grape and Tree Fruit League.

[37]    On October 28, 2013, Regional Director Shawver purported to dismiss the second petition as untimely based upon his conclusion that the Board's decision in the MMC proceedings resulted in a "contract bar" that precluded holding an election. The Board swiftly vacated the dismissal because MMC issues were still pending before it and were not yet final (i.e., there was no contract bar).

efforts by the General Counsel and agreed upon by Employer" may in fact have successfully done so, particularly when such efforts were "represented … to the Fresno Superior Court" as having "remedied some of the alleged unfair labor practice charges …." Also, many of the charges were up to 10 months old, yet no complaint had been filed by the General Counsel until the day prior to the blocking letter. The Board held: "There are enough questions regarding the degree to which any taint has been remedied, as well as questions as to the appropriateness of relying on the late-filed complaint to block the election, to justify holding the election, impounding the ballots, and resolving these issues through election objections and litigation of the complaints." Accordingly, the Board ordered that "the election be held on Tuesday, November 5, 2013," and that "the ballots be impounded pending resolution of any election objections and related unfair labor practice complaints."

The election was duly conducted on November 5, 2013. Presumably, thousands of Gerawan's agricultural employees cast their secret ballot votes that day. As noted, all of the workers' ballots were impounded by the Board and remain uncounted.

UFW's Election Objections Filed

On November 13, 2013, the UFW filed its written election objections. The election objections asserted that numerous unfair labor practices and/or other misconduct by Gerawan, as the employer, warranted the dismissal of the election petition and setting aside the election. The categories of employer wrongdoing alleged in the UFW's election objections included the following: (1) instigation of the decertification campaign; (2) unlawful assistance to the decertification campaign through the involvement, coercion or encouragement of crew bosses to pressure workers into signing the petition; (3) unlawful assistance to the decertification campaign through favorable (i.e., disparate) treatment of decertification signature-gatherers that was not shown toward pro-union employees; (4) unlawful assistance by providing the decertification petitioner with an attorney; (5) unlawful assistance to the decertification campaign by paying for,

23.

supporting or coercing worker participation in anti-UFW protests; (6) unilaterally granting wage increases and other benefits (e.g., fruit giveaways) to influence employees; (7) hiring the decertification petitioner solely to engage in the decertification campaign; (8) communications to employees that tended to disparage or undermine the union; (9) direct dealing and solicitation of grievances; (10) threats of bankruptcy, closure, or loss of jobs if the union were not removed; and (11) threats of violence directed at UFW supporters.

Consolidated Hearing of Election-Related Issues Ordered

On December 19, 2013, in response to the election objections,[38] the Board issued an order in *Gerawan Farming, Inc*. (2013) 39 ALRB No. 20, to indicate which matters would be set for hearing. The Board determined that the objections alleging the employer unlawfully instigated or significantly assisted the decertification campaign would be set for a hearing.[39] Additionally, the objection alleging disparate treatment would also be set for hearing, conditioned on the outcome of the General Counsel's pending investigation.[40] Many of the other objections were also set for hearing, conditioned on the outcome of the General Counsel's investigation thereof, but with the

---

[38] Other parties (i.e., Silvia Lopez and Gerawan) also filed election objections, but those objections are not at issue here.

[39] In *Gerawan Farming, Inc., supra,* 39 ALRB No. 20, the Board stated that, pursuant to *Gallo Vineyards, Inc.* (2004) 30 ALRB No. 2 (*Gallo*), "[w]here an employer has been found to have … provided significant support for decertification efforts, the Board *will* dismiss the election petition." (39 ALRB No. 20, p. 4, italics added.)

[40] In *Gerawan Farming, Inc., supra,* 39 ALRB No. 20, the Board further noted that "[m]erely permitting the circulation of the petition on company time or allowing employees to discuss, during working hours, decertifying a union has been held insufficient to support a finding of active employer instigation of, or participation and assistance in, a decertification campaign. However, it is objectionable if the employer discriminates in favor of anti-union activity." (*Gerawan Farming, Inc., supra,* 39 ALRB No. 20, pp. 4-5; citing *D'Arrigo Bros. Co. of California* (2013) 39 ALRB No. 4 (*D'Arrigo*) and other cases.)

further proviso that, as to such other objections, "a ballot count" would be required to determine whether the misconduct at issue "had a tendency to affect free choice in the November 5, 2013 election." (*Id*. at pp. 5-15.) Among the specific claims of objectionable conduct as to which a ballot count would have to be considered was the alleged employer support of anti-UFW protests (including the October 2, 2013 bus trip), the one-day piece-rate increase, and the claims of direct dealing or solicitation of grievances. (*Id.* at pp. 5-13.)[41]

The Board notified the parties that (i) the UFW's election objections and (ii) the related unfair labor practice allegations (in the General Counsel's complaint) potentially affecting the validity of the election would be heard together in a consolidated administrative hearing; however, the Board was awaiting the completion of the General Counsel's investigation of pending unfair labor practice charges. On July 31, 2014, the Board finally ordered that the executive secretary cause the matter to be set for hearing on September 29, 2014.

On September 9, 2014, after a 10-month investigation and only 20 days before the scheduled hearing date, the General Counsel filed an Amended Consolidated Complaint, which included greatly expanded allegations of unfair labor practices against Gerawan.[42] When other parties objected to this last-minute pleading, the Board directed the ALJ to focus the hearing on "the pre-election issues and thus to resolve the ballot box dispute …."

The Amended Consolidated Complaint included allegations that Gerawan had committed unfair labor practices which were described as follows: (1) undermining the

---

[41] The Board's directive that certain objections should only be considered in light of a ballot count was never fulfilled. Each of the purportedly objectionable occurrences were taken into account by the ALJ and Board, but no ballot count was ever made, and thus no tally was ever considered.

[42] The ALJ noted the last-minute timing of the Amended Consolidated Complaint "had the general feel of trial by ambush."

UFW's status as bargaining representative by a series of communications to employees; (2) unilaterally improving the terms or conditions of employment in order to undermine the union (i.e., granting unilateral pay increases or other benefits); (3) instigating, supporting or assisting the decertification campaign in a variety of ways, including hiring Silvia Lopez for that purpose; (4) assisting the decertification effort through the conduct of various crew bosses who either directly involved themselves in the signature gathering process and/or allowed worktime signature gathering; (5) assisting the decertification effort by allowing the decertification proponents preferential attendance flexibility; (6) assisting the decertification effort by supporting or facilitating protest activities engaged in by decertification proponents against the Board and against the UFW; (7) assisting the decertification effort by providing legal representation to the decertification petitioner; and (8) threatening workers that the company would go out of business or their jobs would be lost if UFW were to obtain a collective bargaining agreement. In the prayer of the Amended Consolidated Complaint, the Board's General Counsel sought, as a specific remedy for the alleged unfair labor practices, "the destruction of the ballots and the dismissal of the Petition for Decertification."

Administrative Hearings and ALJ Decision

The consolidated administrative hearings conducted by the ALJ began on September 29, 2014, and ended on March 12, 2015, consisting of 105 hearing days and the examination by respective counsel of approximately 130 witnesses. On September 17, 2015, the ALJ's written decision was issued. The ALJ framed the "overall question" in the matter as "whether the employer, Gerawan Farming, Inc., … committed unfair labor practices or other objectionable conduct with respect to the decertification election that was held on November 5, 2013." A large part of the ALJ's decision consisted of

26.

weighing and evaluating the credibility of the many witnesses and of particular portions of their testimony.[43]

In the ALJ's decision, a number of the more serious allegations against Gerawan were rejected as unsupported. According to the ALJ's decision, the evidence failed to show that Gerawan instigated the decertification movement. The evidence also failed to show that Gerawan hired Silvia Lopez for the purpose of organizing the decertification campaign or that she was otherwise acting as Gerawan's agent. As found by the ALJ, Gerawan did not pay for Silvia Lopez's legal representation, either directly or indirectly, and there was no credible evidence that Silvia Lopez was paid anything by her employer other than for the hours she worked in the fields. Moreover, the evidence failed to show any credible threats were made to workers of jobs being lost, the company going bankrupt, closure of operations, or other such threats of what would happen if the union stayed. Nor was there any credible evidence of reprisals against pro-UFW workers, nor of threats of violence or any actual violence.

Although the ALJ found that worktime signature gathering incidents had occurred in six crews, and that there was an instance of a crew boss's direct involvement in one FLC crew, the ALJ stated that these violations were not sufficient by themselves to set aside an election. According to the ALJ, it was only in combination with the *other* violations committed by Gerawan that the ALJ decided that the appropriate remedy would be to set aside the election.

---

[43]    The ALJ noted that Silvia Lopez (and several other decertification proponents), when interviewed by Silas Shawver during the course of his official investigation in July 2014, lied to Shawver about their role in blocking the entrances to the fields on the day of the work stoppage. At the ALJ hearing, Silvia Lopez apologized for lying to Shawver, but explained that she and other workers felt deeply betrayed by him, were convinced they could not trust him, and even feared him. Because she had lied, the ALJ discredited much of Silvia Lopez's testimony.

The other violations, as found by the ALJ, included various forms of unlawful assistance by Gerawan to the decertification campaign, including disparate treatment of pro-decertification workers in regard to signature gathering activity during work hours; allowing Silvia Lopez to take extensive time off work (a "virtual sabbatical") which was often devoted to signature gathering; and facilitating and/or failing to prevent, intervene in or respond to the occurrence of several pro-decertification protests and work stoppages.[44] Additional employer misconduct found by the ALJ included granting a unilateral well-timed piece-rate increase for one day during grape harvest; and solicitation of grievances against the union through various flyers and mailers suggesting that the union was worthless and impotent and the person to contact to resolve any issues was Jose Erevia.

In holding that the election should be set aside, the ALJ stated in a conclusory manner that the cumulative effect of the employer's conduct made "it impossible to know if the signatures collected represent the workers' true sentiments," and likewise that the employer's conduct "created an environment which would have made it impossible for true employee free choice when it came time to vote." No reasoned explanation or analysis, grounded in the factual record, was provided by the ALJ to substantiate these particular conclusions or to show that any reasonable causal connection existed between Gerawan's conduct and the purported loss of employee free choice.

---

[44]    On the issue of the October 2, 2013, bus trip to Sacramento sponsored by a donation from the CFFA, the ALJ found it significant that Gerawan and Barry Bedwell kept in regular e-mail communication regarding the workers' decertification effort and that Gerawan had previously introduced Bedwell to Silvia Lopez during the SB No. 25 lobbying trip. These and other circumstances led the ALJ to conclude that Gerawan and Bedwell had likely been in communication about the donation by the CFFA. The ALJ also found the donation violated section 1155.4.

28.

The Board's Decision

Exceptions to the ALJ's decision were presented to the Board, and the matter came before the Board for its review. On April 15, 2016, in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1, the Board affirmed with minor changes[45] the unfair labor practice findings and the conclusion of the ALJ to dismiss the decertification petition and set aside the election. The Board summarized its holding as follows: "[T]he ALJ correctly held that Gerawan engaged in objectionable conduct and committed numerous unfair labor practices. Although we affirm the ALJ's conclusion that Gerawan did not instigate the decertification effort, we agree that Gerawan improperly inserted itself into the campaign." The Board held that Gerawan, as employer, inserted itself into the decertification campaign when it did the following: (1) "discriminatorily permitted anti-Union signature gathering during worktime while prohibiting pro-Union activity of the same kind"; (2) "granted [Silvia] Lopez a 'virtual sabbatical' to conduct the decertification effort," and "did not discipline signature gatherers for missing work, but continued to enforce its absence policies among the rest of the crew"; (3) "tacitly approved an unlawful work blockage, which, although instigated by the decertification petitioner supporters, directly facilitated the gathering of the signatures for the showing of interest"; (4) "colluded with the CFFA to make arrangements for the decertification petitioners to travel by bus to Sacramento in order to protest the dismissal of the first decertification petition, thus condoning employees' taking time off from work to join the protest"; and (5) "granted a wage increase during the decertification campaign and unlawfully solicited grievances."

Regarding the remedy of setting aside the election, the Board adopted the same bare conclusions expressed by the ALJ. The Board's language mirrored that of the ALJ,

---

[45]     The Board found there were two additional crews in which worktime signature gathering occurred, and it modified the findings in that respect.

stating: "Given the totality of the circumstances and Gerawan's unlawful actions, we conclude that it is impossible to know whether the signatures gathered in support of the decertification petition represented the workers' true sentiments.  We affirm the ALJ's conclusion that Gerawan's unlawful and/or objectionable conduct tainted the entire decertification process, [and] we adopt his recommended remedy dismissing the decertification petition, and setting aside the election …." (See *Gerawan Farming, Inc.*, *supra*, 42 ALRB No. 1, p. 69.)  As with the ALJ decision, the Board decision in 42 ALRB No. 1 focuses almost entirely on the employer's wrongdoing, without meaningfully addressing, considering or analyzing the impact of the employer's conduct on employee free choice or the outcome of the election.

Petition for Writ of Review

On May 13, 2016, Gerawan filed the instant petition for writ of review.  On January 20, 2017, after receiving the administrative record and considering the parties' briefing, we agreed to review this matter.

## DISCUSSION

Due to the length of this opinion, we offer the following roadmap of what our discussion below will entail, in sequential order:  (1) a summary of the appellate standard of review for our consideration of the unfair labor practice findings; (2)  our review of each of the challenged findings of unfair labor practices; (3) an explanation of why we may consider the Board's election-related remedies; (4) our conclusion that the Board applied an incomplete or improper legal standard in deciding to dismiss the election in this case; and (5) a summary of our disposition and the matters to be considered by the Board on remand.

## I. Standard of Review

When reviewing questions of fact, we uphold the Board's findings if supported by substantial evidence on the record considered as a whole.  (§ 1160.8; *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd*. (1979) 24 Cal.3d 335, 349;

30.

*Montebello Rose Co. v. Agricultural Labor Relations Bd*. (1981) 119 Cal.App.3d 1, 20-21.)  Under this standard:  "[W]e do not reweigh the evidence.  If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so."  (*Rivcom Corp. v. Agricultural Labor Relations Bd*. (1983) 34 Cal.3d 743, 756-757.)  "Furthermore, those findings and conclusions that are within the Board's realm of expertise are entitled to special deference.  [Citation.]  And, because the evaluation of witnesses' credibility is a matter particularly for the trier of fact, the Board's findings based on the credibility of witnesses will not be disturbed unless the testimony is 'incredible or inherently improbable.' [Citations.]"  (*Harry Carian Sales v. Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 220.)

However, we may not take a rubber stamp approach to our review of the Board's factual findings.  (*Vessey & Co. v. Agricultural Labor Relations Bd*. (1989) 210 Cal.App.3d 629, 643.)  "'[T]he test of substantiality must be measured on the basis of the *entire* record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence.' [Citations.]"  (*Martori Brothers Distributors v. Agricultural Labor Relations Bd*. (1981) 29 Cal.3d 721, 727, italics added.)  Thus, the substantiality of evidence "'must take into account whatever in the record fairly detracts from its weight' [citation]."  (*Merrill Farms v. Agricultural Labor Relations Bd*. (1980) 113 Cal.App.3d 176, 182.)  "'Substantial evidence' is not established by just 'any evidence' [citation] and is not shown by mere suspicions of unlawful motivation [citation].  The burden of proving unlawful conduct is on the ALRB [citation], and such conduct will not lightly be inferred [citation].  The standard of review is met, however, if there is relevant evidence in the record which a reasonable mind might accept in support of the findings.  [Citation.]"  (*Vessey & Co. v. Agricultural Labor Relations Bd*., *supra*, 210 Cal.App.3d at p. 642.)

31.

The language in section 1160.8 prescribing the substantial evidence standard of review based on "the record considered as a whole" was taken from the corresponding section of the National Labor Relations Act (29 U.S.C. § 151 et seq. (NLRA); see 29 U.S.C. § 160(f)), and federal decisions relating to that standard are of precedential value in fleshing out its parameters. (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 258, 264.)[46] Relevant NLRA case law has held that in reviewing board decisions, the Courts of Appeal have "a responsibility for assuring that the Board keeps within reasonable grounds…." (*Id.* at p. 266, citing *Universal Camera Corp. v. Labor Bd.* (1951) 340 U.S. 474, 489-490.) Thus, a reviewing court "'is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" (*George Arakelian Farms*, *Inc. v. Agricultural Labor Relations Bd.*, *supra*, 111 Cal.App.3d at p. 265, citing *Universal Camera Corp. v. Labor Bd., supra,* 340 U.S. at pp. 487-488.)

Our review is not limited to the question of whether substantial evidence supported the Board's decision. We may also consider whether an error of law was made and whether the decision was procedurally sound. (*Phillip D. Bertelsen, Inc. v. Agricultural Labor Relations Bd.* (1992) 2 Cal.App.4th 506, 519.) Board decisions that rest on "erroneous legal foundations" will be set aside. (*Artesia Dairy v. Agricultural Labor Relations Bd.* (2008) 168 Cal.App.4th 598, 605.) Such an error of law would

---

[46]     Section 1148 provides: "The board shall follow applicable precedents of the National Labor Relations Act, as amended." Because of the NLRA's general applicability, we have cited to NLRA cases herein. However, we keep in mind that the Legislature intended the term "applicable precedents" to be limited to "those federal precedents which are relevant to the particular problems of the California agricultural scene." (*F & P Growers Assn. v. Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667, 673; see *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 412-413.)

include the Board's failure to apply the correct legal standard. (*J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d 1, 38-39.) We review all such questions of law de novo.

As to our review of *remedies* granted by the Board, we are guided by several core principles. In stating these principles, we do not yet address the issue of whether we may reach the election-related aspects of the Board's decision and order. That discussion will come in a later section of this opinion. Generally speaking, because the Board has broad discretion to fashion remedies to effectuate the purposes of the ALRA, courts take a cautious approach and will interfere only where the remedy is patently unreasonable under the statute (*Nish Noroian Farms v. Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726, 745), or where the remedy seeks to achieve ends other than those which can fairly be said to effectuate the policies of the ALRA. (*Carian v. Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 674; see *Jasmine Vineyards, Inc. v. Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968, 982.) Of course, because the Board's remedial power exists to *effectuate* the ALRA, it may not be exercised in a manner that defeats the ALRA's provisions or policies. (See, e.g., *J.R. Norton Co. v. Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 29, 37, 40 [the Board's blanket approach to application of make-whole remedy violated statutory language and eviscerated important policies of ALRA]; see also, *Perry Farms, Inc. v. Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 473-474 ["To ignore the disenfranchisement which may have occurred in this case in order to proceed with the imposition of sanctions upon an employer [was] unconscionable" due to its gross disregard of the ALRA public policy to allow workers the right to organize and vote].)[47]

---

[47] In *Perry Farms Inc. v. Agricultural Labor Relations Bd.*, *supra*, 86 Cal.App.3d 448, the Board had disregarded evidence that the employer's workforce should have been defined to include some 600 additional workers who were never notified of the election and were effectively disenfranchised. (*Id.* at pp. 473-474.)

Accordingly, even though the Board's discretion in fashioning an appropriate remedy or remedies to redress unfair labor practices is broad, it is not without boundaries. Among other things, such discretion must be exercised reasonably, not punitively. (*J.R. Norton Co. v. Agricultural Labor Relations Bd.* (1987) 192 Cal.App.3d 874, 908.) When an order of the Board is so severe in comparison to the conduct involved in the unfair labor practice that it is clearly punitive in character, the order will be annulled. (*Ibid.*; accord, *Sunnyside Nurseries, Inc. v. Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 940; *Laflin & Laflin v. Agricultural Labor Relations Bd.* (1985) 166 Cal.App.3d 368, 380.)

## II.  Review of Unfair Labor Practice Findings

We now undertake our review of the unfair labor practice findings under the above standards. Gerawan argues that multiple findings of unfair labor practices were not supported by the record considered as a whole. Gerawan also characterizes the purported violations, to the extent they did occur, as relatively minor, sporadic and/or isolated, rather than pervasive or egregious in nature, particularly if the size and scope of the operations and the widely-dispersed workforce is taken into account. As to certain findings, Gerawan also argues that the challenged conduct did not constitute an unfair labor practice as a matter of law. We proceed to consider each of the particular unfair labor practice findings that are at issue.

## A.  Worktime Signature Gathering and Supervisor Assistance of Signature Gathering

Gerawan first challenges the sufficiency of the evidence to support the findings of worktime signature gathering and/or supervisor assistance regarding signature gathering in certain of the crews. We discuss each of the findings according to the particular crew in which the incident allegedly occurred, identifying the respective crew based on the name of its crew boss. The challenged findings are considered under three headings or categories:  (i) the ALJ's findings of supervisor assistance, (ii) the ALJ's findings of

34.

worktime signature gathering without supervisor assistance, and (iii) the Board's own additional findings of worktime signature gathering beyond what the ALJ found.

As previously indicated, we apply the substantial evidence test to the Board's factual determinations. Under that test, the Board's findings will be affirmed where they are supported by substantial evidence on the record considered as a whole. (§ 1160.8; *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd., supra,* 24 Cal.3d at p. 349; *Montebello Rose Co. v. Agricultural Labor Relations Bd., supra,* 119 Cal.App.3d at pp. 20-21.) "[W]e do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." (*Rivcom Corp. v. Agricultural Labor Relations Bd., supra,* 34 Cal.3d at pp. 756-757.) Although we do not reweigh the evidence, we do consider the *entire* record, and affirm only if there is a reasonable basis for the Board's determination that unlawful conduct occurred. (See, *Martori Brothers Distributors v. Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 727; *Merrill Farms v. Agricultural Labor Relations Bd., supra,* 113 Cal.App.3d at p. 182; *Vessey & Co. v. Agricultural Labor Relations Bd., supra,* 210 Cal.App.3d at p. 642.)

### 1. Supervisor Assistance

The ALJ and the Board[48] found that supervisor (i.e., crew boss) assistance with signature gathering took place on two occasions: Once in the crew of Jose Evangelista, and once in the crew of Leonel Nuñez.

#### (a) Jose Evangelista

The ALJ found that in mid-September 2013,[49] FLC crew boss Jose Evangelista received a signature sheet for the decertification petition from a woman who came by,

---

[48] Unless otherwise indicated, all findings were made by the ALJ in the first instance and were later affirmed by the Board.

[49] This date indicates it was in relation to the first decertification petition.

and he signed it on behalf of 18 to 20 crew members and later told his crew what he did. The ALJ's findings were based entirely on the testimony of crew member Jesus Madrigal. Madrigal testified that while he and other workers were engaged in picking peaches and conversing (primarily about the benefits of having a union), Evangelista, who was about 14 feet away at the time, made a comment that he "had already signed." According to Madrigal, Evangelista did not say anything else. Although Evangelista did not state to whom he had given his signature or what its purpose was, Madrigal assumed it was something to support the union. According to Madrigal, on the day before Madrigal's testimony at the ALJ hearing, he asked Evangelista about the matter and Evangelista told him that what had been signed was actually against the union.[50]

In contrast, Evangelista testified that a blank paper was brought out to him by a woman indicating that signatures were needed. The crew was on a break at the time. Evangelista thought the paper merely related to safety training, so he just grabbed the paper and asked his crew to sign it. The woman left after handing him the piece of paper and did not stay or talk to the crew. After a majority of the crew signed, he gave the paper to a supervisor.

The ALJ decided that Evangelista's testimony (i.e., that he thought the paper concerned safety training) was not credible because, according to the ALJ, no training had occurred on that day *or the preceding day*. However, on that point the ALJ clearly misread or misunderstood the testimony. Although it is true that Evangelista stated he did not have a safety class on that morning, he went on to say, in responding to the question of whether he had the class the day before, that he did not recall the exact date of the training, "but yes" it definitely had occurred, in which the workers were "told what

---

[50] Assuming that this conversation occurred, it would not tend to support the position of either party, because by that point in time (the day before the hearing), Evangelista would no doubt have heard that the paper was not what he had initially believed (per his testimony).

we're—we are supposed to do, about how to handle the ladder, about symptoms." Since there had been very recent training, the ALJ's rationale for discrediting Evangelista's testimony was unfounded. Moreover, Madrigal's testimony that Evangelista said he "already signed" something is so vague in what it may have referred to that we conclude it did not reasonably substantiate that Evangelista knew he signed the decertification petition. Mere suspicion or speculation of wrongdoing is inadequate. (*Vessey & Co. v. Agricultural Labor Relations Bd.*, *supra*, 210 Cal.App.3d at p. 642.) For these reasons, we conclude that the finding by the ALJ of assistance by Evangelista was not supported by substantial evidence under the record as a whole.

We note the ALJ also found that Evangelista's FLC crew stopped working at Gerawan as of the first week of October 2013, and thus, "none of the crew members would have voted in the November 5, 2013 decertification election unless in the interim they had obtained a position with a Gerawan direct hire crew." This aspect of the ALJ's decision was not disputed.

### (b) Leonel Nuñez

The ALJ found that crew boss Leonel Nuñez gathered his crew together during worktime at the request of one Virginia Chairez, and that Chairez proceeded to request signatures on the decertification petition. This finding was based on the testimony of a crew member by the name of Rulber Gonzalez. Other testimony by Gonzalez, however, was flatly rejected by the ALJ as not credible, including Gonzalez's assertion that Nuñez made verbal threats the company would go bankrupt if the union remained or that Nuñez expressed anger toward workers who did not sign the petition.[51]

In his explanation of the pertinent events, Nuñez testified that he had already gathered his crew together for the purpose of giving updated instructions when Chairez

---

[51] We note there was testimony that Gonzalez had personal and work-related disagreements with Nuñez, which perhaps explains why the ALJ rejected portions of his testimony.

arrived, asking for permission to speak to his crew. No attendance counter had yet arrived that day to count the workers. Nuñez assumed Chairez to be a counter and that she possibly had an announcement to read from the office, which counters sometimes did, so he gave her permission to speak as long as it was brief. Just before Chairez started talking to the crew, Nuñez walked away from the area to take a call from his supervisor about updated instructions for his crew. He did not hear what was being said at the meeting. He returned a few minutes later to see signatures being obtained by Chairez from several workers, but he did not know what they were for. He also noted that sometimes signatures were needed to confirm that safety training had occurred.

Crew member Armando Flores testified that a woman had come to the crew in October 2013, and that she requested signatures during worktime relating to the union. Flores did not think that Nuñez was nearby at that time. Flores personally declined to sign.

In evaluating credibility, the ALJ found implausible Nuñez's testimony that he (Nuñez) misunderstood the purpose of the visit from Chairez. The ALJ reasoned that if Nuñez had actually thought Chairez was there to read an official announcement from the office (i.e., at the direction of a manager), Nuñez would not have treated the matter as depending on his permission for her to speak and he would not have insisted that she keep it brief. The ALJ also noted that Nuñez's testimony describing how he introduced Chairez to the workers sounded as though listening to Chairez was optional.[52] If no

---

[52]   Nuñez testified that when he introduced Chairez to the workers, he told them that "the young lady wants to talk to you," and that she had asked for permission to talk to them "if they wanted to listen to her." In later testimony, Nuñez sought to clarify that he did not mean that listening was optional. He explained that he had just completed his training meeting, and some workers were already returning to work because he told them they could, when Chairez re-emerged wanting a chance to speak and he introduced her with the words "the lady wants to talk to you." Also, he was in the process of moving away from the group to take a call from his supervisor, so he did not intervene further or remind the people that it was mandatory to listen.

mandatory message from the office was being read, then Nuñez's own testimony confirmed it would be highly irregular for a counter to be speaking to the assembled group for several minutes. Finally, the ALJ noted that Nuñez had never seen Chairez work as a counter or a checker in the tree fruit area.

This is an instance where, if we were the trier of fact, we might have reached a different conclusion on this matter because Nuñez's explanation of events (i.e., that he thought Chairez was there as a "counter" on official business) was, despite any minor discrepancies, an account that seemed to make sense of what happened in a reasonable and believable way. Nevertheless, the inconsistencies and other circumstances cited by the ALJ in evaluating the credibility of Nuñez's testimony could reasonably lead one to a different conclusion. Therefore, we cannot say that the ALJ's credibility determination in this instance was inherently improbable or unreasonable. As our Supreme Court has stated, "[i]f there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." (*Rivcom Corp. v. Agricultural Labor Relations Bd., supra,* 34 Cal.3d at pp. 756-757.) Furthermore, "because the evaluation of witnesses' credibility is a matter particularly for the trier of fact, the Board's findings based on the credibility of witnesses will not be disturbed unless the testimony is 'incredible or inherently improbable.' [Citations.]" (*Harry Carian Sales v. Agricultural Labor Relations Bd., supra,* 39 Cal.3d at p. 220.) We conclude that the ALJ's findings on this matter were supported by substantial evidence.

## 2. Worktime Signature Gathering

The ALJ found worktime signature gathering (without direct supervisor assistance) in five crews. When the worktime signature gathering that occurred in the crew of Leonel Nuñez is included (see above), there were a total of six incidents of worktime signature gathering found by the ALJ. Gerawan challenges each of these particular findings. Preliminarily, we note the Board's position on when worktime

signature gathering may constitute unlawful assistance. "Merely permitting the circulation of the petition on company time or allowing employees to discuss, during working hours, decertifying a union" is not objectionable. (*D'Arrigo, supra,* 39 ALRB No. 4, pp. 12-13; see also, *Nash De Camp Company* (1999) 25 ALRB No. 7; *TNH Farms, Inc*. (1984) 10 ALRB No. 37.) "However, it is objectionable if the employer discriminates in favor of anti-union activity" (*D'Arrigo*, *supra*, 39 ALRB No. 4, p. 13), or if the circulation of the petition and signature gathering is with the obvious approbation or active involvement of supervisors. (*Gallo, supra,* 30 ALRB No. 2.) As will be seen, the theory affirmed by the Board in the present case was that Gerawan discriminated by allowing pro-decertification workers to gather signatures during worktime, while denying that same opportunity to pro-union workers.

In reviewing the findings, we shall first consider the several individual findings of worktime signature gathering, and then we shall separately examine the question of whether there was substantial evidence to establish that such conduct was discriminatory.

(a) <u>Santos Efrain Rios</u>

The ALJ concluded that worktime signature gathering for the decertification petition had occurred in the crew of Santos Rios, but the ALJ made no factual finding to support that conclusion. Moreover, the record does not support the ALJ's conclusion. One crew member, Gustavo Vallejo, testified that he witnessed Santos Rios give papers to his brother, Oscar Rios, and asked Oscar to obtain signatures. Vallejo testified that he witnessed Oscar getting signatures on the papers from approximately 15 workers. However, Vallejo's testimony did not establish the content or purpose of the papers. The ALJ found Vallejo was not credible to the extent that he (Vallejo) was suggesting that the papers given by Santos Rios to Oscar were decertification papers. The only other evidence in the record concerning the papers and signatures was Rios's testimony that he asked his brother to obtain signatures relating to workers picking up their paychecks.

We conclude there was no substantial evidence in the record as a whole to support the ALJ's finding that worktime signature gathering on the decertification petition occurred in the crew of Santos Rios.

(b) Martin Elizondo Cruz

The ALJ found that worktime signature gathering occurred in the crew of Martin Elizondo Cruz. Two workers in that crew, Gustavo Vallejo and Jorge Aguirre, said they witnessed three individuals gathering decertification signatures on the outskirts of where Cruz was conducting a training class. Aguirre also remembered an additional occasion when two people came to Cruz's crew for signatures during worktime after the crew had moved from the trees to the grapes. Another worker, Maria Gonzales Espinoza, recalled that on one occasion, about 30 minutes after work began, a woman she did not recognize wearing clean (non-work) clothes, asked her to sign a paper to help get rid of the union.

Cruz testified that the only time a worker came to gather signatures was when Rolando Padilla did so once during a lunch break, but the ALJ did not credit Cruz's testimony and noted certain discrepancies. The ALJ's credibility decision was not inherently improbable or unreasonable, but was within the ALJ's prerogative as finder of fact under all the circumstances. We conclude the ALJ's finding that worktime signature gathering took place in the crew of Martin Elizondo Cruz was supported by substantial evidence in the record.

(c) Gloria Mendez

The ALJ found that there was worktime signature gathering in the crew of Gloria Mendez, but also concluded that Mendez did not see it happen. Two members of Mendez's crew, Alma Delia Patiño and Severiano Salas, testified to an incident in which Erika Solano had sought signatures for the decertification petition during work hours. Their accounts were consistent and found to be credible by the ALJ. Salas noted that Mendez was not facing their direction when this occurred. Another crew member, Reina Ibanez, gave similar testimony about Solano soliciting signatures. Mendez denied that

41.

she ever saw or became aware of any signature gathering in her crew during worktime. The ALJ concluded that worktime signature gathering by Solano did occur, but Mendez was not aware of it. Substantial evidence supported the ALJ's factual findings.

(d) Francisco Mendoza

In finding worktime signature gathering in the crew of Francisco Mendoza, the ALJ credited the testimony of crew member Adela Castillo. Castillo testified that while she was engaged in work lifting peach buckets onto a trailer, a man and a woman approached and asked if she would like to sign a paper to stop the union from taking 3 percent. Castillo said "no" because she did not know what to do, and the woman responded "[t]hat was fine." Castillo said that after the couple spoke to her, they moved on and talked to people in another row. Castillo did not know the location of her crew boss, Mendoza, when this incident occurred. We agree with the ALJ that Castillo's testimony supported the finding of this lone incident of worktime signature gathering, and also that there was no evidence it was seen or known by her crew boss, Mendoza.

(e) Telesforo Mendoza

The ALJ found worktime signature gathering in the crew of Telesforo Mendoza based on the testimony of one witness, Jaime Montano Dominguez (Montano). Although Montano technically reported to Mendoza, he was not working in the trees or grapes but was building structures or canopies under the direction of "Julio." While at work building the structures, he was approached by a woman asking for a signature. Montano told her he would not sign because he was a union member. He identified the woman as Silvia Lopez.

Gerawan argues that the ALJ should have discounted Montano's testimony since he was an active union supporter and no corroborating evidence was presented by the General Counsel. We disagree. Although the ALJ could have taken that approach, he also was entitled to conclude that Montano was telling the truth regardless of union sympathies. Mendoza himself did not testify, which Gerawan claims was due to

42.

unavailability at the time of the hearing. In any event, no other evidence was presented by either side. We conclude that Montano's testimony constituted substantial evidence of an isolated incident of worktime signature gathering in Telesforo Mendoza's crew.

### 3. Additional Findings by Board of Worktime Signature Gathering

As noted, the Board found two additional instances of worktime signature gathering, not found by the ALJ. The additional findings related to the FLC crew of Alejandro Vasquez and the direct hire crew of Reynaldo Villavicencio. Gerawan challenges both of these findings by the Board.

(a) Alejandro Vasquez

The Board relied on the testimony of Javier Blanco in concluding that there was worktime signature gathering in the FLC crew of Alejandro Vasquez. Blanco testified that on one occasion in July 2013, Silvia Lopez visited his crew to collect signatures during worktime. There were about 20 members of the crew present. The crew boss, Alejandro Vasquez, briefly mentioned to Blanco that a lady was coming to talk to them. Blanco was just returning from the bathroom when Vasquez, who was walking away from the crew, said this to Blanco. At that point, the crew boss left the area, while the members of the crew formed into a circle. There was no evidence the crew boss actually gathered the crew together, rather than simply informing them (while walking away from the area) that someone was coming to speak to them. Silvia Lopez arrived and spoke about supporting the company rather than the union, and she had a paper to sign. The time period involved was during the circulation of the first petition for decertification. This FLC crew (as with the other FLC crews) was finished for the season and was no longer working at Gerawan by the time of the second petition drive and the election.

Gerawan argues that Blanco's testimony was obviously biased, inconsistent and unreliable. In this regard, Gerawan notes that Blanco appeared to have harbored animus against Gerawan because he was suspended from direct-hire employment at Gerawan based on his job performance. Blanco was under the impression that if he supported the

43.

union, the union might be able to get his direct-hire job back. Shortly before the hearing, Blanco received visits from UFW organizers at his home, where Blanco was urged to "support the union and not the company," and he agreed that he would do so. At the hearing, Blanco changed his testimony several times regarding what Silvia Lopez allegedly said during her visit to the crew. At first, Blanco testified that Lopez said that the signatures were to get rid of the union. Then Blanco claimed that Lopez refused to say anything about the purpose for the signatures and that he did not learn why she was gathering signatures until he heard about it later from other workers. Later, he shifted back to saying that Silvia Lopez had stated the reason for the signatures and that he had understood her. The ALJ interjected: "I'm confused why then, a couple questions ago, it sounded like you didn't know why she was there. Did I misunderstand something?" Blanco responded: "No. No." Blanco's testimony also changed without explanation on other topics. When asked the date he started working in Vasquez's crew at Gerawan in 2013, he first represented it was in March of that year, then he said it was late July, and after that he claimed it was June.

In finding worktime signature gathering in Vasquez's crew, the Board implicitly found that Blanco's account of Silvia Lopez's visit to that crew was credible. In reaching that conclusion, the Board did not address Blanco's potential bias or his inconsistent, vacillating testimony. Instead, the Board simply noted in its findings that the crew boss, Vasquez, did not testify and no other witnesses specifically contradicted Blanco's testimony. What the Board failed to acknowledge was that worktime signature gathering in Vasquez's crew was not alleged in the General Counsel's Amended Consolidated Complaint; nor was it referenced in the UFW's election objections.[53] The lack of

---

[53] To our knowledge, no due process or notice objection was raised on this ground. A violation not charged or alleged in the complaint "may nevertheless be found when the unlawful activity was related to and intertwined with allegations in the complaint and the

44.

allegations or charges regarding Vasquez's crew appears to account for the dearth of testimony regarding that crew and the ALJ's failure to make findings.

The matter stands or falls on the question of whether the Board could reasonably credit Blanco's testimony. As noted, we will not disturb the Board's credibility findings unless the testimony is "'incredible or inherently improbable.' [Citations.]" (*Harry Carian Sales v. Agricultural Labor Relations Bd., supra,* 39 Cal.3d at p. 220.) Although Blanco vacillated on a number of points and obviously had strong feelings in favor of the union, we are unable to conclude that *all* of his testimony was so unreliable as to be incredible or inherently improbable. Despite Blanco's many inconsistencies, the Board might have credited material portions of his testimony. Blanco was relatively clear and stable on at least the main part of what he was trying to get across: i.e., he recalled that Silvia Lopez visited the crew on a particular day, she was there during worktime, and she was seeking signatures. Although a close call, on balance we are unable to conclude from the record as a whole that Blanco's testimony was "incredible or inherently improbable" on the matter of whether Silvia Lopez actually visited Vasquez's crew in July 2013 and sought signatures during worktime. Consequently, we hold that the Board's finding of worktime signature gathering in this instance was supported by substantial evidence.

(b) Reynaldo Villavicencio

The ALJ discussed evidence regarding the crew of Reynaldo Villavicencio, but did not make any findings one way or the other with respect to worktime signature gathering. A member of Reynaldo Villavicencio's crew, Francisco Severiano, who at times worked in the same row as Silvia Lopez, testified at length about Lopez's attendance, hours and work habits. The ALJ summarized that portion of Severiano's

_____

matter fully litigated." (*Harry Carian Sales v. Agricultural Labor Relations Bd., supra,* 39 Cal.3d at pp. 251-252.)

45.

testimony and said that he credited all of what he had summarized. However, no mention was made in the ALJ's summary of the remainder of Severiano's testimony, which had described several occasions in which Lopez had asked for signatures of crew members on a petition to stop the union from coming in. Severiano testified that Lopez had asked for the signatures while the crew was working. Based on Severiano's testimony, the Board found that worktime signature gathering occurred in the crew of Reynaldo Villavicencio. We conclude that Severiano's testimony constituted substantial evidence in support of the Board's findings.

### 4. The ALJ's Assessment of Worktime Signature Gathering

After considering his findings of worktime signature gathering and/or crew boss assistance in signature gathering, the ALJ concluded that these incidents did not provide a sufficient basis (by themselves) to set aside the election. The ALJ's assessment was as follows: "In the absence of any other violations, I would have found that the Gerawan work-time signature gathering was an unfair labor practice, but that, by itself, it fell slightly short of the standard to set aside an election as the Board discussed in the *D'Arrigo* and *Gallo* cases. (*D'Arrigo Bros. of California*[, *supra*,] 39 ALRB No. 4, at pages 28-29; *Gallo Vineyards, Inc*.[, *supra*,] 30 ALRB No. 2.)"[54] The Board, while quibbling with the ALJ's assessment, did not reverse it, but emphasized that the case as a whole included a record of much more serious misconduct by the employer.

Gerawan maintains that the findings regarding worktime signatures were at best isolated and sporadic events, particularly when considered in light of the size and scope of operations involving over 50 crews. Moreover, there was very little evidence that any crew bosses saw or were aware of the signature gathering during worktime. The ALJ was not unsympathetic to Gerawan's view, noting that the workers in the trees and grapes

---

[54] We will be discussing the *Gallo* standard (which would allow an election to be set aside whenever "significant" employer assistance is found) later in this opinion. (*Gallo, supra,* 30 ALRB No. 2.)

were separated by enough distance and obstructions that a crew boss cannot always see all of his workers. Again, in the ALJ's assessment, it was the combination of assistance relating to signature gathering with the *other* purported wrongdoing that led the ALJ (and the Board) to conclude that it was necessary to set aside the election.

### 5. **The Asserted "Passavant" Defense**

In the proceedings below, Gerawan claimed that the remedial training conducted in late August of 2013 by Regional Director, Silas Shawver, at the invitation of Dan Gerawan, along with the representations made by Shawver (as both Regional Director and attorney on behalf of the Board and/or the General Counsel) to the Superior Court in the related hearings to obtain injunctive relief, effectively *cured* any past transgressions by crew bosses with respect to signature gathering. Under *Passavant Memorial Area Hospital* (1978) 237 NLRB 138, an employer may relieve himself of liability for unlawful conduct by repudiating the conduct, if certain conditions are met: "To be effective, however, such repudiation must be 'timely,' 'unambiguous,' 'specific in nature to the coercive conduct,' and 'free from other proscribed illegal conduct.' [Citations.] Furthermore, there must be adequate publication of the repudiation to the employees involved and there must be no proscribed conduct on the employer's part after the publication. [Citation.] And, finally, … such repudiation or disavowal of coercive conduct should give assurances to employees that in the future their employer will not interfere with the exercise of their … rights." (*Id.* at pp. 138-139; accord, *J.R. Norton Co. v. Agricultural Labor Relations Bd.* (1984) 162 Cal.App.3d 692, 697.) The Board concluded that since other violations occurred after the remedial noticing and training, Gerawan was not entitled to a *Passavant* defense. Since that assessment would appear to be correct, we conclude that the Board did not err in concluding the defense was not applicable.

However, even though an affirmative defense may not have been shown, we agree with Gerawan that the ALJ and the Board should have considered Shawver's statements

47.

to the Superior Court giving his assessment of the nature and efficacy of the training, and describing the likely impact of such training on the workers' understanding of their rights. In that regard, we have granted the request by Gerawan for judicial notice of the court records regarding the injunctive proceedings in the Superior Court, which records were presented in the ALJ hearing but were not considered by the ALJ or the Board. Since those records were potentially relevant to the Board's evaluation of the issue of whether workers would likely have been coerced or intimidated, the Board should have considered them.[55] As set forth in our dispositional conclusions (see *post*), we will be remanding this case back to the Board. On remand, the Board should consider the reasonable impact of the remedial training (including Shawver's Superior Court descriptions thereof) in the course of the Board's evaluation of all of the facts and circumstances bearing upon whether coercion took place affecting the workers' ability to exercise freedom of choice in the election.

## B. Alleged Assistance Through Preferential or Discriminatory Treatment

The ALJ concluded that Gerawan unlawfully assisted the decertification effort by showing favoritism toward pro-decertification signature gatherers with respect to their ability to engage in worktime signature gathering (i.e., the purported discrimination). In addition, the ALJ found that Gerawan extended to Silvia Lopez a "virtual sabbatical," meaning that she was allowed extensive time off that she often used for obtaining decertification signatures. Gerawan challenges both of these findings.

### 1. Preferential Treatment of Pro-Decertification Worktime Signature Gatherers

The ALJ found that Gerawan allowed pro-decertification workers to circulate signature sheets and solicit signatures during work hours, but did not allow pro-UFW

---

[55] However, we agree with the Board's conclusion that Shawver's general descriptive observations in the Superior Court do not constitute binding judicial admissions.

48.

workers to do the same. According to the ALJ: "There was persuasive credible evidence that pro-UFW workers requested permission from their crew bosses to circulate pro-UFW petitions during work time, and that the foremen rejected those requests." The Board affirmed the ALJ's findings, brushing aside Gerawan's argument that the evidence was a staged attempt to entrap Gerawan's supervisors and that it failed to prove preferential treatment. The issue of disparate treatment or discrimination was not a peripheral one because, based on Board precedent, merely allowing worktime signature gathering to occur is not by itself objectionable and does not constitute employer participation or assistance in a decertification campaign. (*Nash De Camp Company, supra,* 25 ALRB No. 7; *TNH Farms, Inc., supra,* 10 ALRB No. 37). However, such conduct is objectionable if the employer discriminates in favor of anti-union activity. (*D'Arrigo, supra,* 39 ALRB No. 4.)

Preliminarily, we note that the ALJ correctly found that workers in several crews asked their crew bosses for permission to gather pro-union signatures during worktime. In the crew of Alfredo Zarate, worker Agustin Garcia testified that he and another worker, Alberto Bermejo, asked Zarate for permission to gather signatures during work hours. Zarate confirmed that Garcia and Bermejo made that request, and he responded that they could collect signatures during the break times or rest times, but not during working hours. In the crew of Antonio Sanchez, worker Juan Lopez asked Sanchez for permission to solicit pro-union signatures during work hours, which request was turned down by Sanchez. In the crew of Francisco Maldonado, workers Eleazar Mulato and Rafael Marquez testified that they asked their crew boss, Maldonado, for permission to collect signatures during work hours. Maldonado confirmed that he told Marquez and Mulato that they could gather signatures during lunch or break time, but he did not grant their request to engage in that activity during working hours. Finally, in the crew of Martin Elizondo Cruz, crew member Jorge Aguirre asked permission to gather signatures for the union during worktime. According to Aguirre, Cruz denied his request, saying he

49.

had no authorization to grant such permission and that Aguirre would have to get special permission from the office for that.[56] Cruz testified that when Aguirre asked for permission to gather signatures, he told him that he could do it during breaks or at lunchtime, but not during work.

The ALJ inferred from the above evidence, together with the prior findings of worktime signature gathering by pro-decertification workers, that Gerawan had allowed pro-decertification workers to gather signatures during worktime but refused to allow pro-union workers to do the same thing. In challenging the ALJ's decision on this issue, Gerawan contends that, when viewed in light of the entire factual context, the evidence was insufficient to establish preferential treatment. As explained below, we conclude that Gerawan is correct.

According to Jose Erevia, on August 26, 2013, he received an anonymous telephone call alerting him that the UFW was planning to have pro-UFW workers attempt to entrap crew bosses into turning down requests to gather pro-union signatures during worktime. The next day, Jose Erevia directed all crew bosses to read a statement to their crews that included the following message: "To avoid false accusations of wrongdoing or being trapped into committing violations, do not ask me for … permission to gather signatures or distribute promotional material. If you choose that activity then do it during your rest periods, meal period, and off-the-clock periods when you are free to use your time that way." The wording of the announcement was clear that, regardless of who asked or whether they were pro-union or pro-decertification, the answer would be the same. Soon afterwards, consistent with the anonymous tip, there were multiple incidents in several crews where the crew bosses were approached by individual workers who

---

[56]     Although Aguirre testified that an announcement or letter from the front office to the effect that crew bosses could not grant permission to solicit worktime signatures was not read by Cruz until after the request had been turned down, even if that was the case, we note that Cruz's verbal response was substantially the same as what was read.

requested permission to gather signatures for the union during worktime. These worker requests, and the crew bosses' responses to them, constituted the critical evidence relied on by the ALJ in finding disparate treatment. However, both the ALJ and the Board glossed over or sidestepped the evidence demonstrating the staged[57] nature of the requests and the facially-neutral character of Gerawan's announcement in response. We, however, may not do so but are required to consider the whole record. (*Martori Brothers Distributors v. Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 727; *Merrill Farms v. Agricultural Labor Relations Bd., supra,* 113 Cal.App.3d at pp. 181-182.)

Furthermore, as pointed out by Gerawan, the orchestrated requests made by pro-UFW workers occurred soon after the crew bosses had received training from Silas Shawver on behalf of the Board, which included instruction on the importance of not assisting signature gathering. At about the same time, the TRO sought by the Board was issued by the Superior Court, and in response Erevia read the TRO to crew bosses and supervisors and explained what it meant and the importance of complying fully with its terms.[58] Thus, the need for crew bosses' careful compliance had been strongly and recently reinforced, both by the Board's own training and by Gerawan's instruction. The obvious thrust of that training and instruction was to prevent or avoid mistakes by crew bosses, moving forward. Into *this* precise background, Gerawan received word (the anonymous tip) that pro-UFW workers would be approaching crew bosses to ask for permission to solicit worktime signatures, and Gerawan (through Erevia) responded by directing its crew bosses to read the statement to workers that they could not grant

---

[57]    No other explanation for the requests was provided, and no witness rebutted Erevia's testimony on this subject. It would be reasonable to infer that the requests were staged or orchestrated because the union had no reason to be gathering signatures. As the certified bargaining representative, it was not petitioning for an election; only the pro-decertification workers were doing so.

[58]    The TRO ordered Gerawan's agents (i.e., crew bosses) to "cease and desist from approving, encouraging and circulating a decertification petition among its employees."

permission to gather signatures during work hours, but workers were free to engage in such activity at lunchtime or on breaks.

The crucial factual question is this: Were the crew bosses' responses denying the requests by pro-UFW workers for express permission to gather worktime signatures sufficient under the totality of circumstances to give rise to a reasonable inference of preferential treatment toward pro-decertification workers in regards to signature gathering? We conclude they were not. From all indications, Gerawan's directive to its crew bosses was a facially neutral response to the information learned in the anonymous tip, and, given the entire factual context, it is clear that the crew bosses' responses simply complied with that directive and also followed their recent training. Although it is true that several pro-union requests for permission were denied (i.e., they were the only workers who made such a request), there was no evidence that a comparable pro-decertification request was put forward and granted. Indeed, given the clear and specific nature of the announcement that crew bosses were required to read to their crews, it seems implausible that the answer would have been different if the requesting workers had been pro-decertification.

In finding preferential treatment, the ALJ appears to have compared the refusals to grant *express* permission to gather pro-union worktime signatures with the fact that pro-decertification workers had, on their own accord, previously engaged in some scattered incidents of worktime signature gathering. However, under the unique circumstances here as explained above, that was not an apt comparison. Given the timing, the context, the crew bosses' recent training, and the neutral announcement in response to the anonymous tip, all of which were clearly reflected in the record and cannot be ignored by this court, the verbal refusals of permission relied on by the ALJ were simply too situationally distinct, and the attempted comparison too tenuous, to provide a basis for a reasonable inference of discrimination.

Instead, it appears the relevant comparison would be if pro-UFW workers were actually out in the fields seeking signatures during worktime but were stopped from doing so, while in the same or a similar setting, pro-decertification workers were not stopped from engaging in such activity during worktime. Looking to the record as a whole, we do not discern that there was any substantial or solid evidentiary support for the latter theory.[59] Therefore, we conclude that the finding by the Board that Gerawan discriminated in favor of, or treated preferentially, pro-decertification workers in regards to worktime signature gathering was not supported by substantial evidence. (See *George Arakelian Farms*, *Inc*. *v. Agricultural Labor Relations Bd.*, *supra*, 111 Cal.App.3d at p. 265, citing *Universal Camera Corp. v. Labor Bd*., *supra*, 340 U.S. at pp. 487-488 [a reviewing court "is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view"].)

## 2. **The "Virtual Sabbatical"**

The ALJ found, and the Board affirmed, that Gerawan assisted the decertification effort by allowing Silvia Lopez to take extensive time off work, such that she received in effect a "virtual sabbatical" which provided her a greater opportunity to gather signatures for the decertification petition. The undisputed evidence showed that, for the 10-week period from August 12, 2013 to October 20, 2013, Silvia Lopez worked an average of only 8.3 hours per week, while other workers at Gerawan were working approximately

---

[59] The ALJ made no findings of this nature regarding the instant unfair labor practice, and no facts reasonably demonstrating such actual preferential treatment were indicated in the record. We would note further that in order to fairly conclude that Gerawan, as employer, practiced discriminatory or preferential treatment toward one group, something more than merely an isolated, sporadic or *de minimus* occurrence would have to be shown (see *Be-Lo Stores v. N.L.R.B.* (4th Cir. 1997) 126 F.3d 268, 284-285). Here, as already noted, adequate supporting evidence was not reflected in the record as a whole.

50 hours per week on average. During that time, Silvia Lopez had a regular presence on company property collecting signatures. Her daughter, Belen Solano, assisted her in collecting signatures. From August 12, 2013 to September 15, 2013, Belen only worked an average of 9.7 hours per week. It was also undisputed that the employment manual at Gerawan provided that advance written approval by the company was required for a leave of absence, and further provided that the company may discipline an employee who has excessive absences, tardiness, or long lunch breaks. These employment policies were not enforced with respect to Silvia Lopez or Belen Solano.

According to the ALJ, it was evident that "Silvia and Belen could miss work with impunity, but still travel almost at will upon company property.… Yet Inocencio Bernal, who worked in the same crew, lost his position by simply taking off two days in a row." At the hearing, Bernal testified that he had been granted one day off to help his wife who was being released from the hospital, but when he asked his crew boss, Reynaldo Villavicencio, for permission to take one more day off to meet with his immigration attorney, the request was denied. According to Bernal, Villavicencio told him the company did not want people missing so much work. Bernal testified he explained to Villavicencio that his meeting with the attorney was very important, since it concerned his immigration status, and so he really had to be there. Bernal went to the appointment with his attorney, but when Bernal sought to return to his crew for work, he no longer had a position. Despite Bernal's testimony, Gerawan "did not call crew boss Reynaldo Villavicencio as a witness to try to explain this disparate treatment," which the ALJ said may "support drawing an adverse inference." Finally, the ALJ pointed to the additional evidence that "when the UFW requested the company to allow three or four workers to leave early to attend a negotiation session, the request was denied."

Based on the above evidence, the ALJ found employer assistance based on the "virtual sabbatical" given to Silvia Lopez, which facilitated the circulation of the decertification petition. The Board agreed and affirmed the ALJ's finding and rationale.

In doing so, the Board declared that the present case was "strikingly similar" to *Abatti Farms, Inc.* (1981) 7 ALRB No. 36 (*Abatti Farms*), where, according to the Board: "1) proponents of the petition were granted leaves of absence and other benefits (such as large bonuses) to facilitate circulation of the petition; 2) the employer sponsored a holiday party where the petition was circulated in the presence of supervisors; and 3) the employer brought the decertification petitioner together with legal counsel chosen by the employer so the petitioner could consult with him."  The Board noted that in *Abatti Farms*, "the employer … not only gave the decertification petitioner an extended leave of absence to campaign, but also 'abetted him in his decertification efforts by ensuring that he lost nothing [financially] because of the time he spent campaigning.'"  The Board suggested that since Silvia Lopez was not terminated (i.e., she "remained employed despite … extended absences"), she likewise "lost nothing" due to the time spent campaigning.  Finally, the Board observed that in *Abatti Farms*, the employer had unpersuasively tried to dispel the inference of unlawful assistance by pointing to evidence of its liberal leave policy.  That argument failed in *Abatti Farms* because another worker had received harsh treatment for taking a one-day leave of absence for union business.  Here, similarly, Gerawan had argued that Lopez's extended absences did not demonstrate wrongdoing because the company took a very flexible approach in enforcing its attendance policy.  As noted by the Board, that argument was unpersuasive in the present case in light of Bernal's testimony that he lost his position after taking two days off.

Gerawan challenges the Board's conclusions.  According to Gerawan, not only is the instant case substantially dissimilar to *Abatti Farms*, but there was no evidence that Gerawan's flexibility with respect to the work attendance of Silvia Lopez and Belen Solano was based on those workers being pro-decertification.[60]  Furthermore, Gerawan

---

[60]     Although not relied on by Gerawan because there was contrary testimony by Bernal, we note that there was considerable testimony presented at the ALJ hearing from workers, crew bosses and management alike that crew bosses had much discretion and

55.

points out that once it became clear that Silvia Lopez was gathering signatures from workers for the petition and discussing union issues with them, for Gerawan to have intervened by terminating her employment could itself be deemed a form of interference with concerted activity. As explained below, we agree with some of Gerawan's arguments on this issue, but nonetheless conclude that at least a technical violation was substantiated by the record.

To begin with, we agree with Gerawan that this case is not on all fours with *Abatti Farms*. In *Abatti Farms*, the Board concluded that the employer was guilty of pervasive interference and unlawful assistance with the decertification campaign based on a combination of multiple factors. One of those factors was that the petitioner not only received a leave of absence that facilitated signature gathering, but also was paid a large financial bonus and other unearned benefits ensuring that the petitioner "lost nothing because of the time he spent campaigning." (*Abatti Farms*, *supra*, 7 ALRB No. 36, p. 6.) Here, in contrast, Silvia Lopez and other decertification proponents were paid only for the hours of work they actually performed on the job, and nothing more. Thus, if anything, it would have been a financial detriment for Silvia Lopez or Belen Solano to take time off from their work to gather signatures, because in doing so they would be forgoing the wages that they might otherwise have earned if they were on the job. A second factor in the *Abatti Farms* case was the fact that the employer had sponsored a company Christmas party where the petition was conspicuously circulated for signatures in the close presence of the company's supervisors. (*Abatti Farms*, *supra*, 7 ALRB No. 36, p. 7.) Nothing comparable occurred in this case. The third factor in *Abatti Farms* was that the employer went beyond merely recommending an attorney, but affirmatively

_____

were generally very flexible in allowing workers to have time off for personal reasons, such as to leave early for an appointment. According to this testimony, a worker would simply need to notify the crew boss that he or she needed to leave early for personal reasons, and the request would typically be granted.

made arrangements to bring together the petitioner and a particular lawyer. (*Ibid*.) In the present case, in contrast, Gerawan had no involvement in the process by which Silvia Lopez obtained legal representation. Because of the significant differences between *Abatti Farms* and the present case, we conclude that *Abatti Farms* is clearly distinguishable. Contrary to the Board's suggestion, the instant matter simply cannot be shoehorned into the *Abatti Farms* precedent. Therefore, we review the present issue under its own unique facts and circumstances, as shown from the record as a whole, to determine whether substantial evidence supported the Board's finding of assistance through preferential treatment with respect to allowing time off work.

Next, Gerawan maintains that by allowing Silvia Lopez and Belen Solano to take extensive time off, it was merely giving deference to and/or avoiding interference with concerted activity on the part of its workers. In support of this proposition, Gerawan points out that crew member Francisco Severiano testified that when he complained to the crew boss, Reynaldo Villavicencio, about Silvia Lopez's absences, Villavicencio responded that he could do nothing about that.[61] According to Gerawan, even the different treatment received by Bernal could plausibly be explained under this theory—that is, Bernal only had personal reasons to be absent, while Silvia Lopez and Belen were engaged in concerted activity.

Although Gerawan's explanation is arguably a reasonable one, it is not the only plausible interpretation of the evidence. Further, there is an additional piece of the factual puzzle that goes against Gerawan's position. As the ALJ found, Gerawan denied a request from the UFW to allow three or four workers to attend a negotiating session. Later, with respect to subsequent negotiating sessions, Gerawan ultimately agreed to release the workers under conditions where their absences would only be for a couple of

---

[61]    The fact that Gerawan's crew bosses had been repeatedly instructed to keep away from and not interfere with concerted activity would be consistent with this theory.

hours to attend afternoon negotiating sessions. It is apparent that Gerawan's solution was to allow the pro-UFW workers time off to participate in the negotiating sessions after adjustments to the timing of the negotiating sessions minimized the disruption to the workers' work schedules. Thus, an interest in minimizing the loss of worktime was shown by Gerawan with respect to the pro-UFW workers, but that same concern as employer was not applied toward pro-decertification workers Silvia Lopez or Belen Solano.[62] In further contrast, when Bernal sought a second day off work for a legitimate reason, he was denied and was told by his crew boss (who was also Silvia Lopez's crew boss) that the company does not want people missing that much work.

Looking to the record as a whole, it appears that greater flexibility to be absent from work was extended by Gerawan to Silvia Lopez and Belen Solano, both of whom were decertification proponents. Additionally, on this record we believe the Board was within its discretion to draw a negative inference from the fact that Gerawan did not call Villavicencio to testify. (See *Underwriters Laboratories Inc. v. N.L.R.B.* (9th Cir. 1998) 147 F.3d 1048, 1054 ["'[W]hen a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge.' [Citations.]"].) We conclude that the Board's particular finding of assistance based on favorable treatment to Silvia Lopez and another pro-decertification worker (in terms of

---

**62** We agree with Gerawan that no wrongdoing may be imputed from the fact that Gerawan did not fire Silvia Lopez. There is simply no reason to conclude that a mere failure to fire Silvia Lopez or any other employee in this case would have a tendency to prove anything. Further, we note that it would have been reasonable for Gerawan to have proceeded cautiously by avoiding any drastic intervention such as termination of employment that could, at least arguably, be deemed an interference with concerted activity. On the other hand, it is notable that Gerawan did not undertake any lesser disciplinary or corrective measure, such as by insisting that more hours be spent on the job.

58.

the leeway that was shown to them regarding extended absences from work) was supported by substantial evidence.

## C.  Failure to Intervene Concerning Work Stoppages and Protests

On September 30, 2013, in response to the Regional Director's rejection of the first petition, Silvia Lopez and other proponents of decertification carried out a massive work stoppage and protest at Gerawan's west side ranch property.  Additionally, on October 2, 2013, with the help of a financial donation by a third party organization (the CFFA), Silvia Lopez and several hundred other workers who sought a decertification election were able to travel to Sacramento on chartered buses to petition for redress before the Board.

In considering the above worker-initiated protests, the Board found that these events amounted to unlawful assistance *by Gerawan* to the decertification movement because Gerawan did not make any effort to intervene (as to the September 30, 2013 work stoppage) and/or was complicit in some manner (as to the October 2, 2013 bus trip). Gerawan challenges the Board's findings in each matter, maintaining that it had no advance knowledge of the worker protests, it was not complicit, and that under the circumstances, it had no obligation to intervene.  Among other things, Gerawan argues that it was permissible for it to take a cautious or deferential approach to the concerted activity engaged in by its workers, in order to avoid employer interference with it, and, in merely exercising such restraint during peaceful worker protests, it did not commit an unfair labor practice.  On the record before us, as more fully explained below, we conclude that Gerawan is correct.

We preface our discussion of these matters with a recitation of the ALRA's strong protections of employees' concerted activity.  Concerning agricultural workers' right to engage in concerted activity free of employer interference, section 1140.2 provides:  "It is hereby stated to be the policy of the State of California to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and

59.

designation of representatives of their own choosing, … and to be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Similarly, section 1152 states: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities …." Section 1153 states it is an unfair labor practice for an employer "(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152."

1. **The September 30, 2013 Work Stoppage**

On September 30, 2013, only a few days after the Regional Director of the Board rejected the first decertification petition, Silvia Lopez and other leaders in the pro-decertification campaign responded by carrying out a large work stoppage[63] and protest, which involved blocking work entrances to the fields early in the morning and urging all the arriving workers to gather at a designated location where a massive protest took place. Entrances to the fields were blocked by people, cars, colored tape and ladders.[64] As the workers arrived early that morning and discovered what was happening, they

---

[63] The record of the ALJ hearing reflects that the parties and witnesses often used the term "stoppage," which in context appears to refer to the fact that workers were walking off the job (i.e., refusing to work, or stopping their work for a time) for the purpose of carrying out a protest or demonstration.

[64] The colored ribbon or tape was the same as or similar to that used by Gerawan to mark off trees or sections of orchards. The ladders were company-owned equipment.

made their way to the main protest location at Road 145 (145)[65] and Central Avenue. The arriving workers were informed by protest organizers of the news that the Board had rejected their signatures and were told that the stoppage and protest was going to help make their voices heard. Silvia Lopez and other advocates of decertification spoke at the protest using a megaphone, while many other workers chanted that they wanted a vote or carried protest signs. During the protest at 145 and Central, several of the decertification proponents were busy gathering signatures. News reporters arrived at the scene and interviewed protest participants. Nearby the main protest, a small group of pro-UFW workers also gathered. At one point, an ALRB van, with ALRB staff inside, drove very slowly through the crowds of people at 145 and Central to observe what was happening. Estimates of the total number of people at the September 30 protest ranged from between 1,000 to over 2,000 of Gerawan's agricultural workers. The walkout caused a huge disruption to Gerawan's operations during a busy time when fruit had to be harvested. Gerawan estimated the company lost $100,000 to $200,000 due to the September 30 work stoppage.[66]

Silvia Lopez testified that the September 30, 2013 work stoppage and protest was not for the purpose of gathering signatures, but was to protest the dismissal of the first petition and send a message to the Board that the workers really wanted an election. The ALJ did not credit Silvia Lopez's testimony that the work stoppage was not to gather signatures. Other decertification proponents had testified that at least one of the reasons for the September 30 work stoppage was to gather signatures, and Silvia Lopez

---

[65]     It is not clear whether the correct designation is Highway 145 or Road 145. Since the parties and most of the witnesses referred to it as simply "145" or "the 145," we shall do so as well.

[66]     Not only was fruit not harvested, but Gerawan decided to pay all of its workers reporting pay (i.e., four hours' pay) for the day.

acknowledged that about 800 to 1,000 new signatures (for the second petition) were collected during the work stoppage and protest.

The Board found that although Gerawan did not know about the work stoppage in advance and did not give permission to its workers to walk off the job or gather signatures, nonetheless, Gerawan's failure to intervene in the unfolding events of that morning[67] proved that Gerawan "acquiesced" in or gave "tacit approval" to what was happening. The Board reasoned that because it was improper for employees to block work entrances, and given that some employees may have wanted to work and/or arguably did not wish to be part of the protest, Gerawan should have immediately sent people over to rectify the situation. According to the Board, when Gerawan failed to do so, its inaction constituted culpable acquiescence allowing the decertification proponents to gather 800 to 1,000 signatures they would not otherwise have been able to obtain. Under this line of reasoning, the Board found Gerawan guilty of unlawfully assisting in the decertification movement by virtue of its failure to intervene in the September 30, 2013 work stoppage and protest.[68] Gerawan challenges the Board's findings as unsupported by the record as a whole. Moreover, Gerawan asserts there were no facts creating a duty to intervene, and, quite to the contrary, it was both reasonable and permissible for it *not* to do so under all the circumstances. On the record before us, Gerawan is clearly right.

---

[67] By most accounts, the protest at 145 and Central was over by noon or 1:00 p.m.

[68] The ALJ had found that, because the decertification proponents blocked work entrances, they (also referred to by the ALJ as the "Petitioner's group") committed an unfair labor practice by preventing other employees who may have wanted to work that day from doing so, and instead [allegedly] coerced or restrained them to participate in the protest. The Board did not specifically affirm an unfair labor practice finding against the decertification proponents as such, presumably because the group of workers seeking decertification was not a party (or parties) charged with an unfair labor practice. However, the Board did find that such conduct was wrongful, and decided that it could and would be *imputed* to Gerawan, based on Gerawan's failure to intervene.

62.

To begin with, the Board's factual assumptions upon which it concluded that Gerawan had a duty to intervene in the massive work stoppage and protest were unsupported by the record as a whole or inadequate to create such a duty. In its findings, the Board latched onto an isolated statement by Erevia that, early that day, he was aware there was a worker protest underway and it was not the union. However, Erevia's statement, whether considered in isolation or in its fuller context, does not reasonably establish that he had more than a sketchy picture of what was happening. Moreover, nothing in his testimony as a whole reveals a factual basis for an affirmative duty on Gerawan's part to immediately intervene in the initial stages of the worker protest.[69] To summarize, Erevia testified that on September 30, 2013, he received a call around 6:00 a.m. from the security manager who reported "that there was a congregation of people on Lincoln Avenue and Central … and they [the security guards] did not know exactly what's going on[,]" but there were "a lot of rumors and hearsay." The security manager called Erevia back at about 6:30 a.m. and reported that traffic was getting worse in the area of the worker demonstration, law enforcement was being contacted, and it appeared that the protest was "a worker protest" and it "was not the union." Erevia interjected during his account of this conversation that the contacting of law enforcement was a common sense precaution because "[o]bviously, when something like that happens there's always a concern about safety." Erevia testified that he asked the security manager to keep him posted, and he then instructed his field auditors heading out to various ranch locations to be observant and let him know what they learned. He also sent Mike Gerawan an e-mail, with a copy to legal counsel, to let them know what was going

---

[69]    As will be seen, after the workers initially arrived at the field entrances, they moved toward the site of the protest at 145 and Central, which soon became massive in size. Thus, it is reasonable to assume that the only practical opportunity to intervene safely and effectively, if any, would have been in the initial moments of the work stoppage.

on.[70] Erevia continued his testimony: "After that, constant questions started coming in, people wanted to know more, so I was on the phone pretty much the first half of the day trying to figure out what was going [on] and trying to keep attorneys, and in this case Mike Gerawan, informed of what was going on." While it was evident to Erevia that "something big was happening" in the way of a worker protest on the west side involving a "large number of workers," the situation was "very chaotic" and unlike anything he had encountered before.

Erevia further testified that, based on conversations with the security manager and field auditors (between 6:00 a.m. and 7:30 a.m.), he came to understand that entrances to fields had been blocked. Erevia said he did not have any precise information, but based on the prior report that there was a congregation of people at or near the entrances, his understanding was that entrances were being blocked by people. It also appeared from the information he received "early on" that the people had cleared from the areas near the entrances "and had gone to 145." It was not until later in the day that Erevia was apprised that employees had placed tape and ladders in front of some of the entrances. He had also learned from the security manager that law enforcement had cleared all the entrances or areas that were previously blocked.

We note that office manager, Tatjana Projkovska, provided a similar account. She recalled the day of the work stoppage as being highly chaotic and extraordinary. Early that morning, at about 6:00 or 6:30 a.m., while still at home, she received a call from a counter about a ranch entrance being blocked. Projkovska assumed it was something routine, so she sent a message that the crew should try to use an alternative entrance. At about 6:30 or 6:45 a.m., another call came in from another counter informing her that workers were "walking towards Madera Avenue, which is Road 145." Projkovska

---

[70] Mike Gerawan was the co-owner and manager who primarily oversaw field operations, while Dan Gerawan was the co-owner and manager who primarily oversaw plant operations.

64.

realized at that point that "something [was] going on," since workers do not normally leave their assigned worksite and just start walking. She called Erevia, who did not know what to make of it all, but asked Projkovska to be on standby. Projkovska drove to the west side office, and on the way passed through the intersection of 145 and Central. She testified there was a "massive amount of people" at that location; they were yelling and had signs that read "Let us vote," and "No UFW." She had to honk the horn to get the people to move out of her car's path so she could get through the crowd without hitting anyone. Projkovska arrived at the office between 8:15 and 8:35 a.m. During the course of that morning, plant manager Marco Luna called her several times, each time asking her to push further back the scheduling of workers at the processing plant to a later start time, since it did not (yet) appear that any peaches were being harvested.

Projkovska testified that Erevia called and asked her to "get every single crew boss at the office as soon as possible" because "[t]here will be a conference call." In response, Projkovska had her clerks call all the crew bosses to tell them to come to the office right away and to "stay away from whatever is going on, on 145." Projkovska stated she had her clerks include the additional message to stay away from 145 because what was happening there was obviously union-related and she had attended the training given by Silas Shawver (i.e., the ALRB training for supervisors and crew bosses) where Shawver gave specific instructions that "if anything's going on union-related, you as a supervisor or crew boss, you stay away from it." The crew bosses gathered at the west side office, and the conference call took place at about 10:30 a.m. The call lasted about 20 or 30 minutes. Because the conference call was conducted by or in consultation with company attorneys, the content of the conference call was deemed privileged and was not part of the record. At about 10:45 a.m., Marco Luna telephoned Projkovska to have her cancel plant operations for that day. At noon, Projkovska drove home to complete some payroll computations, and when she passed by 145 and Central, "there was nobody there."

65.

Based on the above summary of the pertinent record, we conclude that the Board's premise that Gerawan's managers had knowledge of facts creating a duty to *immediately* intervene in the workers' protest is simply not borne out by Erevia's testimony or by the record as a whole. The Board relied on Erevia's testimony, but at most that testimony (and the remainder of the record) consistently showed the following: A massive worker protest was underway that morning, and the situation was highly chaotic and fluid. After some initial confusion, it was learned that the union was not the instigator. Workers were arriving, but they were also walking away from the work entrances toward a larger protest. While there were initial reports of entrances being blocked, no precise details were known, and the crowds of workers themselves were a likely explanation for the obstruction. In any event, the workers were moving down toward the site of the protest, at 145 and Central.[71]

In light of the record, the present case is readily distinguishable from the cases cited by the Board in which a duty to intervene was held to exist. For example, in *Newport News Shipbuilding & Dry Dock Company* (1978) 236 NLRB 1499, a "dozen incidents of confrontation" occurred over a period of 10 days between members of rival unions. (*Id*. at p. 1501.) To keep members of the rival union away, one of the unions

---

[71]     As noted, the record shows that by the time Gerawan (through Erevia) had learned that entrances were blocked by ribbon and ladders, the workers had largely moved to the protest location at 145 and Central and the protest was well underway. Gerawan points out that, by then, it was not in a position to break up a massive protest, and adds that worker safety was best served by letting the protest play itself out (with law enforcement nearby) rather than trying to storm into the midst of it and squelch the demonstration. The Board does not directly challenge these latter assertions, but argues that something should have been done by Gerawan much earlier with respect to the field entrances. However, even if (hypothetically) Gerawan had known of the presence of the ribbon and ladders somewhat sooner, the Board's supposition that rushing into the commotion to cut ribbons or move ladders would have deterred the workers from continuing in their protest or otherwise have changed anything that occurred, is mere conjecture. Nor, in the initial chaos and confusion of that early morning, could it have been clear that doing so was a reasonably safe option to pursue.

engaged in continuing acts of harassment and intimidation over the 10-day period that included removing anyone from a particular work zone who was a member of the rival union (regardless of the fact that the person was there for work-related reasons), grabbing any papers or work drawings from the person's possession, and ordering them to stay away in an intimidating manner. (*Id.* at pp. 1505-1507.) Although no physical acts of harm or violence had occurred, "the intimidation and threat of force implicit in the circumstances were not lost upon the design employees, and they reacted to the directions and ultimatums … accordingly." (*Id.* at p. 1507.) Since the employer in that case knew of these events over the entire 10-day period, and had remained passive, it is not surprising that the NLRB found a violation of the employer's duty "to maintain discipline in the plant and to provide his employees with the opportunity to work without interference from their coworkers." (*Id.* at pp. 1506-1507.)[72] Nothing of the sort occurred in the present case. There was no evidence of threatening conduct or coercive confrontations, and plainly nothing in that category of which Gerawan was aware.[73] Rather, it appeared that a peaceful but massive worker protest and walkout was underway. By the time Gerawan had more than sketchy information about the blocked entrances, the workers were already engaged in their large-scale protest at 145 and Central, and several hours later, the protest was over. For these reasons, the present case is distinguishable factually from the *Newport News Shipbuilding* case.

---

[72]     As explained in the decision by the NLRB, this duty on the part of the employer may not be "delegated or surrendered to any union or antiunion group, and an employer who acquiesces in the exclusion of employees from his plant by such a group will be regarded as having discriminated against the excluded employees" in violation of the NLRA. (*Newport News Shipbuilding & Dry Dock Company*, *supra*, 236 NLRB at p. 1507.)

[73]     It is true that there need not be a physical assault for an act of coercion to be present. (See, e.g., *Multi Color Industries* (1995) 317 NLRB 890, 897.) Here, however, there was no specific information about particular employees or groups of employees being coerced or restrained to act against their will.

Similarly, the case of *K.B. Specialty Foods Co.* (2003) 339 NLRB 740 represents a stark contrast to the present case. In that case, a group of anti-union employees confronted union representatives, yelled insults, hurled several rocks, made a threat to run over the union representatives, and set union flyers on fire. (*Id*. at p. 748.) Other cases cited by the Board are of the same sort factually, and hence, distinguishable. (See, e.g., *Newton Brothers Lumber Company* (1953) 103 NLRB 564, 567-569; *Fred P. Weissman Company* (1946) 69 NLRB 1002.) For example, in *Newton Brothers Lumber Company*, *supra*, unlike the present case, the employer was advised that the rights of a pro-union employee had been and still were being interfered with in the workplace by certain anti-union employees (i.e., through means of violence, forced exclusion from the workplace and threats) and the employer did nothing to prevent that situation's continuation. (*Id*. at pp. 567-569.)[74]

To reiterate, we conclude that the isolated testimony of Erevia, and the record as a whole, fail to support the Board's premise that Gerawan had knowledge giving rise to an affirmative duty to intervene in the protest.

The Board also seized upon the failure by the crew bosses to intervene when each one individually arrived at their respective field entrance early that morning. The Board found the crew bosses' confusion, inaction and avoidance of the situation to be "surreal." In the Board's view, this purportedly "surreal" and hands-off response by the crew bosses in the field was further evidence that Gerawan was guilty of wrongdoing. However, the Board's assessment strangely failed to reckon with two prominent factual realities that were clearly present and shown by the record, and in the light of which the crew bosses'

---

[74]    The NLRB opinion included the following rule of law: "'An employer's responsibility for such exclusion is … not dependent upon knowledge in advance of exclusion, but arises if the employer … is immediately advised of the exclusion and does nothing to prevent its continuance.'" (*Newton Brothers Lumber Company*, *supra*, 103 NLRB 564, p. 567.)

reactions were not "surreal" at all: (i) the crew bosses were confronted with a highly extraordinary and unexpected situation of a massive worker walkout and protest, and (ii) they had been taught not to intervene in concerted activity engaged in by workers. On the latter point, Gerawan manager Jose Erevia testified that the company would not expect the crew bosses to interfere with what clearly appeared to be concerted activity by the workers, emphasizing that crew bosses had been repeatedly instructed by Gerawan (and by the Board itself, through Silas Shawver) not to intrude into or interfere with workers engaging in concerted activity.[75] Thus, on September 30, 2013, when the crew bosses encountered crowds of workers calling for or already engaging in a work stoppage and protest, with many such workers also gathering in front of and/or obstructing entrances, the crew bosses reacted in accordance with their training when they did not interfere but kept back or distanced themselves from the concerted activity.[76]

The crew bosses' testimony, although at times less than clear in describing initial reactions to the work stoppage, was entirely consistent with the circumstances noted above. Most of the crew bosses testified that they left the area or distanced themselves from the workers while awaiting word from supervisors on what to do. Two stated they were somewhat fearful or concerned for their own safety. Other crew bosses were more explicit in recalling their training and/or expressing a concern to not interfere with concerted activity. For example, Raquel Villavicencio testified that she was tense and afraid, she had never seen anything like it before, but she realized that she should remove

---

[75]    Likewise, Mike Gerawan, who was in charge of field operations, testified that he did not go out during the protest to personally investigate what was going on because it "was obviously … union-related or protected[,]" so he "didn't want to walk in the middle of something I wasn't supposed to."

[76]    Along with the issue of avoiding interference with concerted activity, Gerawan asserts that its management and crew bosses were entitled to take a reasonably careful or cautious approach, out of concern for worker *safety*, where any potential question of intervention to break up or squelch the efforts of a large crowd of agitated workers may be concerned, particularly in the early stages when information was more sketchy.

69.

herself from the area of the crowds based on Jose Erevia's training to leave when there is a large group of workers. Crew boss Benigno Gonzales stated he knew he should get away from the area, and that he did not call workers to come back during the protest at 145 and Central because "we cannot get involved in things related to the union." Crew boss Emma Cortez testified that when she heard workers talking about a protest, she "didn't want to intervene."[77] Crew boss Santos Rios said he decided to leave the area where people were protesting because, "what could I be doing there?" Another crew boss, Martin Elizondo Cruz, stated that although he could easily have removed the ribbon, he did not do so for fear of being "scolded," since he did not understand all that was going on with the workers and entrances or why the ribbon was there.

Based on the foregoing, the Board's conclusion that the crew bosses' reactions to the work stoppage were "surreal" or somehow revealed purported wrongdoing on Gerawan's part was not supported by substantial evidence in the record as a whole. At most, the crew bosses' deferential and hands-off response was—from an evidentiary standpoint—equivocal and inconclusive concerning the issues at hand. If anything, as the above summary of the larger record indicates, the crew bosses' reactions more closely and coherently aligned with the factual explanations offered by Gerawan—i.e., that the crew bosses were acting in accordance with their training to avoid concerted activity. In short, the crew bosses' nonintervention into the workers' protest that morning did not constitute substantial evidence of unlawful conduct on Gerawan's part.

Finally, in an ironic twist, the Board criticizes Gerawan for issuing a press release on the day of the walkout that expressed approval for the workers' fundamental right to choose. The September 30, 2013 press release provided the following statement by Dan Gerawan on behalf of the company: "It is unfortunate that our employees felt they

---

[77] The ALJ discredited Emma Cortez's testimony about her "activities" on September 30, 2013, because the ALJ found it implausible that she would have just waited around or hid in her car for six hours.

needed to take such a drastic action to have their voices heard. We are still hopeful that the Ag Labor Board will protect the workers' right to choose. We believe that the right to choose is a fundamental right of all employees. So too is the right to express one's views in a peaceful and respectful manner." Remarkably, the Board concludes that this statement of worker rights and freedoms is evidence that Gerawan was actually trying to *coerce* its workers. We see no reasonable basis for the Board's position. As Gerawan aptly remarks, "[t]he Board fails to explain its Orwellian conclusion that championing workers' 'fundamental right to choose' constitutes coercion." Moreover, "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." (*NLRB v. Gissel Packing Co.*, *supra*, 395 U.S. at p. 617.) The only exception is where the communication contains a "threat of reprisal or force or promise of benefit." (*Id.* at p. 618.) As a relevant ALRA provision puts it: "The expressing of any views, arguments, or opinions, or the dissemination thereof, … shall not constitute evidence of an unfair labor practice under the provisions of this part, if such expression contains no threat of reprisal or force, or promise of benefit." (§ 1155.) It is clear that Gerawan's press release was protected free speech and, since it did not contain a threat of reprisal or promise of benefit, it cannot constitute the basis for an unfair labor practice. The Board clearly erred in considering it to be a factor in deciding whether Gerawan's failure to intervene constituted an unfair labor practice.

In accordance with the foregoing analysis, we conclude there was no substantial evidence in the record as a whole to support the Board's findings and conclusion that Gerawan's failure to intervene in the September 30, 2013 work stoppage and protest constituted an unfair labor practice. As explained above, the Board focused upon equivocal, fragmentary evidence that did not prove the existence of a duty to immediately intervene, and the Board drew inferences from such evidence that neither the evidence by itself nor the record as a whole could reasonably support. As we noted previously,

71.

"'[T]he test of substantiality must be measured on the basis of the *entire* record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence.' [Citations.]" (*Martori Brothers Distributors v. Agricultural Labor Relations Bd., supra,* 29 Cal.3d at pp. 727-728, italics added.) Thus, the substantiality of evidence "'must take into account whatever in the record fairly detracts from its weight' [citation]." (*Merrill Farms v. Agricultural Labor Relations Bd., supra,* 113 Cal.App.3d at p. 182.) Further, a reviewing court is not barred from setting aside a Board decision where the court "'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.*, *supra*, 111 Cal.App.3d at p. 265, citing *Universal Camera Corp. v. Labor Bd., supra,* 340 U.S. at pp. 487-488.) Such is the case here. In the end, what emerges is that the Board attempted to hang an unfair labor practice finding on what amounted to little more than bare suspicions. That, of course, was insufficient. (*Vessey & Co. v. Agricultural Labor Relations Bd.*, *supra*, 210 Cal.App.3d at p. 642.) Moreover, our conclusion that Gerawan's failure to intervene did not constitute an unfair labor practice is further confirmed by the fundamental policy of the ALRA to promote the right of agricultural employees to engage in concerted, expressive and associational activity relating to representational issues *without* the interference of employers. (§§ 1140.2, 1152, 1153.) Since the record did not establish a basis for a duty to intervene, Gerawan's deference to its workers' peaceful protest and concerted activity was clearly not an unfair labor practice.

## 2. October 2, 2013 Bus Trip and Protest

The Board found that Gerawan unlawfully assisted the decertification campaign by virtue of its conduct relating to the workers' October 2 bus trip to Sacramento. In the October 2 bus trip, which took place only two days after the September 30, 2013 work

stoppage, about 400 Gerawan workers traveled to the state capitol, primarily for the purpose of petitioning for redress and/or protesting *before the Board* at its state headquarters in Sacramento. The Board's finding against Gerawan consisted of two distinct facets: One, that Gerawan was *complicit* in CFFA's donation of funds to pay the transportation expenses of chartering buses and providing meals in connection with the workers' Sacramento trip, which donation by CFFA was purportedly wrongful[78] under the ALRA as a violation of section 1155.4, subdivision (c) (§ 1155.4(c)); and two, that CFFA's financial contribution and the workers' bus trip may be *attributed to* Gerawan under ALRA case law. Gerawan challenges both aspects of the Board's overall finding of an unfair labor practice.

Before proceeding, we provide some additional background facts in order to furnish adequate context to our discussion. Silvia Lopez was on a Fresno talk radio program hosted by Ray Appleton, at which time she made an appeal for financial help so that workers in the decertification movement could go to Sacramento to protest before the Board's main office there. The Regional Director had recently rejected the workers' first decertification petition, and Silvia Lopez and others believed that by going to Sacramento, to the site of the Board's headquarters, it would help get their message across that the workers really wanted a chance to vote. According to Silvia Lopez, the trip to Sacramento was to have their voices heard and to pressure the Board into allowing an election to go forward. However, there was one obstacle: the workers needed funds for transportation—hence the appeal for help on the radio broadcast. On October 1, 2013, Berry Bedwell (president of the CFFA) received a call from one of CFFA's members, Kent Stevens of Sunview Vineyards, who had heard the radio interview.

---

[78] The Board reversed the ALJ's finding that CFFA violated section 1155.4, since CFFA was not a party charged under the pleadings. However, the Board's discussion assumes that the statute was in fact violated, even if no binding finding against CFFA could issue. The Board then attributes responsibility for such violation to Gerawan.

Stevens asked Bedwell if the CFFA could help the workers with the expense of getting to Sacramento. Although Bedwell was in Washington, D.C. at that time, he was able to contact by telephone all the members of CFFA's executive committee[79] and obtain authorization from them for CFFA to make a financial contribution to pay for buses and food to help the interested workers get to Sacramento. Bedwell called the talk radio host, Ray Appleton, to obtain contact information for attorney Joanna MacMillan,[80] one of the attorneys who represented Silvia Lopez. On October 1, 2013, Bedwell told attorney MacMillan that CFFA would pay for the workers' transportation expenses, including food costs, up to a total of $20,000. Bedwell made his CFFA credit card available to attorney MacMillan so that the workers could charter buses to get to Sacramento the next day, which was October 2, 2013. Bedwell understood that multiple buses would be needed and at least hundreds of workers would likely be going. MacMillan used the credit card to charter the buses, and food was also purchased during the bus trip using the same credit card. In all, the CFFA paid expenditures totaling $13,348 in support of the bus trip to Sacramento.

As to the logistics, before sunrise on October 2, 2013, at about 5:15 or 5:30 a.m., multiple buses were parked outside one of the company offices on the west side. Hundreds of workers met there and boarded the buses. Office manager Projkovska was awakened by an early morning call alerting her to the presence of buses parked on the street in front of the west side office, but she did not take any action at that time. She testified that she did not learn until later that day that the buses took workers to Sacramento. Dan Gerawan testified he did not learn about what happened until later that morning, when he found out that approximately 400 of his workers went to Sacramento

---

[79]   Gerawan was not part of the executive committee.

[80]   Joanna MacMillan worked as an associate with attorney Raimondo in representing Silvia Lopez. At that time, both were with the law firm of McCormick, Barstow, Sheppard, Wayte & Carruth in Fresno.

on buses.[81] Bedwell testified that he did not tell Dan Gerawan in advance that the CFFA was paying for hundreds of his workers to go to Sacramento for a protest in the midst of Gerawan's busy harvest season. Dan Gerawan claimed he did not know in advance that CFFA paid for the buses, but he learned of that fact sometime during the week after the October 2 bus trip. Dan Gerawan stated that, based on advice of counsel, he did not call Bedwell to complain about the events of October 2, but he was upset that the company lost revenue that day and had to scramble to make sure it fulfilled all of its orders. The sudden loss of 400 workers had a big effect on the harvesting and packing schedule.

In its determination that Gerawan could be held responsible for CFFA's payment of the workers' transportation and food expenses on October 2, 2013, the Board found two facts to be particularly significant. One was the fact that Dan Gerawan and Bedwell had been in regular contact by e-mail or telephone regarding the events of the decertification movement, but they failed to e-mail one another about the October 2 bus trip and protest. Considering that Bedwell and CFFA had facilitated the absence of 400 of Gerawan's workers from the fields during peak harvest, the ALJ and the Board thought this lack of communication was telling. The other fact of note was that office manager Projkovska testified that she had called several charter bus companies to inquire about availability of buses. The call was apparently made only a day or two prior to the October 2 bus trip and protest. Projkovska claimed it was a routine inquiry she regularly made at about that time of year, pursuant to Marco Luna's instructions, in case there was a need to move any remaining workers from the east side over to the west side during peak season.[82] The ALJ and the Board believed that Projkovska's inquiry about buses

---

**81** Dan Gerawan testified that the "knew such a trip was going to happen eventually or may happen … since Appleton had announced he'd secured the money."

**82** The ALJ found this explanation to be less than credible because, when Projkovska made the calls to inquire about bus availability, packing on the east side had already mostly shut down.

showed that Gerawan knew about the impending bus trip and/or the donation of funds.[83] From these and other circumstances, the Board concluded that Gerawan was fully complicit in the financial contribution made by CFFA.

(a) The Purported Violation of Section 1155.4

As noted, one part of the Board's finding of unlawful employer assistance was that CFFA's contribution to support the October 2, 2013 bus trip and protest violated ALRA section 1155.4(c), and further, that Gerawan was somehow complicit in that unlawful financial contribution.

We begin by examining the question of whether CFFA's donation to pay transportation and food expenses relating to the workers' October 2, 2013 bus trip to Sacramento constituted a violation of section 1155.4(c) of the ALRA. Section 1155.4(c) makes it "unlawful" for an agricultural employer or association of agricultural employers[84] to give money or other things of value to "[a]ny employee or group or committee of employees of such employer in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing." The goal of the statute is "protecting against corruption and undue influence in the collective bargaining process." (*United Farm Workers of America v. Dutra Farms* (2000) 83 Cal.App.4th 1146, 1156 (*Dutra Farms*).) The corresponding provision of the NLRA has consistently been construed by the NLRB and federal courts in a manner to avoid loopholes that might

---

[83]    The buses for the October 2, 2013 bus trip and protest were actually booked by Attorney MacMillan of the McCormick, Barstow, Sheppard, Wayte & Carruth law firm, using the CFFA credit card, not by Projkovska.

[84]    The ALJ found that CFFA is an association of agricultural employers, and that finding has not been challenged. Accordingly, we shall assume that CFFA is an association of agricultural employers for purposes of section 1155.4.

defeat or weaken the statutory objective, and the same approach has been followed in construing section 1155.4. (*Dutra Farms*, at p. 1155.)

Gerawan argues that section 1155.4(c) was inapplicable because CFFA's donation was not "for the purpose of" causing the recipients thereof to influence *other employees* regarding representation or bargaining issues. Rather, it was for the purpose of allowing a group of interested workers to protest before the Board in the state capitol, so that those workers could have their voices heard by the government agency with decisionmaking power over them. In other words, the bus trip subsidized by CFFA was not to influence other *employees*, but to speak to and influence *the government* through the employees' exercise of their First Amendment right to petition for redress and peaceably assemble and protest. Gerawan emphasizes that the purpose requirement in section 1155.4(c) may not be disregarded or treated as surplusage.[85] Under the clear terms of subdivision (c) of the statute, only gifts that are "for the purpose of" causing the recipients thereof to influence "other employees" concerning representation or collective bargaining are deemed unlawful. According to Gerawan, since the gift under consideration here was *not* for that purpose, the statutory prohibition was inapplicable and CFFA did nothing wrong.

The Board disagrees, arguing that a broad construction of section 1155.4(c) is warranted to prevent corruption of the process through such financial contributions. The Board asserts that *Dutra Farms*, *supra*, 83 Cal.App.4th 1146, supports its position. In that case, after the UFW announced a campaign to organize strawberry pickers into a union, a committee of anti-union employees was formed by employees who worked for two employers that grew strawberries. Those two employers provided financial

---

[85] Gerawan is correct that the "for the purpose of" requirement in the statute must be given meaningful effect. In construing a statute, "'effect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part of the provision useless or deprived of meaning.'" (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 18; *Guess v. Bernhardson* (2015) 242 Cal.App.4th 820, 828; see Code Civ. Proc., § 1858.)

assistance to the committee. One employer made monetary contributions and the other paid for latrines used at an employee-led march organized by the committee. The committee's purpose or agenda was solely to oppose the UFW, and it sought to further that cause through regular evening meetings with employees during the growing season and by means of marches and demonstrations. (*Id.* at p. 1150.) On appeal from summary judgment in favor of the UFW, both employers argued that section 1155.4(c) was inapplicable because their gifts to the committee were not *for the purpose of* causing the committee to influence other employees. The Court of Appeal rejected that argument on the record before it, explaining as follows: "There is no evidence that appellants were unaware of the nature of the Committee, unaware that it opposed the UFW, or ignorant that the donations had been made. [¶] These facts satisfy the statutory 'for the purpose of' requirement. Section 1155.4(c) does not … require evidence that the donations caused the recipient to engage in any particular conduct, or require evidence that the thing of value was used in a particular setting." (*Dutra Farms,* at pp. 1159-1160.)[86]

To summarize, the Board argues that CFFA's conduct was substantially the same as the two employers in *Dutra Farms*, *supra*, and urges that we reach the same result. Gerawan responds that the present case is clearly distinguishable because, here, there was evidence of a special or distinctive purpose for the gift that would bring it outside the scope of the statutory prohibition—namely, that the gift was to allow interested workers to go to Sacramento to seek redress, peaceably assemble and protest in order *to influence the government*, not to influence other employees.[87] Thus, unlike the situation in *Dutra*

---

[86] Although not entirely clear, it appears that the Court of Appeal's language in the last sentence was referring to the issue of *causation* (i.e., what the gift accomplished), rather than *intent* (i.e., the purpose of the gift).

[87] The testimony describing Silvia Lopez's appeal for help on the radio talk show, and of Bedwell's communications to the executive committee of CFFA in seeking to get approval to help the workers travel to Sacramento, provided substantial evidentiary support for this assertion.

*Farms,* where the committee's sole agenda was to influence other employees, here the workers were seeking in this particular instance to influence or persuade *the government*. Gerawan further points out that its position best accommodates workers' rights to engage in concerted activities and exercise their First Amendment freedoms. Finally, Gerawan notes that there was no testimony whatsoever that any employee believed that Gerawan had funded the bus trip.

The Board replies that even if a more particularized showing was required to establish the "for the purpose of" requirement of the statute, such purpose could reasonably be inferred here since decertification proponents would likely seek to influence other employees in *all* of their activities, including during this trip to Sacramento. In that regard, the Board notes that the events occurring in Sacramento on October 2, 2013 included a pro-decertification protest, and it assumes that worker signatures would likely have been gathered for the second petition during the course of the bus trip and protest. The Board also posits that news of what happened that day in Sacramento may have had an impact on other workers who learned about it.

Having framed the section 1155.4(c) issue and stated the parties' respective positions on it, we conclude that it is *unnecessary* for us to decide whether CFFA violated section 1155.4(c) in this case. That is because in the final analysis, whether or not section 1155.4(c) was violated by CFFA—a third party—there was no legal or factual basis present for attributing responsibility for CFFA's financial contribution relating to the October 2, 2013 bus trip to Gerawan. In other words, what matters here is Gerawan's own involvement, fault or responsibility, if any, in the financial contribution, and we believe that *that* question may be resolved without deciding whether CFFA technically violated the statute. Based on our review of the record and applicable law, we conclude there was no substantial evidence to support the finding that Gerawan was involved or complicit in the financial contribution made by CFFA. We proceed to explain our conclusion.

First, there is no evidence in the record to reflect that, during the relevant time frame, Gerawan had any grounds to conclude that a violation of law under section 1155.4 had occurred. What the record as a whole *does* clearly show is that, when events were unfolding on the morning of October 2, 2013, it became apparent to Gerawan that approximately 400 of its workers went by bus to Sacramento, and it was later confirmed that the workers had chosen to go to Sacramento for the purpose of protesting before the Board and the Governor. Even assuming for the sake of argument that Gerawan may have suspected that CFFA helped pay the transportation expenses for the interested workers to go to Sacramento, there is nothing in the record to suggest that Gerawan would have had any reason to believe CFFA provided such transportation expenses *for an unlawful purpose* of causing the recipients thereof to exert influence over other employees in regard to their rights to bargain and organize through a representative of their own choosing. (See § 1155.4(c).) Again, the workers clearly had a predetermined plan and purpose to petition the government (the Board or Governor) in Sacramento, and any third-party financial assistance that Gerawan may have supposed to exist would reasonably have been viewed accordingly.

Second, in the face of this exercise by its workers of concerted activity and petitioning the government for redress, we hold that Gerawan was under no mandatory obligation or legal compulsion to intervene in or repudiate the workers' peaceful bus trip and protest. If anything, shutting down or repudiating such conduct would have run the risk of being construed as improper employer interference with workers' associational or concerted activities protected under provisions of the ALRA (see §§ 1140.2, 1152, 1153, 1155). Along the same lines, we fail to see how Gerawan's mere deference toward its employees' concerted activity and exercise of their freedom to speak, assemble, and petition for redress in this case may be punished by the Board as an unfair labor practice. To peaceably assemble and present viewpoints concerning labor disputes or conditions in industry "must be regarded as within that area of free discussion that is guaranteed by the

80.

Constitution." (*Thomas v. Collins* (1945) 323 U.S. 516, 532.)  Contrary to the Board's heavy-handed approach to this issue, it has long been recognized that although the state has power to regulate unions and labor relations, it must not "trespass upon the domains set apart for free speech and free assembly" in how it applies such laws.  (*Ibid*.)  Moreover, as noted, not only was the employees' freedom of speech and assembly involved, but also their right to petition for redress to the government (here, the Board itself) in Sacramento.  (See *United Transportation Union v. Michigan Bar* (1971) 401 U.S. 576, 578-579, 585 [the right to petition includes "collective activity undertaken to obtain meaningful access" to government].)[88]  "The Supreme Court has stated that 'the rights to assemble peaceably and to petition for redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights.'"  (*City of Long Beach v. Bozek* (1982) 31 Cal.3d 527, 532, judg. vacated and cause remanded (1983) 459 U.S. 1095, reiterated (1983) 33 Cal.3d 727.)

The workers were able to travel to Sacramento and exercise these precious freedoms because of the financial assistance provided by a third party, CFFA.  Of course, the mere fact that Gerawan's workers were assisted by the gifts of a third party in the exercise of their First Amendment freedoms does not by itself create an unfair labor practice.  Indeed, in constitutional jurisprudence, it has been recognized that third-party support is often essential to effective public advocacy or petitioning for redress.  (See, e.g., *N.A.A.C.P. v. Button* (1963) 371 U.S. 415, 436 [penalizing third party participation and support "could well freeze out of existence" essential petitioning activity].)

---

[88]    The right to petition is closely related to other First Amendment rights. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." (*Borough of Duryea v. Guarnieri* (2011) 564 U.S. 379, 388.)

In summary, we conclude that the employees' October 2, 2013 bus trip and protest entailed the exercise of concerted activity under the ALRA, as well as the exercise of rights recognized under the First Amendment to peaceably assemble, protest and to petition the government for redress. On the record before us, Gerawan was not *required* to interfere with, repudiate or punish the employees for doing so, whether or not Gerawan may have learned or suspected that CFFA funded the transportation costs. We conclude that the Board erred in characterizing Gerawan's deference to its employees' concerted or expressive activities as an unfair labor practice.[89]

Third, the evidence purportedly showing that Gerawan was "complicit" in the financial contribution provided by CFFA (for travel and food) was patently insufficient to give rise to such an inference. As noted, the primary evidence relied on by the Board were the facts that (i) Bedwell and Dan Gerawan did not communicate about the events of October 2, 2013, despite their otherwise regular communications about events relating to decertification, and (ii) one or two days before the October 2 bus trip, Gerawan's office manager, Projkovska, made an inquiry about the availability of buses. These circumstances, if viewed liberally and considered together with Silvia Lopez's talk radio statements, may allow an inference that Gerawan somehow learned, suspected or anticipated that some of its workers would soon be traveling to Sacramento by bus for a protest and that CFFA was potentially the source of the needed transportation assistance for the workers. However, there is no reasonable and non-speculative foundation in the record for concluding anything of substance beyond that; and certainly nothing to indicate involvement with respect to CFFA's financial gift.[90] Thus, the Board's finding

---

[89] The tragic irony of the Board's finding of unfair labor practice is that the workers who engaged in their right to peacefully protest and petition for redress before the Board were the ones ultimately punished by the Board.

[90] In passing, we note that on October 1st, the news that the needed financial assistance had been provided for the workers' plan to travel to Sacramento was first communicated by Bedwell to Ray Appleton, then to Silvia Lopez's attorney (MacMillan)

of actual complicity by Gerawan in CFFA's financial donation went far beyond what the evidence reasonably showed and, in our review of the entire record, cannot be affirmed. (See *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.*, *supra*, 111 Cal.App.3d at p. 266 [courts of appeal have a "responsibility for assuring that the Board keeps within reasonable grounds," citing *Universal Camera Corp. v. Labor Bd., supra,* 340 U.S. at pp. 489-490]; see also, *Vessey & Co. v. Agricultural Labor Relations Bd.*, *supra*, 210 Cal.App.3d at p. 642 [burden of proving unlawful conduct is on the Board, such unlawful conduct will not be lightly inferred, and mere suspicions are insufficient].)

In summary, nothing in the record reasonably shows that Gerawan was in any way involved in or exerted influence over the series of events or decisions leading to CFFA's making of a gift to assist the interested workers regarding transportation costs. We conclude that the Board's finding that Gerawan was actually complicit in CFFA's financial contribution is unsupported. Furthermore, as already discussed above, even if Gerawan had some degree of reasonable suspicion or advance warning of the impending events, Gerawan was not required to prevent, interfere with, or scuttle the workers' plan to protest before the Board in Sacramento.

(b) Failure to Intervene in or Repudiate Bus Trip

The Board found that the workers' October 2, 2013 bus trip and the third-party financial contribution (from CFFA) which enabled it to happen could be attributed to Gerawan under principles set forth in the case of *Vista Verde Farms v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307 (*Vista Verde Farms*). We disagree.

---

and then to Silvia Lopez; at which point, Silvia Lopez somehow got word out to hundreds of workers about where and when to meet the next morning to get on the buses. Also, Ray Appleton announced that the money had been secured for the workers to go to Sacramento, so Dan Gerawan "knew that such a trip was going to happen eventually." Considering all the people receiving bits of information beforehand, it would not be altogether surprising if some inkling of what was about to happen came to Gerawan's attention.

In *Vista Verde Farms*, the Supreme Court, following NLRA precedent, adopted a liberal approach to employer responsibility under the ALRA for acts of agents or quasi-agents, whereby the question of employer responsibility for coercive conduct by such persons is to be viewed from the standpoint of the affected employees rather than from the strict requirements of agency law. (*Vista Verde Farms*, *supra*, 29 Cal.3d at p. 322.) *Vista Verde Farms* explained: "[A]n employer's responsibility for coercive acts of others under the ALRA, as under the NLRA, is not limited by technical agency doctrines or strict principles or respondeat superior, but rather must be determined … with reference to the broad purposes of the underlying statutory scheme. Accordingly, even when an employer has not directed, authorized or ratified improperly coercive actions directed against its employees, under the ALRA an employer may be held responsible for unfair labor practice purposes (1) if the workers could reasonably believe that the coercing individual was acting on behalf of the employer or (2) if the employer has gained an illicit benefit from the misconduct and realistically has the ability either to prevent the repetition of such misconduct in the future or to alleviate the deleterious effect of such misconduct on the employees' statutory rights." (*Ibid.*) Applying that rule in the case before it, the Supreme Court concluded that the coercive activities of a labor contractor who physically assaulted union representatives and ordered them to leave a labor camp residential area on the day before a representation election could be attributed to the employer. (*Id.* at pp. 313-314, 329-330.) The Supreme Court noted as an additional factor that the employer was present at the time, but failed to repudiate the labor contractor's coercive conduct. (*Id.* at p. 329.)

On the record before us, we find *Vista Verde Farms* to be distinguishable. The analysis in *Vista Verde Farms* is expressly predicated upon the existence of improper *coercive* conduct directed against employees by a third party; but here, the Board failed to show (and the record failed to demonstrate) that CFFA's gift to enable interested workers to travel to Sacramento that day, so they might have an opportunity to petition

84.

for redress and protest before the Board, was itself coercive in nature. Nor was there any evidence that any worker was pressured into getting on a bus or engaging in the protest or petitioning activity. Furthermore, there was no evidence in the record that any worker believed the buses were provided or sponsored by Gerawan, rather than by an outside source. Instead, testimony reflected that people were told the buses were donated by someone after the radio interview.

Nevertheless, the Board reasoned that workers, upon seeing that the buses were parked outside of Gerawan's ranch office, would have reasonably assumed that Gerawan was at least permitting the trip to occur, especially when they were not disciplined for missing work and Gerawan never said anything later to repudiate or disavow the trip. However, the Board's reasoning ignores two important factors. One is Gerawan's own free speech rights. As *Dutra Farms* acknowledged in construing section 1155.4 of the ALRA, "'an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit."'" [Citation.]" (*Dutra Farms*, *supra*, 83 Cal.App.4th at pp. 1160-1161.) Since the ALRA does not trump an employer's free speech rights, Gerawan would be free to express an opinion agreeing with the protesting employees and their cause; and since that is so, it is likewise true that Gerawan would not be compelled to speak out against or disavow their protest or the bus trip. (See *Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 342, 347 [freedom of speech includes both the right to speak and the right to refrain from speaking or being compelled to carry a particular viewpoint with which one disagrees]; *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 15-17 [plur. opn.].) A second factor that the Board apparently overlooked here is that Gerawan, as employer, was not *required* to punish, discipline or repudiate its workers for engaging in concerted or expressive activity. Rather, in the interest of avoiding potential

interference with such protected activities and allowing leeway for same, an employer may choose to refrain from such a response.

Finally, the present situation is unlike other cases cited by the Board where the NLRB found that a disavowal was necessary. In those cases, a disavowal by the employer was required under the circumstances to correct a material falsehood that otherwise would likely have impacted the employees' freedom of choice. (See, e.g., *Richlands Textile, Inc*. (1975) 220 NLRB 615, 618 [employer failed to disavow a statement made by a local politician telling employees he had been informed that the plant would close down operations if the workers unionized]; *Colonial Corporation of America* (1968) 171 NLRB 1553, 1554 [employer did not repudiate or deny a handbill that asserted that company was a nonunion company and would not attempt to continue operations under a union]; *Colson Corporation. v. N.L.R.B.* (8th Cir. 1965) 347 F.2d 128, 136 [employees could have reasonably believed a group of "businessmen" who contacted them to dissuade them from joining were "still connected with or at least were agents of" the employer because they had previously operated the company].) No comparable material falsehood existed in the present case that would require Gerawan to speak up and disavow it.

For the reasons explained above, *Vista Verde Farms* is distinguishable and does not provide a sufficient legal basis for attributing legal responsibility to Gerawan for the donation made by CFFA, a distinct third party. (See, e.g., *Superior Farming Co. v. Agricultural Labor Relations Bd*. (1984) 151 Cal.App.3d 100, 122-123 [*Vista Verde Farms* rule must not "be applied mechanically, without regard to circumstances, reasonableness, and fairness"].) There was no substantial evidence in the record to indicate that any workers were coerced or misled by CFFA's donation. Moreover, because of the important conjunction and interplay of free speech and concerted activities in this matter, we hold that Gerawan was not required to prevent, intervene in or repudiate the workers' bus trip and protest, and its failure to do so was not an unfair labor

practice.[91]  Accordingly, the Board's finding that Gerawan committed an unfair labor practice in connection with the events surrounding the October 2, 2013 bus trip was not supported by substantial evidence.

## D.  Solicitation of Grievances and Direct Dealing

### 1.    Solicitation of Grievances

The Board found that Gerawan was guilty of an unfair labor practice based on its purported solicitation of grievances.  The finding was premised on a series of communications made by Gerawan to its employees after the UFW suddenly returned to the scene following a nearly two-decades-long absence.  Upon returning, the UFW sought to bargain and soon afterwards, applied for the commencement of the MMC process to the Board.  Gerawan sought to apprise its employees of these major developments.  The question before us is whether substantial evidence shows that, in doing so, Gerawan's communications crossed the line by making an improper solicitation of grievances.

As summarized previously herein, Gerawan's communications to its employees were primarily through a series of flyers, mailers or paycheck inserts.  The first of these, dated November 13, 2012, was signed by "Ray, Mike, and Dan Gerawan" and told the workers the following message:  "22 years ago, the United Farm Workers won an election to represent the agricultural employees of Gerawan Farming.  However, except for one meeting 20 years ago, they have not contacted us since then.  A few weeks ago we received the attached letter from the UFW demanding that we turn over your personal information to them and that we begin negotiating with them.  [¶] One of the reasons we have to turn over your personal information to the UFW, including your home address, is because the UFW normally uses such information to visit employees' homes.  It is up to

---

[91]    For this reason, we disagree with the Board's conclusion that mere failure to disavow the bus trip and protest could have created liability based on a theory of ratification.

you whether you wish to talk to them if they visit your home. [¶] As your employer, we did not want this to happen but we have no control over this. The UFW says they represent you, even though you probably did not even work here 22 years ago and some of you were not even born yet."

Over the next several months, Gerawan sent follow-up mailers to its employees written in a question-and-answer format. The mailers purported to respond to a few basic questions or misconceptions, but otherwise referred the employees to the ALRB as the appropriate agency to which they may express concerns or ask any further questions, noting that "[e]mployers are prohibited from helping their employees in such matters." A subsequent mailer in April of 2013 informed employees that, pursuant to the most recent negotiations, the UFW is seeking "3%" of their paychecks as dues, and that it (the UFW) would have Gerawan terminate employees who refused to pay any money to the union. This mailer also told the workers, "AS ALWAYS, OUR DOOR IS OPEN," and provided telephone numbers for Ray, Mike or Dan Gerawan, as well as for Jose Erevia, as the human resources manager at Gerawan. On several such flyers, a toll free number was set forth below Jose Erevia's telephone number, to allow workers to leave anonymous comments. Also, as noted previously, the workers and crew bosses were trained to address any questions about the union to Jose Erevia.

Additionally, hourly pay raises were announced by a series of flyers sent out by Gerawan in March of 2013 (e.g., from $9 to $10 per hour), indicating that the decisions to grant such pay raises were from "Ray, Mike and Dan," and claiming that Gerawan consistently pays higher wages than other companies in the industry. The flyers did not credit the UFW's presence for these pay raises, but expressed that they were solely Gerawan's decision, noting the union was properly informed of the raises and that "we assume they will not cause any unnecessary delay." Jose Erevia was typically listed as the contact person on such flyers. According to the flyers, the pay raises were granted

because Gerawan sought to pay its workers more than its competitors did; so to stay ahead of the competition, the raises were announced.

The final communication referenced in the Board's findings was a DVD sent by Gerawan to its employees shortly before the election. The DVD was a presentation of Gerawan's viewpoint concerning unionization, which Gerawan was free to express, subject to the limitations of section 1155. (See *NLRB v. Gissel Packing Co.*, *supra*, 395 U.S. at p. 617; § 1155.) However, the Board pointed out the DVD also included a statement that "there are many ways for you to let us know about issues without having to wait for the union to come around and hope they will listen."

Based on the DVD and prior flyers and mailers, combined with the absence of evidence of any past practice of soliciting grievances, the Board found that Gerawan unlawfully solicited employees' grievances. Gerawan challenges the Board's finding, arguing that all of the subject communications were either permissible statements of opinion protected under Gerawan's free speech rights, the proper communication of information to its employees, or a lawful expression of willingness to listen to grievances without any promise to resolve them.

"[T]he mere solicitation of employee grievances prior to an election is not a per se violation." (*Idaho Falls Consol. Hospitals, Inc. v. N.L.R.B.* (9th Cir. 1984) 731 F.2d 1384, 1386.) Nor is it a violation merely to have an open door policy or to express a willingness to listen to grievances. (*Id*. at p. 1387.) By itself, "a simple offer to hear any complaints the employees may have, or to set up machinery to that end, is … non-coercive." (*N.L.R.B. v. K & K Gourmet Meats, Inc*. (3rd Cir. 1981) 640 F.2d 460, 466.) Again, a mere "willingness to listen and to consider" employee concerns is not a violation. (*Id*. at p. 467.)

However, solicitation of grievances becomes an unfair labor practice when (i) accompanied by an express or implied promise that the grievances will be remedied, and (ii) the circumstances give rise to the inference that the remedy will only come to

fruition if the union loses the election. (*Idaho Falls Consol. Hospitals, Inc. v. N.L.R.B.*, *supra,* 731 F.2d at pp. 1386-1387; see *N.L.R.B. v. Arrow Molded Plastics, Inc.* (6th Cir. 1981) 653 F.2d 280, 283; *Beverly Enterprises, Inc. v. N.L.R.B.* (2d Cir. 1998) 139 F.3d 135, 143.) "[W]hen the circumstances of the solicitation implicitly or explicitly promise to correct grievances the solicitation may [constitute a violation]." (*N.L.R.B. v. V & S Schuler Engineering, Inc.* (6th Cir. 2002) 309 F.3d 362, 370.) "[W]hen the employer's grievance solicitation is accompanied by promises of benefits contingent upon the employees' rejection of the union, such conduct constitutes an interference with the rights of employees …." (*N.L.R.B. v. Eagle Material Handling, Inc.* (3d Cir. 1977) 558 F.2d 160, 164.) Thus, "[a] solicitation of grievances becomes an unfair labor practice *only when* it is accompanied by either an implied or express promise that the grievances will be remedied." (*N.L.R.B. v. K & K Gourmet Meats, Inc., supra,* 640 F.2d at p. 466, italics added.) In summary, the gist of the applicable rule may be stated as follows: During an organizing campaign or a pre-election period, an employer may not solicit employee grievances in a manner that expressly or impliedly promises that the problems will be resolved if the union is turned away, nor may it do so where the combined program of solicitation and promised correction suggests that union representation is unnecessary. (*N.L.R.B. v. V & S Schuler Engineering, Inc.*, *supra*, 309 F.3d at p. 370.)

Absent a past practice of doing so, an employer's solicitation of grievances in the midst of a union campaign or pre-election period creates "a rebuttable presumption" of an implied promise to remedy the grievances. (*Aladdin Gaming, LLC* (2005) 345 NLRB 585, 607; *Torbitt & Castleman*, *Inc.* (1996) 320 NLRB 907, 909-910; *Reliance Electric Company* (1971) 191 NLRB 44, 46.) As explained by one NLRB decision: "Where … an employer, who has not previously had a practice of soliciting employee grievances or complaints, adopts such a course when unions engage in organizational campaigns seeking to represent employees, we think there is a compelling inference that he is implicitly promising to correct those inequities he discovers as a result of his inquiries

and likewise urging on his employees that the combined program of inquiry and correction will make union representation unnecessary." (*Reliance Electric Company, supra,* 191 NLRB at p. 46; accord, *Orbit Lightspeed Courier Systems* (1997) 323 NLRB 380, 393.) On the other hand, if there *has* been a past practice of soliciting employee grievances, the employer may continue to carry out that same practice during an organizational campaign without creating a rebuttable presumption of an implied promise to remedy the grievances. (*Carbonneau Industries* (1977) 228 NLRB 597, 598.) However, past practices may not be used to justify the solicitation of grievances during an organizational campaign if the employer significantly increases or intensifies its past method and scope of solicitation. (*Id.* at p. 598.) In any event, regardless of the manner of proof (i.e., with or without a rebuttable presumption), the solicitation of grievances is not an unfair labor practice unless proven to be accompanied by an express or implied promise that the grievances will be remedied. (*N.L.R.B. v. K & K Gourmet Meats, Inc.*, *supra*, 640 F.2d at p. 466.) As we have stressed, an employer's mere willingness to listen and consider employees' concerns is insufficient. (*Id.* at p. 467.)[92]

Here, by providing its workers with the telephone numbers of Dan and Mike Gerawan and Jose Erevia on the company's flyers and mailers for the purpose of being available to listen to workers' questions or concerns, under a declared "open door" policy of communication, and by providing a toll free number for workers to make anonymous comments, Gerawan did expressly invite input or questions from its workers. The statement in the DVD includes a similar invitation. Thus, technically, some degree of

---

[92]    We note in the federal case just cited, it was observed that "[i]n every case to which this court is cited in support of the Board's finding [of a violation] … , the solicitation of grievances was effective [in causing grievances to be presented] and the employer was found to have responded with a promise." (*N.L.R.B. v. K & K Gourmet Meats, Inc., supra,* 640 F.2d at p. 467.) In the present case, there was no evidence brought to our attention of any actual presentation of grievances by employees nor any response to the same by Gerawan.

solicitation of grievances plainly did occur.  The only question is whether, on the record before us, the Board could reasonably conclude that Gerawan's conduct was more than "mere" solicitation, but actually embodied the elements of *unlawful* solicitation of grievances.

In finding this solicitation of grievances was unlawful, the Board relied on the fact that Gerawan did not have a past practice of soliciting grievances from its workers.  The evidence showed the purported solicitations began as a new course of action starting in November of 2012.  Since there was no past practice shown here, the Board applied the rebuttable presumption that Gerawan's solicitations of grievances involved an implied promise to remedy such grievances.  That presumption, combined with the general anti-union tone of the flyers, mailers and DVD signaling the employer's opinion that the union was unnecessary to protect the workers' interests, led the Board to conclude that Gerawan had committed the unfair labor practice of solicitation of grievances.

Gerawan contends the Board had no reasonable basis to infer from Gerawan's absence of a past practice of soliciting grievances that the solicitations carried an implied promise to remedy grievances.  We agree with the gist of Gerawan's contention, but we think it is more accurate to state that the evidence in the record overcame the rebuttable presumption as a matter of law.  Under the unique circumstances of this case, Gerawan's commencement of direct and frequent communications with its employees was clearly reasonable and proper, even assuming Gerawan had not done so in the past.  What the Board failed to adequately grasp in its analysis of this issue was the *major* change of circumstances that arose when, after a nearly two-decade absence, the UFW suddenly reappeared on the scene, claiming to be the workers' rightful bargaining representative, seeking a contract, and ultimately, pursuing MMC.  This dramatic shift from the long-term status quo profoundly affected both Gerawan and its workers.  Under the circumstances, it was entirely reasonable to expect that the workers would have need of information, clarification, and to have their many questions or concerns answered.

92.

Moreover, despite the Board's claim to the contrary, there was substantial evidence in the record to support Gerawan's assertion that it was responding to questions actually received from its employees. It is also noteworthy that the workers were advised to contact the ALRB for more specific help or guidance beyond the basic information provided by Gerawan. Gerawan, for its part, would also have a legitimate free-speech right to explain to its employees what had happened and what the new developments might potentially mean, so that its employees would not only have the benefit of more adequate information but also a general understanding of their employer's perspective on it. (See *NLRB v. Gissel Packing Co.*, *supra*, 395 U.S. at p. 617 [employer has free speech right to communicate its views on union to employees]; § 1155 [same]; *Beverly Enterprises, Inc. v. N.L.R.B., supra,* 139 F.3d at p. 144 [employer entitled to respond to factual inquiries of employees].)

Under these unique circumstances, then, the fact that Gerawan had not previously engaged in such extensive or frequent communications with its employees, or solicited employee questions or concerns, prior to the UFW's reappearance is not even remotely suspicious given that the UFW's sudden reappearance was itself highly out of the ordinary and an unprecedented development impacting both employer and employees. (See, e.g., *Intertape Polymer Corp. v. NLRB* (4th Cir. 2015) 801 F.3d 224, 240 [not every instance of out-of-the-ordinary behavior by an employer can be deemed coercive, threatening or suspect in nature; some actions are "entirely ordinary" when considered in light of the special circumstances]; *Edwin Frazee, Inc*. (1978) 4 ALRB No. 94 [change from ordinary business patterns not suspicious or indicative of improper motive where justification evident from circumstances].) For this reason, the "no past practice" basis for applying a rebuttable negative inference (i.e., the presumption of an implied promise to remedy any grievances) was clearly overcome and rebutted. Lacking the effect of the presumption, the Board's case for unlawful solicitation collapses because there is nothing in the record supporting an implied promise to provide benefits or to remedy grievances.

Moreover, to the extent that these particular communications also contained something of Gerawan's own view or perspective on the recent events or on the union, we reiterate that such expressions were protected free speech since they did not include any form of coercive expression such as a reprisal, threat, or a promise of a benefit if the union was gone. (See *NLRB v. Gissel Packing Co.*, *supra*, 395 U.S. at p. 617; § 1155; *Intertape Polymer Corp. v. NLRB, supra,* 801 F.3d at p. 238 ["'[P]ermitting the fullest freedom of expression by each party nurtures a healthy and stable bargaining process.' [Citation.]"].)[93]

The Board suggests that the mere fact that Gerawan had a toll-free number for anonymous comments was itself a violation, arguing it was comparable to the suggestion box in *H.L. Meyer Company, Inc.* (1969) 177 NLRB 565. That is clearly incorrect, because the implied promises of benefits in that case arose from the manner in which the employer responded to the suggestions placed in the box. The suggestion box "was used to solicit and settle employee grievances and to imply certain offers of benefits should the Union be defeated .…" (*Id.* at p. 566.) Here, in contrast, there was no evidence of any worker grievances being placed on the toll-free number or any employer responses thereto. Consequently, there is no evidence relating to the toll-free number to support an inference of an implied promise to provide benefits or remedy grievances.

We separately consider the brief remark contained within the 10- or 11-minute DVD sent by Gerawan to its workers shortly before the election. In its findings, the Board agreed with the General Counsel's position that the DVD improperly solicited

---

[93] We also note that, with the exception of the DVD, all the communications at issue were sent many months before the decertification drive actually began and long before the election. The Board appears to treat the union's return and Gerawan's communicative responses (beginning November 2012) as the start of an "organizational campaign," even though the UFW was already the certified bargaining representative. The Board never explains this conclusion. As far as we can tell from the record, the only actual campaign at issue in this case was relating to decertification, which did not begin until approximately June of 2013.

grievances when it advised Gerawan's workers that "there are many ways for you to let us know about issues without having to wait for the union to come around and hope they will listen." The DVD was not part of the earlier informational exchange (i.e., the flyers and mailers) by which the employer had provided information to its employees and responded to questions following the reemergence of the long-absent union. The DVD came much later, being sent shortly before the election. Nevertheless, in light of the earlier solicitation of questions and informational exchange that occurred in the prior mailers and flyers—which we have concluded was reasonable and proper under the unique circumstances—the statement in the DVD about Gerawan's availability to hear workers' concerns was not something new or out of the ordinary, but was simply one final reiteration of Gerawan's already expressed willingness to listen. Therefore, we conclude that the record does not support the Board's finding that the comment in the DVD constituted an improper solicitation of grievances. An "expressed willingness to listen" and consider issues is not sufficient. (*Idaho Falls Consol. Hospitals, Inc. v. N.L.R.B.*, *supra*, 731 F.2d at pp. 1386-1387 [employer's expressed "open door policy," willingness to listen, and attempt to "discern the problems troubling the employees" was not unlawful solicitation].)

In conclusion, the Board erred in finding that Gerawan committed an unfair labor practice based on the solicitation of grievances. As explained above, the record does not support the Board's finding because there was no factual basis to support an inference of an implied promise to remedy grievances.

## 2. Direct Dealing

In deciding on the solicitation of grievances issue, the Board made an additional finding that the solicitation evidence established a different unfair labor practice— namely, that of direct dealing. Gerawan challenges the Board's direct dealing finding on the ground that it was not supported by substantial evidence in the record.

Preliminarily, we undertake to adequately describe what direct dealing is. "It is well settled that the Act requires an employer to meet and bargain exclusively with the bargaining representative of its employees, and that an employer who deals directly with its unionized employees or with any representative other than the designated bargaining agent regarding terms and conditions of employment violates [the Act]." (*Allied-Signal, Inc*. (1992) 307 NLRB 752, 753.) Direct dealing need not involve actual bargaining. (*Id*. at p. 753.) The "fundamental inquiry" in a direct dealing case is "whether the employer has chosen 'to deal with the Union through the employees, rather than with the employees through the Union.' [Citation.]" (*N.L.R.B. v. Pratt & Whitney Air Craft Div*. (2d Cir. 1986) 789 F.2d 121, 134 (*Pratt & Whitney*).) In other words, "the question is whether an employer's direct solicitation of employee sentiment over working conditions is likely to erode 'the Union's position as exclusive representative.' [Citations.]" (*Allied-Signal, Inc*., *supra*, 307 NLRB, pp. 753-754.) "The duty of an employer to deal directly with the elected representative is exclusive, implying 'the negative duty to treat with no other.' [Citation.]" (*McFarland Rose Production* (1980) 6 ALRB No. 18, p. 8.)

Based on the above summary of the law, it is fair to say that a violation occurs when the employer deals or treats directly with its employees concerning the terms or conditions of employment, bypassing the union's exclusive representative status, and thereby erodes the union's position as the exclusive representative of the workers. "[D]etermining whether direct dealing has taken place is a complex task involving a balancing of the rights of the workers, the union, and the employer. In that balancing process, the employer's right to present its position so that employees may hear both sides should not be downplayed." (*Pratt & Whitney*, *supra*, 789 F.2d at p. 135.) In *Modern Merchandising* (1987) 284 NLRB 1377, the employer, without notice or input from the union and despite the union's subsequent objection, implemented a plan to have "employee committees" established in each of its stores for the purpose of soliciting suggestions from store employees on a variety of topics, including working conditions.

96.

(*Id*. at p. 1379.) The Board held that the employer's conduct constituted direct dealing: "It is clear from the facts that the [employer's] conduct, both in suggesting to employees that they set up employee committees to solicit suggestions regarding working conditions and in bypassing the Union in formulating and implementing [the plan], has had the effect of eroding the Union's position as exclusive representative." (*Ibid*.)

Here, the Board appears to have concluded that *all* of the communications referenced by it in connection with its discussion of the charge of solicitation of grievances constituted direct dealing. That assessment is far too broad. For example, when Gerawan explained to its employees on several occasions that the UFW had returned after a nearly two-decade absence, that statement and related statements were essentially informational in character, providing employees with needed information in response to questions and concerns naturally arising from the extraordinary and unexpected development of a long-absent union returning, demanding a contract and seeking MMC. Clearly, Gerawan's effort to explain and provide information regarding that major change of circumstances was not direct dealing regarding the terms and conditions of employment.

On the other hand, there is substantial evidence to support direct dealing relating to a different communication—namely, the particular flyers or mailers announcing the hourly pay raises in March of 2013. In announcing the pay raises, it was emphasized that "Ray, Mike, and Dan Gerawan have made the decision to give crew labor a raise just as they always have" and "we have informed the UFW union of our plan, and we assume they will not cause any unnecessary delay." Reasonably implicit in this message to its employees was that Gerawan was granting the pay raises entirely on its own, apart from the union, and that it was hoped that the union would not delay or get in the way of what Gerawan alone was doing for them. So understood, this would appear to allow the Board to draw an inference of direct dealing, as defined above.

97.

In conclusion, while the solicitation of grievances allegation was not adequately supported by the record, we affirm the Board's separate finding of an unfair labor practice based on direct dealing. Of course, any assessment by the Board of the impact of such occurrence of direct dealing would have to consider that this incident was isolated and occurred a long time before the election.

## E.  The One-Day Piece-Rate Increase for Grape Packers

On October 25, 2013, Mike Gerawan ordered a one-day increase in the piece rate for grape-packing workers from $1.25 per box to $1.50 per box.  Mike Gerawan testified that, at mid-morning on that date, he learned that "a significant number of packers" had walked off the job.  He had no knowledge or expectation that any of those who had walked off would be returning that day.  He testified that he was concerned whether the grapes picked that day would be able to be packed on that same day, because otherwise the quality of the grapes would be detrimentally affected.  Because it appeared that a longer-than-normal day of packing would be required by the remaining grape packers to get the job done, Mike Gerawan ordered food be provided for a dinner meal (i.e., pizza and tacos) in the packing areas.  Ordering food was not uncommon when the workers were asked to work unusually late.  Additionally, "as a reward … and encouragement" to those who chose to stay late and complete the packing, Mike Gerawan increased the piece rate per box for that day.  As it turned out, the workers who had left that morning returned later in the day and resumed working.  Thus, any returning worker who chose to resume working that day would have received the increased rate per box actually packed by him or her, and would also have been able to partake of the free pizza and tacos.[94]

---

[94]    Of course, those who stayed would have packed many more boxes.  Thus, the workers who remained on the job all day and did not go to the protest would have gained far more (monetarily) from the increase than those who walked off but later returned to work.

The ALJ substantially credited Mike Gerawan's testimony. The ALJ found: "Some of the workers left in the middle of the day on October 25, 2013, to participate in a protest timed to announce the filing of the second decertification petition. This may have resulted in the need for workers to stay later that evening to finish packing the grapes. There was credible testimony that the grapes need to be packed quickly to be marketable." The ALJ further found that "Mike Gerawan was credible in testifying that the piece-rate was sometimes changed due to the quality of the grapes."

Nonetheless, the ALJ found that the piece-rate increase created an unfair labor practice. Although Mike Gerawan's testimony was credited on a number of points, his explanation for the piece-rate increase was deemed insufficient to provide an adequate justification under the circumstances. Specifically, the ALJ found that the predominant reason for the piece-rate increase was not to adjust to perceived changes in the condition or quality of the grapes, but to reward and encourage employees who worked late. Thus, the increase appeared to be unlike Gerawan's past practices. Moreover, since the piece-rate increase came on the same day the second decertification petition was filed, and it applied to workers who stayed as well as to workers who subsequently returned from the protest, the ALJ found that the "well-timed" piece-rate increase and the free pizza and tacos "likely created a celebratory atmosphere that workers would have unmistakably attributed to company joy over the decertification petition filing." The Board affirmed the ALJ's unfair labor practice finding.

Gerawan argues that the Board erred because the presumption of an improper motive for granting the pre-election piece-rate increase was adequately rebutted, based on the testimony of Mike Gerawan credited by the ALJ. According to applicable law, an improper motive for the subject wage increase must be shown. "The motive of the employer is critical in determining whether the granting of a wage increase prior to an election is an unfair labor practice. An important indicator of that motive is whether there has been a change from the status quo. [Citation.] Moreover, the law is well

established that there is a presumption of illegal motive adhering to wage increases granted prior to an election.  [Citations.]"  (*N.L.R.B. v. Anchorage Times Pub. Co.* (9th Cir. 1981) 637 F.2d 1359, 1367; see also, *Nick J. Canata* (1983) 9 ALRB No. 8, pp. 11-12 ["Any announcement by an employer of a new economic benefit during an election campaign is presumed improper and, to rebut that presumption, the employer must adequately explain the reason for granting the benefit"].)[95]

Although the explanation offered by Mike Gerawan for the piece-rate increase appears reasonable, the Board was not required as a matter of law to conclude that it adequately justified the piece-rate increase.  Other factors were present which, in combination with the proximity to the anticipated election, permitted an inference of improper motive.  One such factor was that the increase did not appear to fit into the normative *status quo* as reflected by past practices, or at least there was an absence of specific facts to show that it did.  (See, e.g., *NLRB v. Anchorage Times Pub. Co.*, *supra*, 637 F.2d at p. 1367 [change from status quo can be indicator of improper motive]; *N.L.R.B. v. Styletek*, *Division of Pandel-Bradford, Inc.* (1st Cir. 1975) 520 F.2d 275, 281, fn. 5 [it is "perilous" for an employer to grant benefits before an election "unless the employer can support with very specific facts the reason for granting benefits just then," such as "a past history" of wage adjustments on a particular date or occasion]; cf., *Jimmy Dean Meat Co.* (1977) 227 NLRB 1012, 1034 [demonstrated consistency of pay raise with past policy and practice showed it was not for improper purpose].)  Here, Mike Gerawan testified that "from time to time" he would change the piece rate "depending on the quality of the grapes [or] the time of year," explaining that "[l]ater in the year we get sweating on the grapes and there's delays in packing until the grapes dry.  So, it varies with conditions."  He did not mention extended work hours or the need to encourage and

---

[95]    Here, although the election had not yet been scheduled, the second decertification petition was on file with the Board and it was reasonable to assume that an election would at least potentially be ordered.

reward packers who were working late as a past rationale for increasing the piece rate, even though occasional long workdays for packers were fairly typical, especially towards the end of each season. There was no evidence the quality or condition of the grapes had actually changed, which Mike Gerawan indicated was his key criterion. On balance, it was permissible for the Board to infer that the piece-rate increase did not squarely fit into the pattern of Gerawan's past or existing practices for such increases.

An additional factor relied on by the Board was that the increase coincided with the day on which the second decertification petition was filed. We note that this factor was of somewhat limited evidentiary value because it tended to cut both ways. While the Board emphasized that the increase took place on the precise day the petition was filed, we cannot overlook the other side of the same coin—namely, that it was *also* the day that a considerable number of grape packers walked off the job, the timing of which was entirely outside of Gerawan's control. Still, in light of the fact that Gerawan reacted to events by implementing a seemingly out-of-the-ordinary pay increase, we believe it was reasonable for the Board to consider the coincidence of the increase with the date of the petition, especially when viewed in combination with the other factors.

However, in affirming the ALJ on this matter, the Board went on to find that the effect of the coincidental timing (plus the food) led to a celebratory atmosphere that workers would have attributed to the company's joy over the petition being filed. The Board's gratuitous surmise as to the workers' reaction to the one-day increase to finish packing the grapes was not supported by any evidence in the record; thus, it was mere speculation on the Board's part which will be disregarded.

On the broader issue of whether a violation occurred, we conclude the Board's decision was within the bounds of reason, supported by permissible inferences drawn from the record, when it found that an improper motive was present upon which to premise a finding of an unfair labor practice against Gerawan for granting its grape packers a one-day piece-rate increase. As noted, the supporting evidence consisted of the

101.

increase's proximity to the anticipated election, the apparent departure from past practices, and the coincidence of the increase with the filing of the second decertification petition. This is an instance where, had we been the trier of fact, we would likely have reached a different result. Nevertheless, we defer to the Board because, on this record, the finding of a violation was at least marginally sustainable.

In defense of its actions, Gerawan further argues that the completion of the grape packing that night was in the nature of a pressing business exigency that required immediate unilateral action, including a rate increase. (See *S & J Ranch, Inc*. (1992) 18 ALRB No. 2, p. 8 [business necessity defense mentioned, but found factually unsupported].) We are unable to find clear support for that theory in the evidentiary record. Mike Gerawan testified that when numerous packers left that morning, he checked the numbers to decide whether "we had the ability to pack the grapes that were already picked at that point[,]" or "whether or not we could keep picking and pack it with the number of packers we had[,]" and he apparently determined that it could be done with the packers working extended hours to finish. Again, it was not unexpected or unusual for packing crews to be asked to work extended hours to finish packing the grapes toward the end of the season. However, there was no clear evidence that Gerawan had a practice or policy of implementing piece-rate increases as a reward to workers on past occasions where extended work hours were needed. We conclude that the theory of a business necessity or of an economic exigency necessitating an immediate unilateral rate increase was not clearly established; that is, the evidence was not of such a character that the Board was required to find for Gerawan on that issue.

Based on the foregoing, we conclude there was substantial evidence to support the Board's conclusion that the piece-rate increase prior to the election constituted an unfair labor practice. With certain qualifications noted below, we affirm the Board's determination of that issue.

In regard to the probable *impact* of this violation on the workers' freedom of choice, Gerawan contends that even if there was a violation, what occurred here was materially distinguishable from the usual or hallmark violation where an across-the-board pay increase is given prior to an election. We agree with Gerawan's contention. Here, we are dealing with a very brief (i.e., one day only), relatively modest (i.e., 25 cents per box) increase in the piece rate for a subset of workers (i.e., grape packers) under circumstances in which there was an apparent need to get a considerable volume of grapes packed with fewer workers on hand. Because of these unique circumstances, it was unreasonable and arbitrary for the Board to mechanistically (or *per se*) presume that the workers were coerced or lost their freedom of choice due to the one-day piece-rate increase.[96] Indeed, it was not merely possible, but arguably more likely than not, that the workers would have reasonably perceived the temporary increase to stem from the company's special need to complete the packing backlog with fewer workers.[97] Therefore, the Board clearly erred when it applied an automatic presumption of the existence of coercion as a bare conclusion without supporting facts and analysis and without a consideration of the entire record. (See, e.g., *Peerless of America, Inc. v. N.L.R.B.* (7th Cir. 1973) 484 F.2d 1108, 1120 [where non-egregious violations involved, it was improper for the Board to make a conclusory assumption that otherwise resilient workers can be "cowed" by such "marginal indiscretions" into abandoning their voting intentions].)[98] Although it appears highly questionable that this piece-rate increase could

---

[96] To the extent we are arguably overlapping into election remedy issues here, we will justify doing so in the portion of this opinion that follows below.

[97] Also, as indicated herein above, the Board's gratuitous finding of a "celebratory atmosphere" that emanated in such a way that workers would have sensed Gerawan's pro-decertification "joy" is rejected as unsupported speculation.

[98] The *Peerless* court also noted the federal Board's "substitution of conclusion for explanation" impedes the reviewing court's ability to do its job. (*Peerless of America, Inc. v. N.L.R.B.*, *supra*, 484 F.2d at p. 1119.) The same is true here.

have resulted in significant coercion under the circumstances, we stop short of deciding the matter for the Board.  Rather, as will be more fully presented in the dispositional section of this opinion, the issue of whether this violation, together with other unfair labor practices affirmed by us, reasonably interfered with the workers' freedom of choice in the election to such an extent that such misconduct was likely to have affected the results, will have to be considered by the Board on remand based upon the totality of facts and circumstances in the record.

In passing, we note that the Board's conclusory finding of coercion regarding this unfair labor practice suffered from another fundamental flaw.  Conceptually, the Board has treated this case as essentially a challenge to the petition for decertification, with Gerawan's unfair labor practice violations purportedly resulting in an invalidating "taint" on that petition.  The problem with the Board's theory as it relates to this particular violation is that the October 25th piece-rate increase happened *after* the signature gathering was completed and the petition was being delivered for filing, and therefore as a matter of elementary logic and causation, the increase could not possibly have had *any* effect—coercive or otherwise—on the workers' *signature gathering* process.

In summary, then, we affirm the Board's finding of an unfair labor practice based on the pre-election piece-rate increase, but reverse the Board's conclusory holding and/or presumption that it had a coercive impact on the employees' freedom of choice.

## III.  Review of the Board's Election-Related Remedies

As discussed at length above, we have found that the Board erred in several of its unfair labor practice findings.  Since the Board premised its election remedies (i.e., dismissal of the election) upon the unfair labor practice findings, it is necessary to remand the matter back to the Board to reconsider its remedial rulings under the corrected findings.  More than that, it appears to us that the Board applied an erroneous legal standard when it set aside the election.  However, before we delve into the Board's legal error in its approach to the question of whether to set aside the election, we must first

address the Board's (and the UFW's) contention that we have no jurisdiction to consider such matters.  At this point in our discussion, we explain why we believe it is proper for us to address the Board's election-related conclusions and remedies without requiring Gerawan to engage in a technical refusal to bargain.

Under the Board's decision in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1, as we view it, the primary remedy (or remedies) imposed by the Board for Gerawan's pre-election unfair labor practices was the dismissal of the decertification petition and the setting aside of the election.[99]  The question before us is this:  may such election-related remedies be reviewed by this court in the present context?  The Board argues that we have no jurisdiction to consider its election determination because the only method for judicial review of such a decision is through the technical refusal to bargain procedure. Since Gerawan has not yet engaged in a technical refusal to bargain, allegedly we have no basis to review the Board's election-related decisionmaking at this time.  Under the unique procedural posture of this case, we disagree with the Board.

## A.  <u>Technical Refusal To Bargain</u>

We begin by briefly summarizing the *technical refusal to bargain* process. Section 1160.8 of the ALRA provides for judicial review of a "final order" of the Board in unfair labor practice proceedings.[100]  However, an election certification decision is *not* such a final order for purposes of judicial review.  (*Nishikawa Farms, Inc. v. Mahony, supra,* 66 Cal.App.3d at p. 787.)  "[A] certification order under section 1156.3 of the

---

[99]    The Board held:  "We affirm the ALJ's conclusion that Gerawan's unlawful and/or objectionable conduct tainted the entire decertification process, we adopt his recommended remedy dismissing the decertification petition, and setting aside the election .…"

[100]    Section 1160.8 states, in part, that "[a]ny person aggrieved by the final order of the board granting or denying in whole or in part the relief sought may obtain review of such order in the court of appeal having jurisdiction over the county wherein the unfair labor practice in question was alleged to have been engaged in .…"

ALRA is not a 'final order' of the board; therefore, it is not normally subject to judicial review except as it may be drawn in question by a petition for review of an order made under section 1160.3[101] of the act restraining an unfair labor practice." (*Id*. at p. 788.) Thus, in the absence of extraordinary circumstances, the only way an employer may obtain judicial review of the Board's order(s) in an election certification proceeding is to (1) refuse to bargain with the representative whose election it challenges; (2) be found guilty by the Board of an unfair labor practice because of such refusal to bargain; and (3) obtain review of the election and certification in the course of judicial review of the unfair labor practice decision. (*Perry Farms, Inc. v. Agricultural Labor Relations Bd.*, *supra*, 86 Cal.App.3d at p. 470; see *J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d 1 at p. 27; *Yamada Brothers v. Agricultural Labor Relations Bd.* (1979) 99 Cal.App.3d 112, 120 ["board decisions in certification proceedings normally are not directly reviewable in the courts and only become reviewable when drawn into question in conjunction with an unfair labor practice proceeding"]; *Agricultural Labor Relations Bd. v. Superior Court* (1996) 48 Cal.App.4th 1489, 1497-1498 [orders in certification proceedings not directly reviewable, but may be judicially reviewed following a final order on an unfair labor practice complaint].) This indirect method for obtaining judicial review of an election certification decision is commonly referred to in the case law as a "technical refusal to bargain." (*Rivcom Corp. v. Agricultural Labor Relations Bd.*, *supra*, 34 Cal.3d at p. 772; *J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at pp. 27-28; *Artesia Dairy v. Agricultural Labor Relations Bd.*, *supra*, 168 Cal.App.4th at p. 602.) Although the technical refusal to bargain process creates significant delay in testing board decisions regarding employee representation, Congress, in enacting the NLRA, intended that result (*Boire v. Greyhound Corp.* (1964) 376 U.S.

---

[101]     This refers to a petition for review under section 1160.8, which is the statutory procedure for judicial review of unfair labor practice decisions rendered under section 1160.3.

473, 477-478), and the same rule is applicable under the ALRA. (*Agricultural Labor Relations Bd. v. Superior Court*, *supra*, 48 Cal.App.4th at pp. 1497-1498.)[102]

Nevertheless, "the general statutory insulation from direct judicial review of board decisions other than final orders in unfair labor practice proceedings is not impermeable. Under both federal and California law, courts may exercise their equitable powers to review board determinations in exceptional circumstances." (*Yamada Brothers v. Agricultural Labor Relations Bd., supra,* 99 Cal.App.3d at p. 121.) For example, judicial review of non-final orders of the Board has been allowed by writ of mandate where there was a clear statutory violation by the Board resulting in a deprivation of a right guaranteed by the ALRA and the ordinary legal remedy was inadequate. (See, e.g., *Cadiz v. Agricultural Labor Relations Bd.* (1979) 92 Cal.App.3d 365, 380-382; *Agricultural Labor Relations Bd. v. Superior Court, supra,* 48 Cal.App.4th 1489, 1502-1503; see also, *Belridge Farms v. Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 556-557.)[103]

---

[102] The original rationale for the NLRA rule was to avoid *abuses* that might occur if direct judicial review of the board's certification rulings were permitted, such as frivolous litigation delays being used to stall a prompt election or otherwise drag out recognition of the worker-supported choice of representation, thereby impairing the strength of that support through attrition and delay. (*Boire v. Greyhound Corp., supra,* 376 U.S. at pp. 478-479.) For this reason, the NLRA allowed direct review in the courts only after (i) the election had been held, (ii) the results were certified, and (iii) the board had ordered the employer to do something predicated on the results of the election. (*Ibid.*)

[103] Although *Belridge Farms v. Agricultural Labor Relations Bd., supra,* 21 Cal.3d 551 did not involve a party seeking judicial review of an election decision, it elucidates the principle that courts may review non-final orders of the Board in exceptional circumstances. The non-final decision for which review was sought in *Belridge* was a failure by the General Counsel to issue an unfair labor practice complaint, which failure was allegedly due to an erroneous construction of an applicable statute. Treating the petition for review as a mandamus proceeding, the writ was denied by the Supreme Court because the General Counsel had correctly interpreted the statute in question. (*Id.* at pp. 556-559.)

**B.  Why Direct Review is Available Here**

Here, we need not consider whether this case comes within an exception to the rule limiting review to final orders of the Board under section 1160.8 because, as explained below, we conclude that *Gerawan Farming, Inc., supra,* 42 ALRB No. 1 *is* such a final order, *including* the election-related remedies.  For this reason, Gerawan was not required to engage in a technical refusal to bargain as a precondition to our judicial review of such remedies.  Rather, in this unique case, review of *the entire order* was available under section 1160.8.  We so conclude in light of the combination of the following material considerations:  (i) the Board has foreclosed any adequate remedy via the technical refusal to bargain process by failing to count the ballots; (ii) the Board's decision and order in *Gerawan Farming, Inc.*, *supra*, 42 ALRB No. 1 may reasonably be construed by this court as one indivisible final order under section 1160.8 because the election-related remedies ordered by the Board therein were predicated upon and inextricably intertwined with the unfair labor practice holdings in the consolidated proceedings below; and (iii) the ultimate remedy granted by the Board in this case of setting aside a decertification election did not, under the circumstances, implicate the policy rationale for precluding direct review.  We now proceed to discuss these reasons for our conclusion in greater detail.

First, by refusing to tally the ballots,[104] the Board effectively deprived Gerawan of any adequate remedy via the technical refusal to bargain process.  This consequence of

---

[104]    As noted previously herein, the tally is distinct from certification of the results (see fn. 8, *ante*).  The tally is ordinarily part of the record before the Board in certification proceedings involving election objections.  (Cal. Code Regs., tit. 8, §§ 20363, subd. (d) & 20365, subd. (c); cf., Cal. Code Regs., tit. 8, § 20360, subd. (a) [as soon as possible after completion of balloting, a Board agent "shall count the ballots and shall prepare … a tally …."].)  Even in cases where impoundment of ballots postpones the timing of the vote tally, the statutory election process is not complete until the vote tally is issued.  (Cal. Code Regs., tit. 8, § 20360, subd. (c)  ["When the ballots are … impounded, the election will not be deemed complete until a ballot count has been conducted and the

refusing to count ballots was recognized in *Cadiz v. Agricultural Labor Relations Bd.*, *supra*, 92 Cal.App.3d 365. In that case, the Board had impounded the ballots in a decertification election and ultimately vacated the election after sustaining the UFW's objection that the petition for decertification was untimely and/or subject to a contract bar under the wording of section 1156.7, subdivision (c). The Court of Appeal disagreed with the Board's interpretation of that statute, concluding that the petition for decertification was timely and not barred. (*Cadiz v. Agricultural Labor Relations Bd.*, *supra*, at pp. 371-376.) In a separate procedural argument in that case, the Board and the UFW insisted that the Board's order could not be judicially reviewed unless or until there was a technical refusal to bargain culminating in an unfair labor practice finding. The Court of Appeal rejected that argument, in part because the Board's failure to count the ballots rendered that potential remedy inadequate: "[*S*]*ince the results of the election are unknown and cannot be known until the ballots are counted*, *the legal remedy is patently inadequate*. To pursue the procedures under section 1160.8 would require that the employer refuse at its peril to bargain with the union at the conclusion of the one-year contract, an act which may or may not ultimately be an unfair labor practice, depending upon who wins the election, the results of which could remain uncertain indefinitely. This differs from the usual case where the ballots have been counted and the results of refusing to bargain are more clearly predictable. In this case if the employer won on the principal issue and the count went against decertification it would still be guilty of an unfair labor practice. It therefore introduces an element of blind uncertainty which in effect is equivalent to gambling on a throw of the dice. No litigant should be required to

---

Board agent has furnished representatives of the parties who are present with a tally … in accord with subsection (a) above"].)

assume such a burden for lack of an expeditious remedy." (*Id*. at p. 383, italics added.)[105]

Here, rather than counting the ballots and issuing a tally, the Board has opted to leave the parties (and the public) completely in the dark regarding that information.[106] As recognized in *Cadiz*, *supra*, the Board's refusal to issue a tally has deprived Gerawan of an adequate remedy under the technical refusal to bargain process.[107]

---

[105]    Although the parties in our case may have their own opinions about how the election by Gerawan's workers turned out, that is no substitute for the tally.  The mere fact that a large number of employees wanted an election does not establish how their votes were actually cast, especially within the privacy of the secret ballot process.  Clearly, the tally is what matters here, not supposition.

[106]    We find the Board's secretive approach troubling, especially in light of the fundamental principle that open and transparent government are an essential check against the arbitrary exercise of official power.  (See, e.g., *Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 164; *International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 328-329.) Something seems greatly amiss when a statutory election process has been commenced and secret ballot votes have been duly cast by the workers, but all pertinent information about what happened in the election—i.e., the vote tally—is suppressed or concealed by the government agency entrusted with that statutory process.  Even if, hypothetically, the situation were one in which the Board could properly exercise discretion to set aside the election, why not do so in a transparent fashion, in the light of day, so that it would be known *what* is being set aside?  As a safeguard against arbitrary administrative action, the ALRA has been construed in a manner to ensure meaningful judicial review of elections.  (See *J.R. Norton Co. v. Agricultural Labor Relations Bd*., *supra*, 26 Cal.3d at pp. 30, 33).  Yet, here, the Board has effectively kept a potentially relevant piece of information hidden from administrative and judicial scrutiny by its refusal to tally the ballots and thereby complete the statutory election process.  (See Cal. Code Regs., tit. 8, § 20360, subd. (c).)  In view of these serious concerns that may arise where (as here) the Board refuses to tally election ballots, we call upon the Legislature to consider whether legislative action is needed to prevent such occurrences in future cases.

[107]    According to Gerawan, the inadequacy of the technical refusal to bargain remedy is further compounded by a feature of the MMC statute that would potentially be available in this case.  Gerawan points out there is a statutory route to compel another round of MMC if the dismissal of the decertification petition were upheld (see § 1164, subd. (a)(4)), which, if utilized by the UFW, could arguably put the UFW in a position to impose a further MMC contract without ever needing Gerawan's bargaining cooperation.

110.

Second, the election-related remedies in this consolidated case were specifically premised upon and arose out of the unfair labor practice findings such that the election-related remedies may reasonably be construed as *an integral part of the one final order* under section 1160.8. This fact, and why it is important, requires some elaboration.

Section 1160.8 expressly provides for judicial review from "the final order of the board granting or denying in whole or in part the relief sought" in an unfair labor practice proceeding. (§ 1160.8.) This statutory language reflects that a final order of the Board would ordinarily encompass not only the unfair labor practice findings but also the *relief* granted or denied based upon those findings. (See, e.g., *Harry Carian Sales v. Agricultural Labor Relations Bd., supra,* 39 Cal.3d at p. 229, fn. 13 [defining final order under this section as one that either dismisses an unfair labor practice complaint or "direct[s] a remedy" for an unfair labor practice].) Thus, it is not unusual for *findings* and *remedies* adopted by the Board in unfair labor practice proceedings to be reviewed together by the appellate court under section 1160.8, as aspects of the same final order. (See, e.g., *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd., supra,* 111 Cal.App.3d at pp. 262-264; *Laflin & Laflin v. Agricultural Labor Relations Bd., supra,* 166 Cal.App.3d at pp. 375-382.)

At the same time, and in tension with the common sense notion of keeping findings and remedies together under section 1160.8, we must take into account that a certification decision made pursuant to proceedings under section 1156.3 is not immediately reviewable under the ALRA. The reason for this, as we have explained

In other words, even if Gerawan technically refused to bargain in good faith as a means to seek collateral judicial review, the move could simply be ignored by the UFW, since the MMC process would inexorably proceed to impose a contract even if Gerawan refused to bargain. Thus, the UFW could potentially obtain an MMC imposed contract without needing to pursue any collateral unfair labor practice proceeding to force Gerawan to bargain and in which Gerawan could seek review of election remedies. We agree with Gerawan that these concerns are valid and further manifest the inadequacy of the technical refusal to bargain remedy here.

above, is that an order in an election certification proceeding under section 1156.3 is *not* a "final order" of the Board, and therefore, it is not normally subject to judicial review except as it may be drawn in question in subsequent proceedings following a technical refusal to bargain. (*Nishikawa Farms, Inc. v. Mahony, supra,* 66 Cal.App.3d at pp. 787-788.) However, despite the statutory distinctions that exist between the two types of proceedings (i.e., unfair labor practice proceedings and election certification proceedings), the present appeal illustrates that in a mixed or consolidated case the two types of proceedings may be exceedingly difficult to parse or segregate when reviewing a particular order. We believe that in such cases as this one, a reviewing court may undertake reasonable judicial construction to determine the nature of the order before it.

Here, not only were the unfair labor practice proceedings consolidated with the election objections, but the Board's election-related decisions in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1 were specifically grounded upon, and constituted a remedy directed for, Gerawan's unfair labor practices. The Amended Consolidated Complaint filed by the General Counsel expressly sought, *as specific relief for the asserted unfair labor practices* described therein, the dismissal of the petition for decertification and destruction of the ballots.[108] That relief was asserted in the prayer to be "just and proper to remedy the unfair labor practices alleged herein."[109] The Board granted the essence of these requested remedies for unfair labor practices when it directed the dismissal of the petition for decertification and consequently set aside the election. In its analysis in 42 ALRB No. 1, the Board considered each of the purportedly unlawful practices found to have been committed by Gerawan, and on the basis of such practices, affirmed the ALJ's

---

[108] The UFW's election objections similarly requested, as a remedy, that the petition be dismissed and the election set aside.

[109] Statutory relief for unfair labor practices in section 1160.3 includes ordering the employer to do or not do certain things *and* "such other relief as will effectuate the policies of this part."

remedial decisions to both dismiss the decertification petition and set aside the election. Where the UFW raised parallel election objections, it generally did so based on the same categories of wrongdoing and the same events or conduct raised by the General Counsel as unfair labor practices.

Thus, although formally the case included proceedings under section 1156.3 (i.e., the UFW's election objections) alongside the unfair labor practice proceedings, *in substance* the two types of proceedings were inextricably intertwined and virtually indistinguishable. As noted, even the dismissal of the petition and the request to destroy ballots were part-and-parcel of the unfair labor practices case; and it is clear that the Board's remedies of dismissing the petition and setting aside the election were premised upon, and imposed as a punishment for, the unfair labor practices. As accurately described in Gerawan's supplemental briefing on this point, "The violations found and the remedies ordered were decided in one, consolidated hearing, based on factually identical ULP charges and election objections, and reduced to one, single final order." In summary, then, the present case not only involved *consolidated* proceedings, but more than that, the election-related remedies and the unfair labor practice findings in 42 ALRB No. 1 were inextricably bound together and reasonably constituted an intrinsic and integrated whole.

The above observations bear upon our interpretation of the nature and effect of the final order in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1. In particular, because the crucial issues were inextricably intertwined in the manner we have described, the Board's blanket assumption that the election-related remedies must automatically be treated as severable and distinct from the unfair labor practice determinations is highly questionable. In fact, 42 ALRB No. 1 is reasonably susceptible to being construed as a single, unitary, final order in all of its parts.[110] When this assessment of the character of

---

[110]    As a concurring federal court justice stated in a similar context in *Intertape Polymer Corp. v. NLRB, supra,* 801 F.3d at p. 244: "This is one, single final order. Why

the order is *combined with* the fact that the Board has deprived the employer of the adequacy of the technical refusal to bargain remedy by refusing to tally the ballots, we believe the proper balance to be struck is to construe the *entirety* of the Board's order in 42 ALRB No. 1, *including* the election remedies, as constituting "the final order" under section 1160.8, and thus within our power to judicially review. (See *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 989 [in interpreting an order or judgment, we may resolve uncertainty by avoiding a construction which will make it harsh, unjust or inequitable].) In other words, we construe the Board's decision and order in 42 ALRB No. 1 to be one final, indivisible order under section 1160.8, both because it is a reasonable construction and because that rendering is necessary to avoid the gross contradiction and inequity of requiring the employer to pursue an indirect review process (concerning the Board's election-related decisions) where the Board itself has rendered that process inadequate.[111]

Third, although the two factors enumerated above were, in combination, dispositive of this issue, we note as an additional factor that the legislative rationale for postponing judicial review until there has been a technical refusal to bargain is not implicated here. The Board's election-related relief of dismissing the decertification petition and setting aside the decertification election did not result in any change to the long-standing representational status quo. Instead, the historically certified union (UFW)

---

artificially segment it? Nothing in the text of the NLRA permits us to salami-slice the Board's order, and the most basic factors of efficiency and economy suggest that we review the underlying order—both the unfair labor practices and the remedial prescriptions—in its entirety." (See also, *Graham Arch. Products Corp. v. N.L.R.B.* (3d Cir. 1983) 697 F.2d 534, at p. 546 (dis. opn.) [a dissenting opinion described an election order in that case as "part and parcel of the Board's 'final' cease and desist order," so that both should be reviewable by the court "as a 'final order'"].)

[111]     The alternative would be to artificially slice out the election remedies and treat them as arising separately out of certification proceedings. For the reasons given, we decline to do so here.

remained in place, exactly as before, with the same authority continuing unabated to bargain on behalf of the workers, file unfair labor practice charges based on the employer's alleged failure to recognize or negotiate with the union, and file MMC requests. Thus, permitting direct review in this case would not postpone an election, delay the union's representative status or recognition, or otherwise undermine the worker's choice of representative through delay or attrition. As a result, the main concerns behind the technical refusal to bargain rule are not even remotely at stake. (See *Boire v. Greyhound Corp., supra,* 376 U.S. at pp. 478-479; *Associated Gen. Contractors, Etc. v. N.L.R.B.* (9th Cir. 1977) 564 F.2d 271, 276-277.) Furthermore, in light of the fact that *Gerawan Farming, Inc., supra,* 42 ALRB No. 1 did not make any change in representation based on the results of an election, but left everything the same as it was before (by setting aside the decertification election), it defies common sense to insist that Gerawan first be ordered "to do something *predicated upon* the results of the election" (see *Boire v. Greyhound Corp.*, *supra*, 376 U.S. at p. 479, italics added) as a prerequisite to judicial review.

The Board refers us to a number of federal cases holding that *consolidation* with unfair labor practice proceedings does not provide an exception to the rule precluding direct judicial review of election remedies. (See *N.L.R.B. v. Great Western Coca-Cola Bottling Co*. (5th Cir. 1984) 740 F.2d 398, 405-406; *Raley's, Inc. v. N.L.R.B.* (9th Cir. 1984) 725 F.2d 1204, 1206; *Daniel Construction Company v. N.L.R.B.* (4th Cir. 1965) 341 F.2d 805, 809.) However, we do not suggest that consolidation, *by itself*, permits us to directly review such remedies under section 1160.8, but only that we may do so where (as here) the following circumstances also exist: (i) the Board has foreclosed any adequate remedy via the technical refusal to bargain process by refusing to tally the ballots; *and* (ii) the election-related remedies were intertwined with and premised upon the unfair labor practice holdings in the Board's final decision and order, such that it may reasonably be construed as an indivisible, single final order. As noted, an additional

115.

factor in favor of our conclusion was that (iii) the relief granted by the Board in this case left the representational situation unchanged and did not implicate the policy of insulating from litigation-related delays the workers' choice of representative in an election.

In any event, the cases cited above are distinguishable on the additional ground that they involved orders not only setting aside a first election but *also* directing a second curative election take place. Obviously, where a subsequent election is ordered or pending, further representational proceedings are still to come. An order of that type would necessarily be interlocutory, not final, and a second curative election would have a potential to alter the representational status quo making a challenge to the first election premature. Unsurprisingly, the above-referenced cases found there was no final order and that judicial review would only be available after the second election and a technical refusal to bargain. (*N.L.R.B. v. Great Western Coca-Cola Bottling Co.*, *supra*, 740 F.2d at pp. 401-402, 405-406; *Raley's, Inc. v. N.L.R.B.*, *supra*, 725 F.2d at p. 1206; *Daniel Construction Company v. N.L.R.B.*, *supra*, 341 F.2d at pp. 808-809.) Here, in contrast, the Board's order did not contemplate any further representational proceedings. The Board did not direct a curative or "do-over" election. Rather, the decertification petition was dismissed and the election set aside by the Board, period. Moreover, since under the unusual combination of circumstances discussed above, those remedies were not severable from the unfair labor practice findings and relief in this case, but were an integral part thereof, said remedies constituted a part of the reviewable final order under section 1160.8.

For all the reasons set forth above, we conclude that the election-related remedies may be reviewed in the context of the instant petition for review. At this point in our discussion, we proceed to our consideration of the legal standard applied by the Board in dismissing the election.

**IV. Erroneous Legal Standard Was Applied in Setting Aside Election**

The ALJ found that Gerawan's unfair labor practices "tainted" the decertification process and made it "impossible to know" if the signatures collected by Silvia Lopez and other workers represented their "true sentiments." As a result, the ALJ dismissed the decertification petition and set aside the election. The Board affirmed the ALJ and adopted the same rationale. Neither the ALJ nor the Board applied the established standard of review applicable to determining an election challenge. The Board apparently believed that, because it declared there was an invalidating "taint" on the decertification petition, it could dispense with the need to weigh and consider the extent to which the employer's misconduct may have affected the workers' freedom of choice in the election. We hold the Board's approach was erroneously one-sided in this case. By focusing almost exclusively on punishing the employer, the Board failed to give due regard to one of the most important policy mandates under the ALRA—namely, the protection of workers' right to choose in representational matters by secret ballot election. (§§ 1140.2, 1152, 1156-1156.7; see *J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at p. 34.) As was stated in *Perry Farms, Inc. v. Agricultural Labor Relations Bd*., *supra,* 86 Cal.App.3d at page 459: "It is not the function of the board to impose punitive measures upon recalcitrant employers at the expense of the rights of the employees whom the ALRA was designed to protect." The Board's truncated analysis constituted legal error, as we endeavor to explain more fully in the discussion that follows.

A. Established Standard for Considering Whether to Set Aside Election Based on Misconduct

The Board's established standard for evaluating whether misconduct has affected free choice in an election has been articulated as follows: "It is well established that the party objecting to an election bears a heavy burden of demonstrating not only that improprieties occurred, but that they were sufficiently material to have impacted on the

outcome of the election.  [Citation.]  The burden is not met merely by proving that misconduct did in fact occur, but rather by specific evidence demonstrating that it interfered with the employees' exercise of their free choice to such an extent that the conduct changed the results of the election."  (*Oceanview Produce Company* (1994) 20 ALRB No. 16, p. 6; see, *Nightingale Oil Co. v. N.L.R.B.* (1st Cir. 1990) 905 F.2d 528, 531.)  These rigorous requirements comport with the express language of the ALRA, which refers to "misconduct *affecting the results of the election*" as a basis for refusing to certify an election due to misconduct.  (§ 1156.3, subd. (e)(2), italics added.)[112]

Similarly, in *Mann Packing Company, Inc., supra,* 16 ALRB No. 15, the Board described the established standard for election challenges as follows:  "In effect section 1156.3(c) [now subd. (e)] creates a presumption in favor of certification, whether of a representation or decertification election [citation], which a party objecting to an election bears a heavy burden to overcome.  [Citation.]  Since we have long employed a realistic 'outcome-determinative' test and have rejected a highly technical 'laboratory conditions' standard for determining whether an expression of employee free choice will be set aside [citation], a party … objecting to an election can meet its burden by a showing of specific evidence that misconduct occurred and that this misconduct tended to interfere with employee free choice to such an extent that it affected the results of the election.  [Citation.]  We may also consider, as an additional factor, the nature and extent of the

---

[112]    Under section 1156.3, subdivision (e)(1) and (2), election objections may be sustained on the ground(s) that (i) any of the necessary substantive allegations in the petition were incorrect (i.e., peak employment requirement met, no election in past 12 months, no contract bar), (ii) the Board incorrectly determined the geographical scope of the bargaining unit, (iii) the election was not conducted properly, or (iv) misconduct "*affecting the results of the election*" occurred.  Subdivision (e)(2) states:  "… The board *shall* certify the election unless it determines there are sufficient grounds to refuse to do so."  (Italics added.)  We note that, under section 1156.3, the threshold number of signatures that should accompany an employee petition for an election (per subd. (a)(1), or whether that showing of interest was met, is not listed among the statutory grounds for challenging an election.

118.

alleged misconduct in light of the margin of victory." (*Mann Packing Company, Inc.*, *supra*, 16 ALRB No. 15, p. 4; see also *Ruline Nursery Co. v. Agricultural Labor Relations Bd*. (1985) 169 Cal.App.3d 247, 254 [statutory language establishes "a presumption in favor of certification"]; *Bright's Nursery* (1984) 10 ALRB No. 18, pp. 6-7 ["The party seeking to overturn an election bears a heavy burden of proof requiring specific evidence that misconduct occurred and that this misconduct tended to interfere with employee free choice to such an extent that it affected the results of the election"]; *Agri-Sun Nursery* (1987) 13 ALRB No. 19, p. 5 [same]; *TMY Farms* (1976) 2 ALRB No. 58, p. 9 [same].)

Although these rules favoring elections and creating a heavy burden to successfully challenge them were initially articulated by the Board in the context of union elections, the same standard applies to decertification elections: "[I]t is the free choice of employees, not the union's survival, that is at issue …. We shall thus adhere to the same standard in decertification elections as applies to representation elections." (*Jack or Marion Radovich* (1983) 9 ALRB No. 45, p. 10.)

One of the reasons the Board imposes a heavy burden on those who challenge elections, and rejects any requirement of "laboratory conditions" concerning petitioning activity or election campaigns, is the Board's recognition that if an election is set aside *in the agricultural context*, the workers will not likely have an opportunity for a rerun election as in the federal system. As a practical reality, and in light of the requirement to have at least 50 percent of peak employment at the time of a petition (see § 1156.3, subd. (a)(1)), the agricultural workers whose vote is set aside by the Board will not likely be able to pursue another election until the next harvest season (i.e., one year later), at which point the workforce may have substantially changed and/or the campaign's momentum been exhausted. For these reasons, the Board has consistently declined to follow the NLRB's "laboratory conditions" standard: "When the NLRB decides to overturn an election and conduct a rerun of the 'experiment', the rerun election can usually be held as

119.

soon as the determination to set the first election aside is made and can be held among substantially the same electorate. In the agricultural labor context, rerun elections, if they are to have the same standards of employee participation as the initial election, generally cannot be conducted until the next peak of employment which may be the next harvest season, a year after the first election. Furthermore, the electorate will likely be substantially changed. Thus, our decision to set aside an election in the agricultural context means that employees will suffer a serious delay in realizing their statutory right to [choose]. We will impose that burden upon employees only where the circumstances of the first election were such that employees could not express a free and uncoerced choice …." (*D'Arrigo Bros. of California* (1977) 3 ALRB No. 37, pp. 3-4; accord, *Sakata Ranches* (1979) 5 ALRB No. 56, p. 3; *Anderson Vineyards, Inc.* (1998) 24 ALRB No. 5, pp. 2-3.)

The Board's established standard for evaluating whether to set aside an election based on misconduct, as discussed in the preceding paragraphs, is commonly known as the "outcome-determinative" test, in contrast to the NLRB's "laboratory conditions" standard. (*Mann Packing Company, Inc.*, *supra*, 16 ALRB No. 15, pp. 4-5; *T. Ito & Sons Farms* (1985) 11 ALRB No. 36, pp. 9-10; see *Triple E Produce Corp. v. Agricultural Labor Relations Bd.* (1983) 35 Cal.3d 42, 48 (*Triple E Produce*).) Generally, under the outcome-determinative test, misconduct is tested and evaluated under an objective standard of its reasonable impact on workers' free choice in light of all the facts and circumstances, rather than by making endless inquiries into the subjective motivations of particular employees. (*Oceanview Produce Company, supra,* 20 ALRB No. 16, p. 6 ["the test is whether the conduct, when measured by an objective standard, was such that it reasonably would tend to interfere with employee free choice"]; *L.E. Cooke Company* (2009) 35 ALRB No. 1, p. 13.) At the same time, the Board and the courts have recognized that one of the circumstances ordinarily relevant or helpful to a fair determination of whether particular conduct may have reasonably interfered with

120.

employee free choice in an election is the margin of the outcome reflected in the vote tally. (See, e.g., *Mann Packing Company, Inc*., *supra*, 16 ALRB No. 15, p. 4 ["We may also consider, as an additional factor, the nature and extent of the alleged misconduct in light of the margin of victory"]; *J.R. Norton Co. v. Agricultural Labor Relations Bd*., *supra,* 26 Cal.3d at p. 22 [in holding that conduct by UFW near the balloting place did not potentially interfere with employees' free choice, the Supreme Court stated "[m]oreover, the election results were not close"]; *Bud Antle, Inc*. (1977) 3 ALRB No. 7, p. 3 ["Based on our review of the entire record and the facts established therein, we find that the UFW has failed to show either particular events or a cumulation of events which affected the outcome of this election in which a high turnout of voters chose a representative by a 600 vote margin."].)[113]

B.  Taint on the Petition

As previously discussed, in this case the Board did not meaningfully evaluate whether Gerawan's purported misconduct affected employee free choice in the election itself. Rather, the Board took the approach that Gerawan's actions created an invalidating taint on the petition for decertification, which purportedly warranted the dismissal of the petition and nullification of the election. In years past, the Board has reserved the taint-on-the-petition approach to egregious employer interference in the petitioning process, such as where the employer was its instigator or provided pervasive and substantial assistance to procuring signatures on the petition. (See, e.g., *Abatti Farms, supra,* 7 ALRB No. 36 [entire petition tainted by employer's broad-ranging affirmative assistance to decertification campaign that included payment of large bonuses

---

[113]  Of course, there are certain egregious violations where this would not be the case, such as serious direct threats during an election, plainly creating an atmosphere of fear, where the conduct was both objectively coercive and made under circumstances that the threats would reasonably be presumed to have been widely disseminated. In such cases, a vote tally would be irrelevant to the determination of the election challenge. (*Triple E Produce*, *supra*, 35 Cal.3d at pp. 48, 52, 55-57.)

121.

to decertification proponents while granting them leaves of absence to facilitate circulation of petition, sponsoring holiday party where petition circulated in presence of supervisors, and affirmatively bringing petitioner and employer's chosen legal counsel together]; *S & J Ranch, Inc.*, *supra*, 18 ALRB No. 2 [employer's agents instigated, openly assisted and participated in circulation of petition]; *Peter D. Solomon and Joseph R. Solomon, dba Cattle Valley Farms/Transco Land and Cattle Co.*, *supra*, 9 ALRB No. 65 [instigation and direct assistance]; *M. Caratan, Inc.* (1983) 9 ALRB No. 33 [petition filed by agent of employer].)

More recently, beginning with *Gallo, supra,* 30 ALRB No. 2, the Board expanded the parameters of what would "taint" the petition enough to allow the Board to set aside an election. In that case, the Board held that if there was "significant" assistance by the employer in the signature gathering process, the Board could declare the petition itself void, and throw out the decertification election without applying the standard of review applicable to election challenges.[114] (*Id.* at pp. 16-17.) In *Gallo*, the Board expressly rejected an argument that the election challenge standard of review should be applied in deciding whether to set aside the election: "We find these cases [e.g., *Oceanview Produce Company, supra,* 20 ALRB No. 16] to be inapposite because they deal with misconduct in the context of election objections, not with whether an election petition was valid when filed, the issue before us." (*Gallo*, *supra*, at p. 15.) *Gallo* was subsequently followed by the Board in the case of *D'Arrigo, supra,* 39 ALRB No. 4, pp. 27-29). In *D'Arrigo*, the Board found it appropriate (based on *Gallo*) to set aside a

---

[114] The Board did not give a precise definition of "significant" employer interference, but noted that such conduct (i) was something more than *de minimus*, and (ii) could at least "*potentially*" put the employer in a position of substantial influence or indirect control over the decertification process. (*Gallo*, *supra*, 30 ALRB No. 2, pp. 16-17, italics added.)

122.

decertification election where there was "significant employer involvement" in the solicitation of signatures, which had tainted the petition. (*D'Arrigo*, *supra*, at pp. 27-29.)

In the present case, were *Gallo* a correct statement of the law, the Board could properly set aside the decertification election by Gerawan's workers on the theory of an invalidating taint on the petition, as long as the Board found there was at least "significant" employer assistance or involvement in the decertification petitioning process. Moreover, if *Gallo* is correct, the Board could do so without ever evaluating the impact of Gerawan's purported misconduct on the workers' free choice in the election itself to determine whether such misconduct would have made any difference in the result. In substance and in practical effect, that is precisely what the Board did in this case because the Board applied a taint on the petition approach and set aside the election based on misconduct that did not involve instigation or egregious wrongdoing, and the Board did so without evaluating the impact of the misconduct on the election.[115] However, we are convinced that the approach articulated in *Gallo* is fatally inconsistent with the ALRA because it fails to accord sufficient value, weight and importance to the employees' fundamental right to choose via secret ballot election. Indeed, it virtually ignores that right. Before we turn our attention to the correct standard that should have been applied here, we shall first explain with greater specificity why we believe *Gallo* is legally flawed and is the wrong standard.

There are several legal deficiencies with the Board's approach adopted in *Gallo*, as were forcefully pointed out in the dissenting opinion in *D'Arrigo*. (See *D'Arrigo*, *supra*, 39 ALRB No. 4, p. 35 et seq. (con. & dis. opn. of Mason, Boardmember).)[116] First, the *Gallo* approach appears to be premised on a faulty legal supposition that the

---

[115]  Although the Board's decision rarely mentioned *Gallo*, there is no question that analytically speaking, it was relying on the *Gallo* approach.

[116]  We are indebted here to the cogent analysis provided in that dissent by Boardmember Mason.

123.

petition is a jurisdictional pleading, the dismissal of which would somehow require the election to be set aside. That is simply not the case. The "showing of interest" requirement, which is what the petition's signature threshold represents (see §§ 1156.3 & 1156.7),[117] is merely an administrative screening mechanism to assist the Board in determining whether there is a bona fide question of representation that would warrant the time and expense of conducting an election. (*Nishikawa Farms, Inc. v. Mahony, supra,* 66 Cal.App.3d at p. 793.) Thus, the showing-of-interest requirement is not jurisdictional, not reviewable, does not create a right not to have an election when unmet (i.e., there is no statutory bar to directing an election even without such a showing), but is merely an administrative tool to permit the agency to devote its time and resources more efficiently to those cases where an election is reasonably warranted. (*Id*. at pp. 792-793; *Thomas S. Castle Farms, Inc. v. Agricultural Labor Relations Bd*. (1983) 140 Cal.App.3d 668, 675 [showing of interest not a jurisdictional prerequisite to an election].)

Despite the minimal legal significance of the showing of interest and despite the fact that it is the workers' only available avenue to seek an election, the Board in *Gallo* placed exacting requirements on it, requiring something akin to laboratory conditions— that is, if any employer interference occurred it must have been less than significant or else the employees' petition would be subsequently dismissed and the election thrown out. As the dissent in *D'Arrigo* aptly put it: "In *Gallo*, the Board held that in evaluating the effect of employer assistance on the validity of a decertification petition, 'significant' assistance would render the petition void, without regard to whether the number of directly affected employees was sufficient to negate the requisite showing of interest. Thus, a more stringent standard was applied to the sufficiency of the showing of interest, a non-reviewable administrative matter, than the outcome-determinative standard applied

---

[117]     Since the *Gallo* approach seeks to look behind the signatures on the petition, to determine if they really represented the employees' wishes, it is clearly a retroactive attack on the showing of interest.

to conduct affecting free choice in the election itself. This is both unsupported by any authority and fundamentally illogical. All other types of employer misconduct potentially affecting free choice in a decertification election, including the most serious types such as threats or promises of benefits, remain subject to an outcome-determinative standard. The carving out of a stricter standard for conduct affecting a non-reviewable administrative matter simply makes no sense." (*D'Arrigo*, *supra*, 39 ALRB No. 4, pp. 37-38, fn. omitted.) Not only does that not make sense, but it places an onerous burden on employees seeking to obtain a decertification election (who have no control over the employer's missteps) and improperly downplays the importance of secret ballot elections under the ALRA. As was rightly stated by the Board in one of its older cases, once an election has taken place the focus of review should be on the election itself, not the showing of interest: "The Board's refusal to review the validity of the showing of interest after an election has been held is in accord with the practice of the National Labor Relations Board, and is based on the premise that after an election, the best reflection of the interest and allegiance of the employees is the election tally." (*Jack or Marion Radovich* (1976) 2 ALRB No. 12, p. 10.)

A second reason the *Gallo* approach is flawed is that it appears to adopt a presumption that knowledge of "significant" employer assistance will be widely disseminated throughout the employee workforce. (See *Gallo*, *supra*, 30 ALRB No. 2, pp. 22-24.) Although the precise nature and contours of this newfound presumption are unclear, to the extent the Board was (or still is) attempting to create a *per se* rule presuming dissemination whenever employer assistance is deemed to be significant, such a rule would clearly conflict with well-established and better-reasoned Board precedent that requires a reasonable factual basis to prove dissemination. (See, e.g., *Ace Tomato Co., Inc*. (1992) 18 ALRB No. 9, fn. 13; *Ace Tomato, Co., Inc*. (1994) 20 ALRB No. 7, pp. 11-13.) Furthermore, and contrary to the Board's analysis in *Gallo*, the Supreme Court case of *Triple E Produce, supra,* 35 Cal.3d 42 does not support *Gallo's* broad

presumption. *Triple E Produce* involved direct threats made by union organizers during an election, the effect of which created an atmosphere of fear and coercion. Under such circumstances, it made sense to follow NLRB case precedent that reasonably inferred widespread dissemination in similar situations where the character of the coercive threats at the time of an election made dissemination highly likely. (*Triple E Produce*, *supra*, 35 Cal.3d at pp. 51-52.) Thus, to the extent that *Triple E Produce* applied a presumption, it did so in an egregious case of threats where there was a reasonable factual basis upon which to expect that dissemination occurred and that the information would be interpreted in a manner to have a coercive effect. We find no legal support in *Triple E Produce* for a presumption of dissemination in any other circumstances. Instead, where dissemination is necessary for making a prima facie case that an election should be set aside, a reasonable factual basis for inferring dissemination must be shown by the record. (See *Dish Network Corp.* (2012) 358 NLRB 174, 183 [proof, not presumption, of dissemination required to show impact on election]; accord, *Ace Tomato, Co. Inc.*, *supra,* 18 ALRB No. 9, fn. 13; *Ace Tomato, Co. Inc.*, *supra,* 20 ALRB No. 7, pp. 9-14.)[118]

Finally, and most importantly, the *Gallo* standard is incorrect because it improperly allows the Board to set aside elections based on a finding of "significant" employer assistance without ever applying the applicable standard of review for such election relief—namely, that misconduct occurred "*affecting the results*" of the election. (§ 1156.3, subd. (e)(2), italics added.) As we have repeatedly emphasized, the ALRA

---

[118] We note that in the present case, the Board did not clearly or explicitly address whether knowledge of the particular incidents was widely disseminated. Of course, since there were no threats, *Triple E Produce* was inapplicable. To the extent that the question of dissemination becomes relevant on remand, the Board should consider other relevant factors besides the violations themselves, including the geographic scope and configuration of the Gerawan workplace, the size of the workforce, and the varying and spread-out worksites. (See *Ace Tomato Co., Inc., supra,* 20 ALRB No. 7 [presumption of dissemination under small plant doctrine held inapplicable where there was a large unit covering a number of fields in the county and no finding of threats was made].)

strongly favors elections, it creates a presumption in favor of certification of elections, and to overturn an election under the ALRA based on purported misconduct there must be specific evidence not only that the misconduct occurred but that it tended to interfere with employee free choice to such an extent that it affected the results of the election. (*Mann Packing Company, Inc*., *supra*, 16 ALRB No. 15, pp. 4-5; *Oceanview Produce Company, supra,* 20 ALRB No. 16, p. 6; see also, *J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at pp. 25-26 [violation not sufficient ground to set aside election "in absence of proof that … [it] was of such a character as to have had an intimidating impact on employees or in any other way affected the outcome of the election"].)  In view of the importance of elections under the ALRA, we conclude the Board is not at liberty to disregard the rigorous ALRA standard for setting aside elections on the pretext that it is reevaluating workers' true sentiments in signing the petition—at least not in the absence of egregious or pervasive interference on the part of the employer (e.g., instigation or other conduct showing the employer was engineering the decertification process instead of the employees, as occurred in the pre-*Gallo* taint-on-the-petition cases).[119]

As was pointed out by Boardmember Mason in his dissenting opinion in *D'Arrigo*, *supra*, 39 ALRB No. 4, pages 42-43, when the Board sets aside an election under the

---

[119]    It should be recalled that, before an election is ordered, the Regional Director investigates and makes a finding whether the petition has made a sufficient showing of interest to warrant holding an election.  (Cal. Code Regs., tit. 8, § 20300, subd. (j).)  If an adequate showing of interest is found, the Board proceeds to order the election. (§ 1156.3, subd. (b) [if, upon investigation of the petition, "the board has reasonable cause to believe that a bona fide question of representation exists," an election is ordered].)  Once the petition has thus served its limited administrative purpose, the relevant measure of employee sentiment should be (and *is*) the election itself.  (See, *Jack or Marion Radovich, supra,* 2 ALRB No. 12, p. 10.)  Thus, at least in the absence of egregious or pervasive assistance corrupting the entire petitioning process, the focus should be on *the election itself*, under the established standard for setting aside elections based on misconduct.

low-threshold *Gallo* standard (i.e., significant employer assistance creating a taint on the petition), it tends to undermine the fundamental principle of employee choice by unnecessarily disenfranchising employees: "This is because under the *Gallo* standard a decertification election will be set aside even where there is a distinct possibility that the assistance had no effect on the validity of the showing of interest, let alone any significant effect on free choice in the election itself. Such an approach thus runs the risk of penalizing the genuine supporters of the petitioner who seek to exercise their statutory right to a decertification election." (*Ibid*.) For that reason, Boardmember Mason argued that "the remedy of voiding the petition" should be restricted "to those instances where it is found that the entire process was infected, either by instigation or pervasive assistance, the only circumstances recognized prior to the *Gallo* decision." (*Id*. at p. 43.) Absent such extreme misconduct that would void the petition, the Board's evaluation would consist of whether the unlawful employer assistance may have had "an effect on free choice *in the ensuing election*." (*Id*. at p. 39, italics added.) "But that evaluation," the dissent rightly observed, "must be undertaken by applying the normative outcome-determinative standard. In all but perhaps the most egregious circumstances, that evaluation cannot be undertaken without reference to the ballot count." (*Ibid*.)

Boardmember Mason's dissent in *D'Arrigo* further noted that this rule would not insulate employers from wrongful conduct: "Restricting the remedy of voiding the petition to those instances where it is found that the entire process was infected, either by instigation or pervasive assistance, … does not insulate an employer from sanction for lesser misconduct. The Regional Director, if aware of the conduct when investigating the decertification petition, has the authority to disregard tainted signatures in determining whether the petitioner has met the requisite showing of interest. More importantly, since employer assistance may affect free choice in the election itself, there is a significant risk that employer assistance could be the basis for setting aside the election under the proper outcome-determinative standard applied to election misconduct. This approach simply

128.

acknowledges the relative importance of the showing of interest and properly places the emphasis on the free choice in the election itself." (*D'Arrigo, supra,* 39 ALRB No. 4 at p. 43.) Finally, the dissent urged that *Gallo* be overruled by the Board "as wrongly decided," and then it concluded: "Without reliance on *Gallo*, the record in the present case does not support invalidating the decertification petition. Applying the proper analysis, I would order that the ballots be counted and, in light of the tally of ballots, the effect of the unlawful assistance in the four crews on free choice in the election be evaluated under the established outcome-determinative standard." (*D'Arrigo, supra,* at pp. 43-44.)

As should be clear from the entirety of our discussion, we believe that Boardmember Mason's dissent in *D'Arrigo, supra,* 39 ALRB No. 4 more adequately vindicates (and complies with) the core policies of the ALRA than does the one-sided *Gallo* approach, because it seeks to preserve and balance both of the fundamental statutory policies of (i) preserving the workers' right to choose through secret ballot elections and (ii) the need to punish employers, and it does so without unnecessarily disenfranchising workers. For all the reasons explained above, we follow the *D'Arrigo* dissenting opinion here, and reject the approach taken in *Gallo*.

C.  The Board Applied the Wrong Standard

In the present case, the incidents of employer assistance and other misconduct committed by Gerawan (i.e., those incidents we have affirmed, whether considered individually or cumulatively) were not sufficiently egregious or pervasive to reasonably permit the Board to declare the entire petition void as a peremptory means of setting aside the election. There was no instigation, and no occurrence of violence, threats, reprisals, or overt intimidation. As the ALJ conceded and the Board affirmed, Silvia Lopez and other proponents of decertification were not the agents of Gerawan in regard to the decertification effort (i.e., it was truly a worker-initiated and worker-led movement), they were not paid any money or compensation by Gerawan except ordinary

129.

wages earned for labor actually performed in the fields, and finally, Lopez's attorney was not paid for or selected by Gerawan.

Although there were incidents of worktime signature gathering by pro-decertification workers in several crews, the record considered as a whole did not adequately support a finding of disparate or discriminatory treatment as to worktime signature gathering. The one instance of direct supervisor assistance (i.e., crew boss Nuñez letting a counter or checker speak briefly to assembled crew and pass out petition) did not involve any verbal support, it was doubtful he remained present, and it appears to have been an isolated event. Further, while we have affirmed the finding as to the attendance flexibility shown to Silvia Lopez and her daughter, the violation that was found to exist under such circumstances did not constitute egregious or inherently coercive conduct and, at most, was merely one factor among many to be carefully evaluated.

The other sporadic incidents for which employer violations have been found plainly did not rise to the level or character of employer interference in the decertification process to permit the Board to pronounce the entire worker petition void. Although the Board ended its decision in *Gerawan Farming, Inc., supra,* 42 ALRB No. 1 with a conclusory statement that Gerawan's conduct "tainted the entire decertification process," that broad assertion was devoid of factual support or reasoned explanation based on the record. In short, this case did not involve the egregious nature or widespread extent of unlawful employer assistance necessary to permit the Board to declare the petition void or invalid under the taint-on-the-petition approach. Nor does the Board's *Gallo* decision, which held that mere "significant" employer assistance may be sufficient to create an invalidating taint (see *Gallo*, *supra*, 30 ALRB No. 2, pp. 16-17), salvage the Board's decision in this case because, as discussed above, we reject and decline to follow *Gallo*. Rather, the focus of the Board's analysis here should have been *on the election itself*, and

the reasonable impact (if any) of the employer's misconduct on the employees' ability to freely choose in the election.

Therefore, and in accordance with the foregoing discussion, we hold that the Board applied the wrong standard in this case. Instead of the taint-on-the-petition approach, the Board should have evaluated the purported misconduct under the established outcome-determinative standard for considering whether to set aside the election, which standard would require the Board to focus its scrutiny on whether the misconduct tended to interfere with employee free choice to such an extent that it affected the results of the election.[120]

Unfortunately, the Board was apparently so zealous to punish this employer, it lost sight of the importance of the election itself under the ALRA, and embraced a one-sided approach to the issues that unnecessarily disenfranchised the workers without any meaningful consideration of whether the employer's conduct reasonably impacted the worker's freedom of choice in the election. Under the fundamental statutory policies of the ALRA, that one-sided approach cannot be countenanced, a least not on the facts of this case. (See *Perry Farms, Inc. v. Agricultural Labor Relations Bd., supra,* 86 Cal.App.3d at p. 474 ["To ignore the disenfranchisement which may have occurred in this case in order to proceed with the imposition of sanctions upon an employer is unconscionable"]; see also, *J.R. Norton Co. v. Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 29, 37, 40 [the Board's blanket approach to application of make-whole remedy violated statutory language and eviscerated important policies of ALRA].)

---

[120] As an aside, we note the Board sought to justify its result with the perplexing statement that "it is impossible to know whether the signatures gathered in support of the decertification petition represented the workers' true sentiments." The statement is perplexing because the Board's inability to divine the employees' subjective motives for signing the petition is not a basis to either strike the petition or nullify the election.

In so holding, we note that the Board's application of an improper legal standard in this case cannot be salvaged on a theory that it was merely an exercise of the Board's broad discretion to either (i) select a particular remedy or (ii) interpret the provisions of the ALRA. As to the Board's remedial conclusion, it is well-established that relief imposed by the Board may not be predicated on an erroneous legal standard. (*J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at pp. 29, 38-39; see *Artesia Dairy v. Agricultural Labor Relations Bd.*, *supra*, 168 Cal.App.4th at p. 605 [stating rule that "ALRB decisions that rest on erroneous legal foundations will be set aside"].) Because the Board's remedial conclusion must be reached by means of the correct legal standard, which did not happen here, any appeal to the principle of remedial discretion is misplaced.

Nor was this an instance where we must yield to the Board's interpretation or application of the ALRA. Of course, as the agency entrusted with the enforcement of the ALRA, the Board's interpretation of the ALRA is "entitled to deference" and we must accord it "significant weight and respect." (*Gerawan Farming Inc. v. Agricultural Labor Relations Bd.*, *supra*, 3 Cal.5th at p. 1155.) Nevertheless, when the Board's declared interpretations or legal standards "alter or amend the statute or enlarge *or impair its scope*," courts have a duty to correct the Board's error. (*J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at p. 29, italics added.) Thus, in *J.R. Norton Co.*, *supra*, a legal standard adopted by the Board was rejected by our Supreme Court because the standard was clearly erroneous or unreasonable in light of statutory language and an unacceptable conflict with important policies of the ALRA. (*Id.* at pp. 29-38; see also, *Nish Noroian Farms v. Agricultural Labor Relations Bd., supra,* 35 Cal.3d at p. 745 [Board's use of general formula for backpay determination affirmed since not "patently unreasonable" under the statute]; cf., *Gerawan Farming Inc. v. Agricultural Labor Relations Bd.*, *supra*, 3 Cal. 5th at p. 1155 [emphasizing that administrative interpretation of a statute will be followed if not clearly erroneous].)

132.

In *J.R. Norton Co.*, the Board's use of a *per se* or blanket standard for granting make-whole relief was rejected by the Supreme Court because it "eviscerate[d] important ALRA policy and fundamentally misconstrue[d] the nature of and legislative purpose behind such relief." (*J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at p. 29.) Not only did the Board's standard in that case misread statutory language of section 1160.3 in regard to the evaluative analysis required for make-whole relief, but the blanket approach used by the Board violated the important ALRA policy to protect the integrity of elections against arbitrary administrative action. (*J.R. Norton Co.* at pp. 29-38.) After first emphasizing that the "principal purpose" of the ALRA was to enable agricultural workers to elect representatives "*of their own choosing*" (*id*. at p. 30, italics in original), the Supreme Court explained as follows: "Although it is inconsistent with both the NLRA and ALRA to foster the delays that result from judicial review of frivolous election challenges, the policies of neither act support the application of a blanket rule for the imposition of make-whole relief. Such a rule places burdensome restraints on those who legitimately seek judicial resolution of close cases in which a potentially meritorious claim could be made that the NLRB or ALRB abused its discretion. It thereby impairs the important interest served by the provision in both acts for a check on arbitrary administrative action. (*Id*. at pp. 32-33.) The Supreme Court further concluded: "The ALRB's … rule of automatic imposition of make-whole relief cannot be sustained on the ground that it promotes ALRA policy by fostering collective bargaining. A central feature of the collective bargaining process is the exercise of the employees' free choice in selecting their bargaining representative. The ALRB's blanket rule for the application of the make-whole remedy does not provide a sufficient guarantee that the integrity of representation elections will be preserved." (*Id*. at p. 35.)

Here, consistent with the analysis in *J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d 1, we have found the Board's legal standard to be deficient on both statutory and fundamental policy grounds under the ALRA. To

summarize, the Board's *Gallo* "taint" standard fails to preserve the fundamental ALRA policy to protect employees' right to choose, since it causes the Board to set aside elections and effectively disenfranchise the voting workers whenever an employer's assistance or other misconduct is deemed significant, without ever considering whether the conduct in question actually interfered with employee free choice in the election itself or had any material bearing on the outcome. That approach would also unreasonably marginalize section 1156.3, subdivision (e)(2), which authorizes elections to be set aside based on misconduct *if* it is found that such misconduct "affect[ed] the results of the election." Additionally, as was noted in our discussion herein of Boardmember Mason's dissent in *D'Arrigo, supra,* 39 ALRB No. 4, the Board's standard in *Gallo* inevitably creates a substantially greater burden on employees seeking an election than the ALRA itself requires, since it would require something akin to laboratory conditions regarding the showing of interest by unreasonably requiring employees to bear the brunt of the punishment when an employer's missteps were "significant" but did not actually interfere with free choice in the election or affect its outcome. As we have also observed, the *Gallo* standard runs counter to longstanding ALRB precedent, which, in keeping with the strong ALRA policy favoring elections, generally applied the outcome-determinative test to election challenges premised on misconduct.

Finally, as we have pointed out, the alternative that would best avoid or minimize the deficiencies of the Board's approach, while vindicating and preserving the important ALRA policies discussed above, would be to apply the well-established outcome-determinative standard in cases such as this one, while restricting the use of the "taint on the petition" approach (as a method of causing election dismissals) to instances of egregious and pervasive wrongdoing. Here, since we have held on the record before us that there was no egregious or pervasive employer wrongdoing, the conclusion follows that the Board applied the wrong legal standard.

134.

As should be evident from the preceding summary, our correction herein of the Board's erroneous legal standard has been closely tethered to fundamental ALRA policy and statutory language, and thus is fully consistent with the analysis used by the Supreme Court in *J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d 1. Accordingly, this was *not* an instance in which judicial deference to the Board's legal standard was appropriate.

Because the Board applied the wrong legal standard, we vacate the Board's remedy of dismissing the petition and setting aside the election, and remand the matter to the Board to apply the correct standard. Such a remand comports with Supreme Court precedent stating the general rule that where the Board applies the wrong standard, "the case must be returned to the Board so that it can apply the proper standard." (*J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at pp. 38-39.) "'It is a guiding principle of administrative law, long recognized by this Court, that "an administrative determination in which is embedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge." [Citations.]'" (*Id*. at p. 39.)

## V.  Issues Regarding Disposition and Remand

In our review of this case, we have concluded that a number of the unfair labor practice findings made by the Board were not supported by substantial evidence in the record considered as a whole, and that the Board applied the wrong legal standard when it dismissed the petition and set aside the election. Moreover, because the Board relied upon the erroneous findings and the incorrect legal standard when it directed the remedies of dismissing the petition and setting aside the election, those remedies have been (and are) vacated. Consequently, it is appropriate to remand the matter back to the Board to reconsider its election decision based on the corrected findings and the proper legal standard. (See, e.g., *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.*, *supra*, 111 Cal.App.3d at p. 277; *Intertape Polymer Corp. v. NLRB, supra,* 801 F.3d

135.

at p. 241 ["Because our decision eliminates one of the two bases upon which the Board set aside the election, … the Board will also find it necessary to reconsider its decision …."]; *J.R. Norton Co. v. Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at pp. 38-39 [matter remanded to Board to apply correct legal standard].)

On remand, then, the Board must apply the established standard for reviewing whether misconduct has prejudicially interfered with employee free choice in an election—namely, the outcome-determinative standard. This means the Board must consider all the relevant facts and circumstances and fairly determine, based on the record, whether the misconduct committed by Gerawan (under the corrected findings) tended to interfere with the employees' free choice to such an extent that it affected the results of the election. (*Mann Packing Company, Inc.*, *supra*, 16 ALRB No. 15, pp. 4-5; *Oceanview Produce Company, supra,* 20 ALRB No. 16, p. 6.)

For purposes of remand, it is also appropriate to provide direction to the Board on questions of law likely to recur. (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.*, *supra*, 111 Cal.App.3d at p. 277.) Because the Board will be determining on remand whether employer misconduct reasonably affected the results of the election, the Board should consider *all* the relevant information concerning that issue. In this case, common sense, fairness and sound ALRA precedent dictate that the Board's consideration of all relevant factors should include the vote tally. (See, e.g., *Mann Packing Company, Inc.*, *supra*, 16 ALRB No. 15, p. 4 ["We may also consider, as an additional factor, the nature and extent of the alleged misconduct in light of the margin of victory"]; *J.R. Norton Co. v. Agricultural Labor Relations Bd., supra,* 26 Cal.3d at p. 22 [as confirmation that conduct by UFW near the balloting place did not potentially interfere with employees' free choice, the Supreme Court observed "[m]oreover, the election results were not close"]; *Bud Antle, Inc.*, *supra,* 3 ALRB No. 7, p. 3 [concluding based on review of the entire record and the facts established therein that the party challenging election failed to show that "particular events or a cumulation of events …

136.

affected the outcome of this election in which a high turnout of voters chose a representative by a 600 vote margin."].) Accordingly, and since no impediment exists to completing the statutory election process by issuing a tally (see Cal. Code Regs., tit. 8, § 20360, subd. (c) [if ballots were initially impounded, "the election will not be deemed complete until a ballot count has been conducted …."]), we instruct the Board to open the ballots and issue a tally, so that all relevant factors will be in view when it reconsiders the election decision on remand. (See also Cal. Code Regs., tit. 8, §§ 20363, subd. (d) & 20365, subd. (c) [election objection proceedings are to include tally of ballots]; cf., Cal. Code Regs., tit. 8, § 20360, subd. (a) [as soon as possible after completion of balloting, a Board agent "shall count the ballots and shall prepare both a tally …."].)[121]

A secret ballot election under the ALRA is intended to embody and reflect the workers' fundamental right to choose concerning a question of representation. That right is at the heart of what the ALRA is designed to protect and promote. (*J.R. Norton Co. v. Agricultural Labor Relations Bd., supra,* 26 Cal.3d at p. 30 [it is the "principal purpose" of the ALRA].) The sustainability of the election held by Gerawan's workers, which in this case will depend upon careful evaluation by the Board of whether Gerawan's misconduct reasonably had a coercive impact on workers to an extent that the outcome of the election was materially affected, is too important of a question to be considered on a curtailed or partial record (i.e., no tally) merely because the Board chose to initially impound the ballots. Accordingly, the failure to provide a vote tally should be corrected by the Board, and the tally and size of the margin of victory should be weighed as a significant factor in its reconsideration of the election question on remand.

---

[121] Also, as noted herein, the Board's reconsideration should include the remedial court proceedings previously overlooked by it, including the transcripts wherein Silas Shawver depicted the extent and apparent impact of the remedial training, as a further factor in evaluating whether employees would likely have been coerced.

## **DISPOSITION**

The Board's order dismissing the decertification petition and setting aside the election is vacated.  The matter is remanded to the Board to reconsider its decision regarding the election in a manner consistent with this opinion, with such reconsideration to be based on the corrected findings and legal standard set forth herein, and to include a fair and reasonable consideration of the ballot tally.  Each party shall bear their own costs.

_____
                                                                                                LEVY, J.

WE CONCUR:


_____
HILL, P.J.


_____
DETJEN, J.